IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRANDYN JOSEPHE BENJAMIN,   )
          )
   Petitioner,        )
          )
v.          )     CASE NO. 1:14-cv-1224-BL
          )        [WO]
GREG LOVELACE, Commissioner,  )
Alabama Department of Corrections,[1]  )
          )
   Respondents.     )

## MEMORANDUM OPINION AND ORDER

Petitioner Brandyn Josephe Benjamin, a death-sentenced inmate in the custody of the Alabama Department of Corrections, has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his conviction for the capital murder of Jimmie Floyd Lewis and the resulting death sentence he received in September 2004. Benjamin claims that his conviction and sentence were obtained in violation of his rights under the United States Constitution. For the reasons stated below, the petition will be denied.

---

[1] Greg Lovelace has replaced John Q. Hamm as the Commissioner of the Alabama Department of Corrections. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Lovelace is automatically substituted as respondent in this action. The Clerk of Court is DIRECTED to update the docket sheet and change the caption accordingly.

**TABLE OF CONTENTS**

BACKGROUND ...............................................................................................4

    I.     The Murder of Jimmie Lewis................................................................4

    II.    Trial ........................................................................................................5

    III.   Direct Appeal .........................................................................................6

    IV.   State Post-conviction ............................................................................8

PETITIONER'S CLAIMS...............................................................................9

STANDARDS OF REVIEW ...........................................................................10

    I.     Procedural Defenses............................................................................10

    II.    Review Pursuant to 28 U.S.C. § 2254(d). ........................................16

DISCUSSION ................................................................................................21

    I.     Ineffective Assistance of Counsel (Claims III.A–E)................................21

        A.  Trial Counsel Failed to Adequately Argue and Present Evidence in Support of Petitioner's *Batson* Challenge (Claim III.A)....................25

        B.  Appellate Counsel Ineffectively Failed to Adequately Present Petitioner's *Batson* Claim on Direct Appeal (Claim III.B). ..................66

        C.  Trial Counsel Failed to Conduct a Reasonable Investigation and Present Evidence During the Guilt-Innocence Phase of Trial (Claim III.C). .......................................................................................70

        D.  Trial Counsel Failed to Prepare and Present an Adequate Mitigation Case for the Penalty Phase (Claim III.D)............................88

        E.  Trial Counsel Failed to Object to Repeated and Egregious Prosecutorial Misconduct (Claim III.E). ..............................................132

    II.    Petitioner's Death Sentence Violates the Eighth Amendment (Claim III.F).............................................................................................153

**III.   The Rule 32 Court Erroneously Excluded Evidence (Claim III.G)** ...................................................................................187

**IV.   Claims Summarily Dismissed by the State Courts (Claim III.H).** .....192

   **A.  Counsel Ineffectively Protected Petitioner's Sixth Amendment Confrontation Rights (Claim III.H.1).** ...................................................192

   **B.  Counsel Ineffectively Failed to Object to Incorrect Jury Instructions (Claim III.H.2).** ...................................................................201

   **C.  Counsel was Ineffective at the Judicial Sentencing (Claim III.H.3).** ...................................................................................................214

   **D.  Petitioner's Death Sentence Violates the Equal Protection Clause (Claim III.H.4)** ...................................................................................219

   **E.  Alabama's Secret Lethal Injection Procedures Violate the Eighth   Amendment (Claim III.H.5).** ...................................................224

**CERTIFICATE OF APPEALABILITY** ...........................................................229

**CONCLUSION**.....................................................................................................230

## BACKGROUND

### I.     The Murder of Jimmie Lewis

In its decision affirming petitioner's conviction and sentence on direct appeal, the Alabama Court of Criminal Appeals ("ACCA"), quoting from the trial court's sentencing order, summarized the evidence adduced at trial as follows:

> The victim, Jimmie Lewis, had gone to Wiregrass Commons Mall about 9:00 p.m. on the night of November 18, 2000, to pick up his wife, who operated a shop in the mall. He had gone to Mrs. Lewis' shop and determined that she was ready to close, and because it was raining outside, he returned to bring the car closer to the mall exit so that Mrs. Lewis wouldn't get wet. Mr. Lewis had parked his car in a remote area of the mall parking lot. The defendant had gone to the mall with the specific intent of finding a victim to rob. He watched mall security to see how often they made rounds and also parked his car in an area which wouldn't raise suspicion. As Jimmie Lewis approached his car, the defendant appeared and apparently demanded the victim's wallet. A struggle ensued, and the defendant struck the victim several times and shot him twice—once in the chest and once in his leg. The defendant took the victim's wallet and contents and left the scene. The victim was dead when the police and paramedics arrived shortly thereafter. The defendant later related all of the details of the crime to a friend[, Michael Baker,] indicating that he had no remorse for his actions. [Baker] [then] went with his attorney to the District Attorney. The District Attorney arranged for a body wire to be placed on [Baker] so that the police could hear the defendant confess his actions once again to [Baker]. The defendant was then arrested and his room searched. A copy of the Dothan Eagle newspaper account of the crime was found in the defendant's room and later the victim's wallet was also found.

*Benjamin v. State*, 940 So. 2d 371, 375 (Ala. Crim. App. 2005) ) (internal quotations and citation omitted).  In addition to the newspaper article and the victim's wallet, police located in petitioner's bedroom the firearm he used in the robbery-murder of Mr. Lewis.  (Doc. 19-3 at 193 (testimony of police officer involved in search warrant execution describing recovery of a black handgun); (doc. 19-7 at 131–132 (testimony of forensic examiner describing ballistics analysis of seized gun and shell casings recovered at the scene of Lewis's murder)).[2]  The ACCA further explained that, in addition to his recorded conversation with Baker, petitioner "made a statement to law enforcement officers in which he admitted that he intended to rob the victim, that he had a handgun with him, and that he and the victim struggled." *Benjamin*, 940 So. 2d at 375.  The ACCA observed, however, that petitioner claimed in his statement that "he unintentionally or accidentally shot the victim during the struggle." *Id.*

## II.    Trial

Petitioner was tried in the Circuit Court of Houston County on a charge of capital murder pursuant to Ala. Code § 13A-5-40(a)(2), murder during the course of

---

[2] Citations to the state court record, including the clerk's record from petitioner's trial and Rule 32 proceedings and the reporters' transcripts of petitioner's trial and Rule 32 evidentiary hearing, as well as all pleadings and documents filed in federal court, will utilize the docket number and PDF page number generated in the ECF system and appearing at the top of the document, *e.g.*, "Doc. 19-x at x."

a first-degree robbery. *Benjamin*, 940 So. 2d at 374. Circuit Judge Jerry White presided over the trial. Petitioner was represented by attorneys Michael Crespi and Kalia Lane. Crespi was lead counsel. The lead prosecutor was District Attorney Douglas Valeska. Petitioner did not testify in his defense, and the defense did not present any witnesses during the guilt phase of trial. The jury returned its verdict convicting petitioner of capital murder on May 27, 2004. (Doc. 19-5 at 144). At the request of the defense, Judge White continued the penalty phase of trial to July 6, 2004. Petitioner presented the testimony of four witnesses during the penalty phase, including his sister, a family friend, a church pastor, and a school guidance counselor. The State presented no witnesses in the penalty phase. The jury returned a verdict recommending, by a vote of ten to two, that petitioner be sentenced to death. (Doc. 19-6 at 144). At the sentencing hearing, held on September 2, 2004, Judge White sentenced petitioner to death. (Doc. 19-6 at 170).

## III.    Direct Appeal

Crespi represented petitioner on direct appeal to the ACCA. He raised five claims in his initial brief, including that the trial court's sentencing order failed to comply with Alabama law and the United States Constitution. (Doc. 19-7 at 53–54).[3] The ACCA affirmed petitioner's conviction but agreed that "that the trial

---

[3] In his other claims of error, petitioner argued the following: the trial court "improperly denied" his "motion to dismiss the indictment and for a more definite statement"; the trial court

court's written sentencing order in this case [did] not comply with the requirements"

of Alabama law in that the order failed "to make specific findings concerning the

existence or nonexistence" of statutory aggravating and mitigating circumstances as

well as nonstatutory mitigating circumstances. *Benjamin*, 940 So. 2d at 383–84.

The ACCA therefore remanded "with instructions that the trial court amend its

sentencing order to comply with the requirements" of Alabama law. *Id*. at 384. On

return from remand, the ACCA affirmed petitioner's sentence. *Id*. at 388.

Petitioner thereafter filed an application for rehearing with the ACCA. (Doc.

19-7 at 114–34). Petitioner's brief in support of the application for rehearing sought

reconsideration of some claims already denied by the ACCA and attempted to raise

new claims, including several claims of prosecutorial misconduct and a claim that

the prosecutor "used his peremptory strikes to prevent African Americans from

serving on the jury in violation of *Batson v. Kentucky*." (Doc. 19-7 at 143). The

ACCA denied the application for rehearing on February 3, 2006. (Doc. 19-8 at 145).

Still represented by Crespi, petitioner next filed a petition for certiorari review in the

Alabama Supreme Court ("ASC"), which was denied. (Doc. 19-8 at 2–101).

Finally, with representation provided by attorneys from the Equal Justice Initiative,

---

"improperly admitted" the Baker wire recording; the death penalty violates the Constitution; and the trial court "improperly refused" the defense's requested jury instruction on reasonable doubt. (Doc. 19-7 at 10).

petitioner filed a petition for certiorari review in the United State Supreme Court. (Doc. 19-8 at 185–205). The Supreme Court denied the petition on October 30, 2006. *Benjamin v. Alabama*, 549 U.S. 997 (2006).

## IV.   State Post-conviction

Petitioner next sought relief from his conviction and sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. He filed his initial Rule 32 petition in April 2007. (Doc. 19-9 at 20). An amended Rule 32 petition was filed in May 2008. (Doc. 19-11 at 150). In August 2008, the Circuit Court entered an order granting the State's motion for partial dismissal of the amended Rule 32 petition and dismissed eight of the claims raised in the petition. (Doc. 19-13 at 56–63).[4] The remaining claims were set for an evidentiary hearing before the Circuit Court, which commenced on February 1, 2010. The Circuit Court entered its order denying the amended Rule 32 petition's remaining claims in July 2011. (Doc. 19-18 at 179– Doc. 19-19 at 10, 28). Petitioner appealed the denial of his Rule 32 petition to the ACCA, which affirmed the Circuit Court in a reasoned decision. *See Benjamin v.*

---

[4] Specifically, the eight claims summarily dismissed by the Rule 32 court in this order were the following: 1) petitioner's claim that his death sentence violates the Equal Protection Clause; 2) petitioner's claim alleging his due process rights were violated by his trial before a purportedly "invalid" temporarily-appointed judge; 3) petitioner's claim challenging the constitutionality of Alabama's "secret" lethal injection procedures; 4) & 5) petitioner's claims alleging the ineffective assistance of his trial and appellate counsel in failing to adequately protect his rights under the Sixth Amendment's Confrontation Clause; 6) & 7) petitioner's claims challenging his trial and appellate counsel's failure to object to improper jury instructions; and 8) petitioner's claim ineffective assistance of counsel at the judicial sentencing hearing. (Doc. 19-13 at 56–63).

*State*, 156 So. 3d 424 (Ala. Crim. App. 2013).  Following the ACCA's denial of petitioner's application for rehearing, petitioner sought certiorari review in the ASC, which was denied in June 2014.  (Doc. 19-54 at 279).  Petitioner thereafter filed his federal habeas petition on December 16, 2014.

## PETITIONER'S CLAIMS

Petitioner presents the following claims for relief from his conviction and sentence:

(1)   Petitioner was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the Constitution when his trial and/or appellate counsel

a.   failed to adequately argue and present evidence in support of his claim that the prosecution exercised its peremptory challenges in violation of *Batson* (Claim III.A & B);

b.   failed to conduct a reasonable investigation and present evidence during the guilt phase of petitioner's trial (Claim III.C);

c.   failed to prepare and present an adequate mitigation case during the penalty phase of petitioner's trial (Claim III.D); and

d.   failed to object to repeated and egregious prosecutorial misconduct (Claim III.E);

(2)    Petitioner's sentence of death violates the Eighth Amendment because it was imposed without adequate proportionality review (Claim III.F);

(3)    The state courts unconstitutionally excluded some of petitioner's mitigation evidence at the Rule 32 evidentiary hearing (Claim III.G); and

(4)    The state courts erred in summarily rejecting several of petitioner's claims of constitutional error (Claim III.H).

## STANDARDS OF REVIEW

Respondent asserts that some of petitioner's claims are procedurally barred from federal habeas review, while his remaining claims cannot survive the deferential review required by 28 U.S.C. § 2254(d).  The standards and criteria to be applied in evaluating these defenses are set out below.

## I.    Procedural Defenses

"Procedural default" is the legal doctrine pursuant to which a state inmate may forfeit or lose the right to present a claim of federal constitutional error in federal habeas.  "Generally, procedural default can arise in two ways: (1) when the state court correctly applies a procedural default principle of state law and concludes that the petitioner's federal claims are barred; or (2) when the petitioner 'never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred' in state court."  *Carruth v. Comm'r, Ala. Dept. of Corr.*, 93

F.4th 1338, 1354 (11th Cir. 2024) (quoting *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999) (*per curiam*)). Because respondent asserts petitioner has procedurally defaulted claims of error under both scenarios, they are further described below.

"As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

> To determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision, [the federal court] consider[s]: (1) whether the last state court rendering a judgment in the case clearly and expressly state[d] that it relied on state procedural rules to resolve the federal claim without reaching its merits; (2) whether the decision rest[s] solidly on state law grounds and is not intertwined with an interpretation of federal law; and (3) the state procedural rule is adequate, *i.e.*, not applied in an arbitrary or unprecedented fashion.

*Thomas v. Attorney General*, 992 F.3d 1162, 1184 (11th Cir. 2021) (internal quotations and citations omitted). Regarding the third of these factors, "[t]he state court's procedural rule cannot be manifestly unfair in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine. In other words, a state procedural rule cannot bar federal habeas

review of a claim unless the rule is firmly established and regularly followed." *Boyd*, 697 F.3d at 1336 (quotations marks and citations omitted).

The second common procedural default scenario described in *Carruth* stems from a habeas petitioner's failure to exhaust his claim in the state court. A state prisoner seeking habeas corpus relief must first exhaust the remedies available to him in the state courts before seeking relief in federal court. 28 U.S.C. § 2254(b)(1)(A). "The prisoner exhausts his remedies by presenting his constitutional claim to the State courts, to afford them an opportunity to correct any error that may have occurred." *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1074 (11th Cir. 2012) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*)).

The "opportunity" to resolve federal constitutional claims in the state courts must be "full and fair." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Hence, the state prisoner must alert the state courts to the federal nature of a given claim. *Duncan,* 513 U.S. at 365–66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). To do this, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the

facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

Exhaustion requires that the state prisoner "invok[e] one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. This obligates the state prisoner to seek even discretionary review in the state's highest court, provided such "review is part of the ordinary appellate review procedure in the State." *Id.* at 847. A claim raised for the first and only time in a procedural posture in which review of claims is discretionary, however, has not been "fairly presented." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). *See also Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007) (finding that the habeas petitioner failed to fairly present his claims in Georgia's state courts where the claims were first raised in a petition for certiorari review to the Georgia Supreme Court).[5]

Because a federal court ordinarily may not grant habeas corpus relief when the petitioner has not exhausted available state remedies, "[i]f a petitioner fails to exhaust his state remedies, a district court must dismiss the petition without prejudice to allow for such exhaustion." *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013). If state remedies are no longer available to the state prisoner due to state

---

[5] This rule has been applied to bar federal review of claims presented, for the first and only time, in discretionary review before the ASC. *See Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 918–19 (11th Cir. 2017).

procedural limitations, the unexhausted claim is generally treated as exhausted but procedurally defaulted from federal habeas review. *Id.* at 816 ("An unexhausted claim is not procedurally defaulted unless it is evident that any future attempts at exhaustion would be futile due to the existence of a state procedural bar."). *See also McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar.").

"A procedural default can be overcome if the petitioner 'demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Carruth*, 93 F.4th at 1355 (quoting *Coleman*, 501 U.S. at 750)). "As a general matter, 'cause' for procedural default exists if 'the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner may achieve this threshold by showing, for instance, that "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray*, 477 U.S. at 488

14

(citations and quotations omitted).  "Attorney negligence is generally not good cause to excuse procedural default.   Attorney performance is only relevant if the procedural default stems from constitutionally required counsel's deficient performance, or 'when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding,' but the prisoner did not have effective counsel in his first collateral proceeding."   *Carruth*, 93 F.4th at 1355 (citation omitted) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)).   Likewise, the ineffective assistance of counsel may constitute "cause" for a procedural default of a federal claim in the state courts.  *Id.*

In addition to cause, the habeas petitioner must demonstrate actual prejudice to overcome a procedural default. "Actual prejudice means more than just the possibility of prejudice; it requires that the error 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ward v. Hall*, 592 F.3d 1144, 1178 (11th Cir. 2010) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).   "To demonstrate actual prejudice, the petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different.'"  *Thomas*, 992 F.3d at 1185 (quoting *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010)).

Finally, a federal court may review a procedurally defaulted habeas claim on the merits, even in the absence of cause or prejudice, if necessary to remedy a "fundamental miscarriage of justice." *Carruth*, 93 F.4th at 1354. A fundamental miscarriage of justice occurs if a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. To show a fundamental miscarriage of justice based on asserted actual innocence, the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To determine if someone was actually innocent, petitioner must demonstrate 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Carruth*, 93 F.4th at 1355 (quoting *Schlup*, 513 U.S. at 327)).

## II.    Review Pursuant to 28 U.S.C. § 2254(d).

For those claims exhausted and decided on the merits in the state courts, this court is to apply the standard of review set out in § 2254(d)(1) and (2), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

16

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

17

clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In short, to satisfy § 2254(d)(1)'s "unreasonable application" standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020).

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "In reviewing whether a state court's decision was based on an 'unreasonable determination of the facts' under § 2254(d)(2), [the court] presume[s] the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons v. Warden, GA Diagnostic & Classification Prison*, 695 F.3d 1202, 1206 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). "This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts." *Id.* (citing *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

While "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both

18

legal conclusions and factual determinations by the state courts, is formidable. As the Supreme Court has explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation and citations omitted). *See also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").

The force of AEDPA's "daunting" standard of review is demonstrated in other ways. For example, AEDPA deference is owed when a state court has summarily denied relief on a claim. That is, where there is no "opinion from the state court explaining the state court's reasoning," the habeas petitioner still must show "there

19

was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. Thus, faced with a state court's summary disposition on the merits, "a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id*. at 102.

Furthermore, even where the state court has provided a reasoned decision, AEDPA still requires the federal court to "consider any potential justification" for the state court's ultimate disposition, even those not expressly offered by the state court. *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc); *id*. at 1037–38 (explaining that, where "a state court rejects a petitioner's claim in a written opinion accompanied by an explanation, the federal habeas court reviews only the state court's 'decision' and is not limited to the particular justifications that the state court supplied"). So, while a federal court in habeas must "evaluate the reasons offered by the [state] court," if the state court's decision can be justified "on a basis the state court did not explicate, the state-court decision must still stand." *King v. Warden, Georgia Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023). *See also Davis v. Comm'r, Ala. Dep't of Corr.*, 120 F.4th 768, 789 (11th Cir. 2024) ("However, we are not limited by the particular

20

justifications the state court provided for its decision, and we may consider additional rationales that support the state court's determination.").

If petitioner succeeds in surmounting the formidable obstacles imposed by AEDPA, then this court is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (citation and internal quotation marks omitted). Even in *de novo* review, however, with limited exceptions, the court may not grant habeas corpus relief if the state court error at issue was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "In collateral cases, a federal constitutional error is harmless unless it imposed 'actual prejudice.'" *Sears v. Warden*, *GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting *Brecht*, 507 U.S. at 637–38). Actual prejudice results when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

## DISCUSSION

The court will address each claim, including subclaims, as well as respondent's defenses thereto, in the order in which they are presented in the petition.

## I.    Ineffective Assistance of Counsel (Claims III.A–E)

Most of petitioner's claims allege that he received ineffective assistance from his trial and direct appellate counsel. There are five separately numbered claims for

relief premised on the ineffective assistance of petitioner's trial and appellate counsel, with some of these claims containing distinct subclaims. Plus, petitioner asserts ineffective assistance claims as adjuncts to other substantive claims of constitutional error and offers ineffective assistance as "cause" for any procedural default of some of his claims. Because the same general standard governs all ineffective assistance claims, the court first explains that standard before addressing the petition's claims.

The clearly established federal law governing a claim of ineffective assistance of counsel ("IAC") is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Broadly, *Strickland* requires the petitioner to show both that his counsel performed deficiently and that such deficient performance prejudiced the outcome of the petitioner's trial (or appeal). *Id*. at 687. To show deficient performance, the petitioner must show that his counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688. "In other words, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013) (quotation omitted). In reviewing the actions and omissions of counsel, courts are to "indulge a strong presumption that counsel's conduct falls

22

within the wide range of reasonable processional assistance." *Strickland*, 466 U.S. at 689.

*Strickland*'s prejudice prong requires that the petitioner "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome[.]" *Id*. This requires more than a showing that counsel's errors "had some conceivable effect on the outcome of the proceeding[.]" *Id*. at 693. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In a capital case in which ineffective assistance is alleged to have prejudiced the petitioner's sentence, "the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1355 (11th Cir. 2020) (quoting *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011)).

Where review of an ineffective assistance of counsel claim is governed by AEDPA, review is "doubly deferential." *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking

23

> whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (quotation and citation omitted). So, while satisfying *Strickland*'s deferential inquiry is "never an easy task[,]" *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id*. (citation omitted). If the answer to this question is "yes," the federal court lacks the power to grant habeas relief. *Pye*, 50 F.4th at 1042.

The practical effect of applying the "doubly deferential" standards of *Strickland* and AEDPA in tandem is that "it will be a rare case in which an

24

ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Gissendaner*, 735 F.3d at 1323.

The court now turns to application of these principles to petitioner's discrete claims of ineffective assistance of counsel.

### A.   Trial Counsel Failed to Adequately Argue and Present Evidence in Support of Petitioner's *Batson* Challenge (Claim III.A).

Petitioner first claims that his trial counsel, Crespi, "was ineffective because, through incompetent representation, he allowed a jury to be seated in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits the discriminatory use of peremptory challenges in jury selection." (Doc. 1, ¶ 64). Respondent concedes that this claim of ineffective assistance was presented in petitioner's Rule 32 petition, was denied on the merits by the Rule 32 court, which decision was affirmed on appeal to the ACCA, and that, therefore, the claim is exhausted for federal habeas purposes. (Doc. 62 at 36). Accordingly, this court reviews the ACCA's decision pursuant to § 2254(d)(1) and (2). *See Wilson v. Sellers*, 584 U.S. 122, 126 (2018) ("[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").

25

### 1.    Relevant *Batson* Principles

Although the instant claim concerns counsel's alleged ineffective assistance, and is therefore governed by the *Strickland* framework discussed above, it is helpful to frame the *Strickland* analysis with a brief outline of the legal principles governing petitioner's underlying claim of *Batson* error.  In *Batson*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  476 U.S. at 89.  The Court also described the burden-shifting framework by which a defendant may prove a discriminatory juror challenge.

> [W]e have recognized that a black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion.  The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties.

*Id*. at 93–94 (citations omitted).  If the prosecutor succeeds in articulating a sufficiently race neutral reason for his challenge, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id*. at 98.  The ultimate burden of persuasion is, "of course, on the defendant who alleges

discriminatory selection of the venire to prove the existence of purposeful discrimination." *Id*. at 93 (quotation marks and citation omitted).

At step one of *Batson*, "the trial court should consider all relevant circumstances" in determining whether the defendant has presented a prima facie case of discrimination. 476 U.S. at 96. Illustrative examples of such circumstances cited in *Batson* include "a 'pattern' of strikes against black jurors included in the particular venire" or that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id*. at 97. Other examples of relevant circumstances bearing upon the defendant's prima facie showing may include "the subject matter of the case . . . if it is racially or ethnically sensitive" and "evidence of past discrimination in jury selection." *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir. 2012) (citations and internal quotations omitted).

The prosecutor's race neutral reason at step two of *Batson* "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. Rather, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." *Id*. at 98. Indeed, step two of *Batson* "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The issue at step two "is the facial validity of the prosecution's

27

explanation.    Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

Step three of *Batson*, in which the trial court determines whether the defendant has shown purposeful discrimination, usually "involves an evaluation of the prosecutor's credibility." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citing *Batson*, 476 U.S. at 98 n.21).   The trial court must consider all the relevant circumstances—including those informing the determination at step one—in assessing whether the prosecutor's race neutral reasons should be believed.[6] Because the trial court is uniquely positioned to observe the demeanor of the attorneys and jurors involved in the voir dire process, *id*., "a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." *Davis v. Ayala*, 576 U.S. 257, 271 (2015) (internal quotation marks and citation omitted).

---

[6] Additional factors and circumstances that may be relevant at step three of *Batson* include "disparate questioning and investigation of black and white prospective jurors in the case[,]" "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case" (sometimes referred to as comparative juror analysis), and "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019).

### 2. Trial Court *Batson* Proceedings

Petitioner alleges trial counsel failed to adequately object, at stage three of *Batson*, to the peremptory challenges of three African-American prospective jurors, identified in the petition and in the state court proceedings as C.B., R.G., and B.D. (Doc. 1 ¶, 65). Below, the court reviews portions of the voir dire transcript pertinent to each of these prospective jurors followed by discussion of the trial court's *Batson* hearing.

#### a. C.B.

Because the State intended to present in its case-in-chief a body wire recording of petitioner admitting to robbing and shooting the victim, and because the wire recording was obtained with the cooperation of an informant, Michael Baker, seeking favorable treatment on pending drug-related charges, Valeska sought to identify prospective jurors who might be troubled by both the surreptitious recording and the State's dealing with a criminal informant. Over several pages of transcript, Valeska posed a series of questions to the venire postulating various hypotheticals about police using body wires and making deals with informants to solve a murder. (Doc. 19-2 at 192–98). He first asked prospective jurors whether they would be so "bothered" by law enforcement's use of a body wire that they "couldn't listen to that evidence?" (Doc. 19-2 at 192). Three venirepersons—W.A. (a black male), J.B. (a

29

white male), and N.A. (a black female)—responded or otherwise indicated that they did not like that conduct.  (Doc. 19-2 at 193).

Following a lengthy preamble covering aspects of what he believed the evidence would show about the murder of Mr. Lewis, Valeska next asked whether venirepersons would be "bothered" if the State made a "deal" in which a nonviolent offender would avoid prison for his cooperation in solving Mr. Lewis's murder. (Doc. 19-2 at 194–95).  Prospective juror A.G., a white male, said he would be "wishy-washy" in that circumstance.  (Doc. 19-2 at 195).  W.A. again indicated his objection to Valeska's hypothetical and confirmed Valeska's clarification that such conduct by the State would "cause [him] some concern."  (Doc. 19-2 at 195–96). N.A. also again indicated her "concern."  (Doc. 19-2 at 196).  At this point, C.B. joined W.A. and N.A. by raising her hand to indicate that she too had "concern" with Valeska's description of the State's conduct.  (Doc. 19-2 at 196).  Following C.B., Valeska acknowledged that V.H., a white male, also raised his hand to indicate his "concern."  (Doc. 19-2 at 196).  In sum, out of the entire venire, approximately six venirepersons, three white and three black, including C.B., registered at least some "concern" regarding Valeska's questions about wearing a body wire or making a deal with a criminal informant.

30

Addressing those venirepersons that "raised [their] hand," Valeska next asked whether it was a "good trade" to provide favorable treatment to someone "charged with drugs or a non-violent offense" to solve a murder. (Doc. 19-2 at 196). C.B. affirmed that such a trade would be "good." (Doc. 19-2 at 197). N.A. indicated it would not be a good trade. (Doc. 19-2 at 197). A.G. stated, "[a]s long as it was a non-violent crime, it wouldn't bother me." (Doc. 19-2 at 197). A prospective juror not identified in the transcript indicated that he or she still had "a problem" because the criminal informant "is not held accountable." (Doc. 19-2 at 197).

b.    R.G.

During voir dire, Valeska asked jurors to "please come up and tell us" if his office had previously "prosecuted someone that's in your family or a close social friend[.]" (Doc. 19-2 at 180). Although the juror questionnaire asked about jurors' previous convictions, the transcript does not indicate that Valeska asked prospective jurors about their own prosecutions or convictions during voir dire. At the close of voir dire, Valeska advised that he needed to conduct individual voir dire of R.G. (Doc. 19-3 at 44). When Judge White asked why, Valeska stated, "[b]ecause he's got some convictions for criminal mischief, and he didn't come up and tell us. And I have to—[.]" (Doc. 19-3 at 44). Judge White appears to have cut off Valeska's explanation, asking, "Did you ask that?" (Doc. 19-3 at 44). Valeska claimed that

31

he had.  (Doc. 19-3 at 44).  After Judge White summoned R.G., Valeska asked if R.G. had been convicted on two counts of criminal mischief, and R.G. confirmed that he had.  (Doc. 19-3 at 45).  Valeska later challenged R.G. for cause "because he didn't come up and tell us the questions that were asked."  (Doc. 19-3 at 48).  Judge White denied the challenge.  (Doc. 19-3 at 48).

### c.    B.D.

During voir dire, Valeska asked the venire whether members knew several persons connected to the case, including, in pertinent part, members of petitioner's family, friends and acquaintances of petitioner and his family, defense witnesses, and persons connected to North Highland Baptist Church.[7]  B.D. affirmatively indicated that she knew several people identified by Valeska, including Geneva Cull, Hugh Jeffrey (petitioner's grandfather) and several people affiliated with North Highland Baptist Church, including Reverend Robert Jones, Deacon Glennie Wiggins, Pastor Margaret Carol, Reverend Carter, and Pearline Jackson.  (Doc. 19-2 at 186–89).

### d.    Jury Selection and Batson Hearing

The ACCA set forth the following general facts respecting the composition of

---

[7] Trial testimony established petitioner's deep connections to North Highland Baptist Church. Petitioner's grandfather, who cared for petitioner for many years after petitioner's mother's untimely death, was a chairman of the church's deacons before his death.  (Doc. 19-6 at 58). Petitioner attended the church with his mother and then his grandparents until his grandfather's

32

the venire at petitioner's trial, each side's use of peremptory challenges, and trial

counsel's objection under *Batson*:

> The record of Benjamin's trial shows that both the State and Benjamin
> were allowed 15 peremptory strikes.  The strike list indicated that the
> State struck 9 white jurors and 6 black jurors.  Benjamin used all of his
> 15 strikes to remove white prospective jurors.  After the jury was struck,
> Benjamin's counsel made a *Batson* objection and argued that 7 black
> prospective jurors remained on the venire after the strikes for cause and
> the State used 6 of its 15 strikes to remove black prospective jurors.
> The court then asked the prosecutor to state its [sic] reasons for striking
> the six black jurors.

*Benjamin*, 156 So. 2d at 431 (citations to state court record omitted).[8]  Crespi argued

that the prosecution's disproportionate peremptory strikes of African-American

prospective jurors established a prima facie case under *Batson*.  (Doc. 19-3 at 54).

As recounted by the ACCA, Judge White required the State to explain the basis for

each of its six peremptory challenges of African-American prospective jurors.  (Doc.

19-3 at 55–57).    Assistant District Attorney Gary Maxwell provided the

prosecution's reasons for its peremptory challenges.

As pertinent here, Maxwell explained that he peremptorily challenged C.B.

---

death resulted in his moving to New Jersey to live with an uncle.  Then, after he returned to Dothan
as a teenager following the death of his uncle, petitioner resumed attending church at North
Highland Baptist and sang in the youth choir.  (Doc. 19-6 at 60).

[8] Following challenges for cause, there were forty-two members of the venire.  Hence, each side
was afforded fifteen peremptory challenges, with the last of each side's challenges to serve as
alternate jurors.  (Doc. 19-3 at 49).

because "[s]he didn't like the fact that we used a wire, and she didn't like the fact that we dealt with an informant." (Doc. 19-3 at 56). B.D. was challenged because she "knew the defendant's sister, knows the defendant's mother, knows Reverend Jones,[9] Glennie Wiggins, Reverend Carol, Reverend Carter, Pearline Jackson, and knows a lady by the name of Geneva Cull, who has been visiting the defendant in jail." (Doc. 19-3 at 56–57). Finally, Maxwell stated that R.G. "was the one with two criminal mischief convictions. And we had asked about convictions, and he did not answer up until he was called up by the prosecution." (Doc. 19-3 at 57).

After Maxwell offered his reasons, Judge White denied petitioner's motion to quash the jury, ruling "that all of the reasons that have been listed are race-neutral reasons." (Doc. 19-3 at 57). Crespi objected to Judge White's ruling, citing *Batson* and "all the authorities as cited in our separately filed memorandum of case law authority." (Doc. 19-3 at 57). Crespi did not challenge or otherwise contest the prosecutor's articulated reasons for any of his strikes.

### 3.    The State Court's Merits Adjudication

Petitioner first raised his *Batson*-ineffective assistance claim in his Rule 32 petition. Following the evidentiary hearing, the Rule 32 court denied the claim on its merits. (Doc. 19-18 at 188–90). The ACCA affirmed in a reasoned decision. In

---

[9] Reverend Jones pastored North Highland Baptist Church and testified on behalf of petitioner in the penalty phase of trial. (Doc. 19-6 at 57).

34

pertinent part, the ACCA first rejected petitioner's claim that he need not demonstrate that he was prejudiced by his counsel's alleged deficient performance because "prejudice is presumed in a *Batson* context." *Benjamin*, 156 So. 3d at 431. The ACCA distinguished prior ASC precedent, *Ex parte Yelder*, 575 So. 2d 137 (Ala. 1991), and *Ex parte Frazier*, 758 So. 2d 611, 616 (Ala. 1999), applying the presumptive prejudice standard because neither case "addressed whether the presumed-prejudice standard applies when an attorney does make a *Batson* objection, as the attorney did in this case, or whether that standard applies when a defendant raises the issue as an ineffective-assistance-of-counsel claim in a postconviction proceeding." *Benjamin*, 156 So. 3d at 431.

While the ACCA therefore declined to apply a "presumptive prejudice" standard, it concluded that, "[i]rrespective of the standard that we use in evaluating this claim, Benjamin failed to show that his *Batson* objection would have ultimately been successful." *Benajmin*, 156 So. 3d at 432. In support, the ACCA examined each of the three prospective jurors petitioner alleged were unconstitutionally challenged by prosecutors. Regarding C.B., whom Maxwell claimed to have struck because she "didn't like" that investigators used "a wire" and "dealt with an informant," (doc. 19-3 at 56), the ACCA found as follows:

> A review of the voir dire examination indicates that C.B. responded to several questions posed by the prosecutor during voir dire. She said

35

that she had previously worked at Wiregrass Commons Mall, where Lewis was murdered, that she had seen a gun fired, and that wearing a "body wire" to tape someone bothered her.

*Benjamin*, 156 So. 3d at 433. The ACCA held that C.B.'s subsequent clarification of her views about the state's conduct—*i.e.*, that she thought it was a good "trade" for the State to catch a murderer by providing beneficial treatment to a non-violent offender—did not require prosecutors to accept her "ambivalent" views about the State's conduct and that, accordingly, their decision to strike C.B. was race neutral notwithstanding any "rehabilitation" of her views. *Id*. at 433–34 (citations and quotations omitted).

The ACCA next addressed the peremptory strike of R.G., whom Maxwell claimed to have struck because he had two prior convictions for criminal mischief which he had not disclosed during general voir dire. The ACCA first addressed petitioner's contention that prosecutors had not asked prospective jurors their own criminal histories during voir dire:

> The record of Benjamin's trial indicates that during voir dire examination the prospective jurors were asked twice if any member of their family had been convicted of a crime. Question number 11 on the juror questionnaire also asked: "Have you, any member of your family or anyone you know ever been accused of a crime?"[] A subpart of this question was "What result?" Thus, the voir dire examination does support the State's assertion that the prospective jurors were asked if they had any prior convictions. We do not know R.G.'s response, if any, to this question on the juror questionnaire. During voir dire, juror R.G. was asked to approach the bench. Juror R.G. admitted that he had

36

been convicted of two misdemeanor counts of criminal mischief.

*Benjamin*, 156 So. 3d at 434–35 (footnote and record citation omitted). Like the Rule 32 court before it (*see* doc. 19-18 at 189–90), the ACCA observed that Alabama courts have long recognized that criminal conduct of the prospective juror or his or her close relatives and friends provides a sufficiently race neutral basis for a peremptory challenge. *Benjamin*, 156 So. 3d at 435 (citations omitted). The ACCA further rejected petitioner's argument that prosecutors' purported concern about R.G.'s prior convictions was pretext for racial discrimination because they did not strike A.H., a white woman, whose son had prior convictions. Because A.H. did not have any known prior convictions, the ACCA reasoned, she and R.G. "were not similarly situated and there is no evidence that this reason for striking juror R.G. was a sham or pretext." *Id*.

Finally, as to B.D., whom Maxwell claimed to have struck because she knew several people affiliated with petitioner, including family, friends of family, church acquaintances, and at least one expected witness on his behalf, the ACCA first observed that strikes predicated on a juror's relationship with defendants and witnesses are generally recognized as sufficiently race neutral to comport with *Batson*. *Benjamin*, 156 So. 3d at 436 (citations omitted). The ACCA further rejected petitioner's argument that Maxwell's articulated reasons were pretext for

37

racial discrimination because "neither the prosecutor nor defense counsel attempted to conduct any meaningful voir dire of B.D. concerning her relationship with" the persons listed by Maxwell when explaining his strike. *Id*. at 437. The ACCA reasoned that B.D.'s responses about the various people she knew provided the prosecution with a race neutral basis for the strike and that, even if she had been "rehabilitated" through further questioning about the extent of her relationships, "her initial response supported the prosecutor's use of a peremptory strike." *Id*.

Based upon these findings respecting C.B., R.G., and B.D., the ACCA held that "Benjamin failed to establish that his *Batson* challenge would have been successful[,]" and that, accordingly, the "circuit court correctly denied relief on Benjamin's claim that his trial counsel was ineffective in arguing his *Batson* claim." *Benjamin*, 156 So. 3d at 437.

### 4. Analysis

> a. *The ACCA did not contravene, or unreasonably apply, clearly established federal law in requiring petitioner to show that he was prejudiced by his trial counsel's alleged failure to adequately argue his Batson motion.*

Petitioner first alleges the ACCA's finding that he "failed to show that he was prejudiced by his trial counsel's actions" unreasonably applied *Strickland* and "is in direct conflict with two Alabama Supreme Court decisions[,]" namely, *Ex parte Frazier* and *Ex parte Yelder*. (Doc. 1, ¶ 68). He submits those ASC decisions

38

establish that prejudice is presumed when "ineffectiveness at trial occurs in the *Batson* context[.]" (Doc. 1, ¶ 69).  He admits that, "relying on *Yelder* and *Frazier*, [he] did not attempt to show that prejudice occurred as a result of counsel's handling of the *Batson* issue at trial." (Doc. 1, ¶ 71).  His claim of error appears to lie in his contention that the ACCA failed to adequately distinguish *Yelder* and *Frazier* because the "differences" cited by the ACCA in distinguishing those cases "were irrelevant under the rationale of those cases." (Doc. 1, ¶ 72).  He concludes that this court "should hold, as a matter of federal law under *Strickland* and *Batson*, that prejudice does not need to be shown when the contention is that counsel was ineffective in handling a *Batson* issue at trial." (Doc. 1, ¶ 74).

As petitioner acknowledges in his petition, and as discussed previously in this opinion, "[a]n ineffectiveness claim has two components: A petitioner must show (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense." (Doc. 1 ¶, 69 (citing *Strickland*, 466 U.S. at 687)).  Petitioner points to no clearly established federal law—meaning, the holding of a Supreme Court decision—absolving him of *Strickland*'s requirement that he show prejudice when he challenges his counsel's handling of a *Batson* issue.  To be sure, whatever the ASC may have decided respecting "presumptive prejudice" in *Yelder* and *Frazier*, those decisions are not "clearly established federal law" and it is only the state

court's unreasonable application of "clearly established federal law" that may support a grant of habeas corpus under § 2254(d)(1). Thus, even if the ACCA erred in distinguishing those ASC decisions, such error does not support a grant of the writ.

Neither *Strickland* nor *Batson* hold that a habeas petitioner complaining of his counsel's deficient performance in raising a *Batson* issue at trial need not demonstrate that he was prejudiced by his counsel's alleged error. Petitioner acknowledges in his updated briefing that this Circuit's precedent has long held that not only does a *Batson*-ineffective assistance claim require a showing of prejudice, but also that assessing *Strickland* prejudice in the *Batson* context requires the court to "consider whether the verdict or sentence would have been different with a 'constitutionally composed jury.'" (Doc. 57 at 39–40 (quoting *Jackson v. Herring*, 42 F.3d 1350, 1362 (11th Cir. 1995)). The Eleventh Circuit has continued to enforce *Strickland*'s prejudice requirement in the *Batson*-ineffective assistance context post-*Jackson*. *See, e.g., Philmore v. McNeil*, 575 F.3d 1251, 1261 (11th Cir. 2009) (rejecting *Batson*-ineffective assistance claim because the habeas petitioner "cannot establish prejudice from his attorney's performance given [the state court's] previous alternative holding that the strike was facially race-neutral and non-pretextual").

Given these authorities, and considering petitioner's failure to cite any

40

contrary Supreme Court holding, this court cannot conclude that the ACCA unreasonably applied clearly established federal law in holding petitioner to the requirement that he show prejudice under *Strickland*.   Accordingly, this court declines petitioner's invitation to "hold, as a matter of federal law under *Strickland* and *Batson*, that prejudice does not need to be shown when the contention is that counsel was ineffective in handling a *Batson* issue at trial."  (Doc. 1, ¶ 74).

> b.    *The ACCA did not contravene, or unreasonably apply, clearly established federal law in holding that petitioner failed to demonstrate prejudice.*

Again, petitioner acknowledges that Eleventh Circuit precedent holds that a showing of prejudice on his *Batson*-ineffectiveness claim requires the court to consider whether there is a reasonable probability his verdict or sentence would have been different had counsel adequately argued his *Batson* motion in the trial court. *See Jackson*, 42 F.3d at 1362.  The Eleventh Circuit has continued to apply this formulation of *Strickland* prejudice in *Batson*-ineffectiveness cases since *Jackson*. *See, e.g., Mobley v. Sec'y, Fla., Dep't of Corr.*, 825 F. App'x 651, 655 (11th Cir. 2020) ( "Mobley did not attempt to establish that a juror placed on the jury despite his *Batson* challenge was actually biased against him.  Thus, the state habeas court did not unreasonably apply *Strickland* in concluding that Mobley could not demonstrate prejudice and denying his ineffective assistance of counsel claim.");

41

*Sneed v. Fla. Dep't of Corr.*, 496 F. App'x 20, 27 (11th Cir. 2012) ("But even if counsel was deficient for failing to challenge the State's strike pursuant to *Batson*, Sneed could not establish the prejudice prong of *Strickland*.  Indeed, Sneed has not shown that, had counsel objected, his challenge would have been successful, nor is it clear that the second prospective black juror being on the jury would have carried a reasonable probability of changing the outcome of the trial.").[10]

Given this formulation of petitioner's burden to establish prejudice, the ACCA did not unreasonably apply *Strickland* in concluding that petitioner failed to meet his burden.  To begin with, as petitioner candidly admits in the petition, in the state court he "did not attempt to show that prejudice occurred as a result of counsel's handling of the *Batson* issue at trial."  (Doc. 1, ¶ 71).  Thus, he did not even attempt to persuade the state courts that a biased venireperson was placed on the jury due to counsel's deficient performance or that it is reasonably probable that one of the three black venirepersons he alleges were discriminatorily challenged would not have voted to convict petitioner or sentence him to death.  Absent such a showing in the state court, this court cannot conclude that the ACCA's decision was contrary to, or unreasonably applied, *Strickland*.

---

[10] Here, and elsewhere in this opinion, the court cites unpublished, nonbinding authority.  Although these opinions are nonprecedential, the court finds them persuasive in their application of the holdings of binding authority.

42

In his updated briefing, petitioner argues that he demonstrated prejudice as to his sentence because the jury recommended a death sentence by the narrowest possible margin of 10-2 and, "had Mr. Crespi provided competent counsel, the composition of the jury would have been drastically different: three of the seated jurors—all White—would have been replaced with C.B., R.G., and B.D." (Doc. 57 at 41). He asserts there is "at least a *reasonable probability* that, with C.B., R.G., and/or B.D. on the jury, at least one more juror would have voted against death." (*Id*. (emphasis petitioner's). He appears to posit three main points in support of this contention: 1) "as an empirical matter, African American jurors are less likely to vote for death than their White peers, especially when (as here) the victim is White and the defendant is African American";[11] 2) C.B., R.G., and B.D. "are different people than the jurors who replaced them"; and 3) the "dynamics of the jury as a whole" would have been altered with the inclusion of one or more of C.B., R.G., and B.D. (Doc. 57 at 41–42).

Ultimately, petitioner fails to show that the ACCA unreasonably applied *Strickland* in finding no prejudice. His first contention—that, "empirically," African Americans are less likely to vote for a death sentence when the defendant is black

---

[11] Petitioner cites studies described in legal journals, none of them apparently specific to Houston County or Alabama, in support of his claim about the "empirical" voting tendencies of African American jurors. (Doc. 57 at 41 n.6).

and the victim is white—is unavailing because it requires a reviewing court to make the precise sort of race-based judgment that *Batson* itself forbids. Petitioner points to nothing in the specific representations of C.B., R.G., and B.D. during voir dire that would substantiate any contention that those jurors would be less likely to vote for a death sentence and, as he has already admitted, he did not attempt to make any such showing during Rule 32 proceedings in the state courts. If a prosecutor is forbidden to peremptorily challenge black jurors because "empirical" evidence suggests black jurors are less likely to vote for a death sentence, petitioner offers no authority showing that a court can apply those same assumptions to find prejudice due to the failure of counsel to adequately rebut the peremptory challenge of one or more African American jurors.

It also is not sufficient to claim prejudice because C.B., R.G., and B.D. are "different people" than the white jurors they would have replaced had counsel better argued his *Batson* claim. Petitioner submits, without any record citation or offer of proof, that the "different life experiences, different opinions, and different personalities" of C.B., R.G., and B.D. make it reasonably probable that a jury including one or more of those venirepersons would not have recommended that he be sentenced to death. (Doc. 57 at 41). How, specifically? What about those venirepersons' lives, opinions, and experiences establishes that they would have

44

been less likely to vote for death?  The petition and updated briefing are silent.

Finally, petitioner's argument about the "dynamics" of a more racially balanced jury carries the most weight in his effort to establish prejudice.  Indeed, in *Jackson* the Eleventh Circuit explained that it "would have more confidence in the verdict had it been delivered by a constitutionally composed jury, with both black and white members."  42 F.3d at 1362.  The Eleventh Circuit determined, however, that, notwithstanding the racially imbalanced jury, the petitioner in *Jackson* could not show prejudice because "[t]he jury's verdict was substantially supported by the evidence" and "the crime in this case did not have any particular racial dimensions, which would cast doubt upon a verdict returned by a racially unbalanced, unconstitutionally composed jury."  *Id*.

Here, although the jury's 10-2 recommendation of death was narrow, there has been no showing that it was not supported by the evidence.  Indeed, the jury's unanimous guilty verdict implicitly established the only aggravating circumstance relied upon by the prosecution, *i.e.*, that petitioner murdered Mr. Lewis while engaged in the commission of first degree robbery.  The advisory jury's finding that this lone aggravating circumstance outweighed the mitigating evidence offered by petitioner reflects a different-in-kind moral judgment that is not as easily amenable to *Jackson*'s sufficiency of the evidence inquiry.

To be sure, in *Jackson* there were no "particular racial dimensions, which would cast doubt upon a verdict returned by a racially unbalanced, unconstitutionally composed jury." 42 F.3d at 1362. The Eleventh Circuit stressed that both the victim and the petitioner were "black female[s]" and "[n]othing in the record indicates that a racially balanced jury would have been more likely to acquit or convict of a lesser charge than was the all-white jury in this case." *Id*. There is therefore some credence due petitioner's argument that his trial, with a black defendant and white victim, featured "racial dimensions" rendering the likelihood of prejudice with a racially imbalanced jury more acute.

Notwithstanding these "racial dimensions," however, petitioner has not pointed to anything in the record showing that his race or that of Mr. Lewis was a "central theme of this case" or that it otherwise played any "significant role" at trial. *Price v. Sec'y, Fla. Dep't of Corr*., 548 F. App'x 573, 576–77 (11th Cir. 2013). He cites no item of evidence, witness testimony, or prosecutorial argument which had the tendency of centering the race of the defendant or victim as important considerations in his case. With nothing reflecting some untoward racial consciousness at his trial, the mere fact that petitioner is black and Mr. Lewis was white "alone does not establish that 'there is a reasonable probability of a different result sufficient to undermine our confidence in the outcome of this case.'" *Id*.

46

(quoting *Jackson*, 42 F.3d at 1361) (internal quotation marks omitted).

For all the foregoing reasons, the ACCA did not unreasonably apply clearly established federal law in concluding that petitioner failed to show the requisite prejudice to establish his *Batson*-ineffective assistance of counsel claim.

> c.    *Even under a more relaxed standard of prejudice requiring only that petitioner show that it is reasonably probable that the result of his Batson hearing would have been different, the ACCA did not contravene, or unreasonably apply, clearly established federal law and its decision was not based upon any unreasonable determination of fact.*

As reviewed above, the ACCA affirmed the denial of petitioner's *Batson*-ineffective assistance claim because he "failed to establish that his *Batson* challenge would have been successful." *Benjamin*, 156 So. 3d at 437. The ACCA specifically held that the prosecutors' reasons for challenging C.B., R.G. and B.D. did not violate *Batson*. *Id*. at 433–37. The ACCA's conclusion that petitioner's underlying *Batson* claim lacks merit constitutes a ruling on both the deficient performance and prejudice prongs of petitioner's ineffective assistance claim. *See Carruth*, 93 F.4th at 1359 ("Because the prosecutorial misconduct claim fails, the attached ineffective assistance of appellate counsel claim is also meritless; counsel could not have been ineffective for omitting a nonmeritorious point from their argument and, similarly, their performance also could not have been prejudicial."); *Pinkney v. Sec'y, DOC*,

47

876 F.3d 1290, 1297 (11th Cir. 2017) (failure to raise a meritless claim is not deficient performance and cannot result in prejudice). The court will now address whether the ACCA unreasonably applied clearly established federal law or based its decision upon any unreasonable determination of fact in deciding that petitioner's *Batson* claim lacks merit.

> i. *The ACCA did not unreasonably apply clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, when it held that the strike of C.B. did not violate Batson.*

Petitioner claims that, in denying his ineffective assistance claim corresponding to the peremptory strike of C.B., the ACCA unreasonably applied *Batson* and based its decision upon unreasonable determinations of fact. (Doc. 1, ¶ 75). Specifically, he alleges the prosecutor mischaracterized C.B.'s responses in voir dire when explaining her strike, that the ACCA erroneously found that the prosecutor's reasons were supported by the record, and that the ACCA further erred, legally and factually, in concluding that the peremptory challenge of C.B. was nondiscriminatory notwithstanding any "rehabilitation" of her views upon further questioning. (Doc. 1, ¶¶ 76–81).

Consider first petitioner's claim respecting the ACCA's adjudication of the facts. In pertinent part, the ACCA found that C.B. indicated in her voir dire

48

responses that "wearing a 'body wire' to tape someone bothered her." *Benjamin*,

156 So. 3d at 433.  Petitioner asserts this finding was unreasonable because the

record shows the opposite to be true:

> [C.B.] did not raise her hand when asked whether she was "bothered."
> She was not "bothered" by the wire nor by the offer of leniency to an
> informer.  Further questioning by Mr. Valeska clarified that C.B. was
> an enthusiastic supporter of the use of a wire in this case.  Indeed, she
> gave the most positive response of any member of the venire.

(Doc. 1, ¶ 79 (emphasis petitioner's)).

Careful and appropriately deferential review of the voir dire transcript shows

that the ACCA's finding that C.B. indicated that "wearing a 'body wire' to tape

someone bothered her[,]" *Benjamin*, 156 So. 3d at 433, is reasonable for purposes of

§ 2254(d)(2), even if it is not a technically correct reading of the trial transcript.

Although C.B. did not respond until Valeska asked about venirepersons' reactions

to prosecutors' offering a "deal" to a non-violent offender to solve a murder, and she

did not raise her hand when Valeska first asked whether jurors were "bothered" by

such conduct, her response plainly indicated some level of "concern" with the State's

overall conduct, which included fitting a wire on a criminal informant and offering

the informant special consideration for his cooperation.  Of her own volition, and

with no reason to infer that she misunderstood Valeska's questions, C.B. joined only

a handful of other prospective jurors who indicated they objected to, did not like, or

49

at least had some "concern" with the State conduct described by Valeska. Even if her "concern" did not rise to the level of disapproval, or "bother," her affirmative act of indicating some concern plainly differentiated her from the overwhelming majority of the venire and was therefore due some consideration for its import to the prosecution. The ACCA therefore reasonably construed her expression of "concern" as connoting some level of unease, skepticism, or disapproval.

Furthermore, it was reasonable for the ACCA to conclude that C.B.'s subsequent concession that it would be "good" to make a deal with a drug offender to catch a murderer did not necessarily negate prosecutors' wariness with C.B.'s prior expression of "concern." The question whether, in the final analysis, trading punishment of a drug offender for catching a murderer is a good deal is distinct from whether a juror might be squeamish about the State's dealing with an unsavory person like Baker. Although C.B. agreed that the "deal" would be worthwhile, she plainly registered her "concern" with what Valeska described. With a venire overwhelmingly indicating no similar "concern" about the State's conduct, prosecutors reasonably focused their peremptory challenges on the few venirepersons who did express some "concern."[12]

---

[12] The prosecution peremptorily challenged *every* juror, white and black, who indicated that they were "bothered," or "did not like," or had "concern" with the scenarios described by Valeska during voir dire. So, prosecutors used six of their fifteen strikes to remove *all* prospective jurors who provided some negative response to Valeska's questions about the provenance of what would

50

Nor does C.B.'s clarification about the ultimate merit of the State's "deal" distinguish her even from all of the narrow subset of venirepersons who had expressed similar concerns as she. Recall that A.G., a white male, indicated that he would be "wishy-washy" about being asked to convict based upon evidence obtained through the State's cooperation with a drug offender. (Doc. 19-2 at 195). Like C.B., however, A.G. subsequently affirmed that, "[a]s long as it was a non-violent crime," the State's no-incarceration "deal" with a drug offender "wouldn't bother [him]." (Doc. 19-2 at 197). Nevertheless, prosecutors struck A.G. just as they did C.B.

If the ACCA's decision was not based upon any unreasonable determination of fact pursuant to § 2254(d)(2), the remaining question is whether, pursuant to § 2254(d)(1), the ACCA unreasonably applied clearly established federal law. In the petition, and in his updated briefing, petitioner appears to argue that the ACCA unreasonably applied clearly established federal law because it relied upon a mischaracterization of C.B.'s testimony in finding that prosecutors did not violate *Batson*. (*See* Doc. 1, ¶¶ 84–86; Doc. 57 at 31). Indeed, he alleges in the petition that the ACCA's decision "is an unreasonable application of *Miller-El*," in which, he submits, "the Supreme Court concluded that the prosecutor's mischaracterization

---

be very important evidence in the State's case-in-chief. (*See* Doc. 19-1 at 160 (strike list)). Specifically, these six prospective jurors were struck in this order: N.A. (first overall), C.B. (third overall), A.G. (sixth overall), W.A. (seventh overall), J.B. (tenth overall), and V.H. (eleventh overall). (*Id.*)

51

of the venire member's testimony indicated that the prosecutor had impermissibly used racial bias in exercising a strike." (Doc. 1, ¶ 84).

Petitioner's argument that the ACCA misapplied *Miller-El* is unavailing. To begin with, any "mischaracterization" of C.B.'s testimony by prosecutors or the ACCA was in no sense comparable to that confronted by the Supreme Court in *Miller-El*. Again, prosecutors here challenged C.B. because she "didn't like the fact that we used a wire, and she didn't like the fact that we dealt with an informant." (Doc. 19-3 at 56). The ACCA agreed that C.B. had indicated that "wearing a 'body wire' to tape someone bothered her." *Benjamin*, 156 So. 3d at 433. As discussed above, C.B. was one of only six jurors, all of whom were challenged by the State, who indicated some level of "concern" with what Valeska described. Even if prosecutors or the ACCA erred in stating that C.B. "didn't like" or was "bothered" by that conduct, it hardly rises to the level of a substantial or material "mischaracterization" to describe her expression of "concern" in those terms.

The contrast with *Miller-El* on this point is sharp. The Supreme Court in *Miller-El* described the prosecutor's mischaracterization of the prospective juror's testimony as follows:

> He [the prosecutor] represented that Fields [the prospective juror] said he would not vote for death if rehabilitation was possible, whereas Fields unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation. Perhaps Nelson [the

52

prosecutor] misunderstood, but unless he had an ulterior reason for keeping Fields off the jury we think he would have proceeded differently. In light of Fields's outspoken support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.

545 U.S. at 244. The "mischaracterization" in *Miller-El*, therefore, was plain and obvious because the prospective juror's testimony was "unequivocal." There was no room for debating whether Fields had stated that he could impose the death penalty even where rehabilitation was possible. Here, on the other hand, petitioner's argument about Maxwell's and the ACCA's "mischaracterization" of C.B.'s representations turns on whether her affirmative expression of "concern" can reasonably be described as indicating that she did not like, or was "bothered" by, what Valeska described. In short, petitioner's version of the meaning of C.B.'s responses depends upon a narrow reading of the transcript that is inconsistent with the significant deference owed to the state courts under AEDPA.

*Second*, and more pertinently, petitioner's argument that the ACCA unreasonably applied *Miller-El* ignores that decision's core contribution to the Court's *Batson* jurisprudence. The hallmark of *Miller-El* is its employment of comparative juror analysis to discern discriminatory intent. *See, e.g., Murray v. Schriro*, 745 F.3d 984, 1005 (9th Cir. 2014) ("Rather, what *Miller-El* established is that a comparative juror analysis is an important means for federal courts to review

53

a trial court's ruling in a *Batson* challenge."); *see also Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (citing *Miller-El*, 545 U.S. at 241) ("Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve."). Indeed, the Court in *Miller-El* stressed that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" constituted more "powerful" evidence of discrimination than the fact that prosecutors used their peremptory challenges to exclude 91% of eligible black venirepersons. *Miller-El*, 545 U.S. at 241. Regarding prospective juror Fields, the black venireperson *Miller-El* prosecutors struck because they perceived him to be too open to the idea of rehabilitation, the Court identified several white or Hispanic panelists who expressed sentiments even more favorable than Fields toward rehabilitation yet who were not challenged by prosecutors. *Id*. at 244–45.

Here, by contrast, petitioner attempts no side-by-side comparison of C.B. with any other prospective juror. The reason for this is evident: prosecutors struck *every* venireperson similarly situated to C.B. Every prospective juror, three white and three black, who responded negatively to any of Valeska's questions about venirepersons' comfort with the State's conduct was struck. Moreover, prosecutors

54

struck the white venireperson most similar to C.B.  White male venireperson A.G., like C.B., initially expressed discomfort with the State's dealings with its informant. Still, he went on to admit that the State's deal "wouldn't bother" him as long as the informant had been involved in "non-violent crime."   (Doc. 19-2 at 197). Nevertheless, prosecutors struck him just as they did C.B.  Because fairminded jurists can agree that prosecutors did not "mischaracterize" C.B.'s testimony as did the prosecutors in *Miller-El*, and that comparative juror analysis does not support petitioner's claim, this court is unable to agree with petitioner's contention that the ACCA unreasonably applied *Miller-El*.

> ii.     *The ACCA did not unreasonably apply clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, when it held that the strike of R.G. did not violate Batson.*

Petitioner alleges that prosecutors "struck R.G. for allegedly concealing his own misdemeanor conviction, when he did not, in fact, conceal it because he was not asked." (Doc. 1, ¶ 92).  Furthermore, he claims, prosecutors' discriminatory purpose is demonstrated by their failure to strike a white juror, A.H., who attempted to conceal her son's felony convictions despite that prosecutors queried the venire about family members' convictions. (Doc. 1, ¶ 92).  He also asserts the ACCA "violated" *Miller-El* when it accepted the State's contention on appeal that R.G.'s

convictions supported his peremptory challenge irrespective of any purported attempt to conceal them. (Doc. 1, ¶ 94).

The petition does not plainly state which of the ACCA's findings were unreasonable within the meaning of § 2254(d)(2). As best the court can tell, petitioner appears to challenge the ACCA's determination that R.G.'s convictions, alone, supported his peremptory challenge and that the convictions were indeed the reason for the prosecution's strike of R.G. He maintains that prosecutors struck R.G. not because of his convictions, but because they believed R.G. attempted to conceal the convictions until he was specifically confronted about them. (Doc. 1, ¶ 90). He claims prosecutors did not offer the fact of the convictions themselves as a reason for the strike at trial and that the ACCA was prohibited from accepting the State's "alternative" explanation offered in Rule 32 proceedings. (Doc. 1, ¶ 94).

The record does not clearly and convincingly establish that the ACCA erred, much less that its findings of fact were unreasonable. While the record establishes that Valeska based his for-cause challenge on the perceived failure of R.G. to admit to his convictions until he was specifically confronted by Valeska, the record is at least ambiguous regarding the complete basis for the State's peremptory challenge of R.G. Indeed, when the State was asked to explain its reason for the peremptory challenge of R.G., Assistant District Attorney Maxwell's very first statement was to

56

remind Judge White that R.G. had "two criminal mischief convictions."  (Doc. 19-3 at 57).  Maxwell then reiterated prosecutors' belief that R.G. had failed to volunteer the fact of his convictions when the venire was asked about prior convictions during voir dire.  (Doc. 19-3 at 57).

Nothing in the transcript establishes that prosecutors did not or would not have exercised the peremptory challenge based only upon R.G.'s convictions.  Nor does the record clearly and convincingly establish that the conjunctive "And" uttered by Maxwell, which was recorded by the court reporter as introducing a new sentence, was not intended to join two independent but related reasons for the State's challenge: R.G.'s convictions *and* his perceived lack of candor about those convictions.[13]  Apart from the ambiguous voir dire transcript, petitioner does not point to any other evidence in the state court record tending to show that prosecutors did not strike R.G. because of his convictions.[14]

---

[13] Again, Maxwell's full explanation for R.G.'s strike was as follows: "Mr. G[] was the one with the two criminal mischief convictions.  And we asked about convictions, and he did not answer up until he was called up by the prosecution."  (Doc. 19-3 at 57).

[14] Petitioner has not presented evidence of pretext, such as evidence that prosecutors did not strike white venirepersons who also presented with convictions.  In his petition, he appeared to allege that his effort to prove pretext in that manner was thwarted by state court discovery orders.  He alleged that he sought discovery of "the prosecutor's voir dire notes, made on the prosecutor's strike list" because those notes "probably include[] criminal history information[.]"  (Doc. 1, ¶ 97).  Although the voir dire notes were entered into the state court record under seal, they are included in the federal record.  (*See* doc. 19-19 at 29–79).  Having now accessed the voir dire notes, and having made other arguments based upon their content, (*see* doc. 57 at 35), petitioner does not contend that the voir dire notes reflect any criminal convictions for any other prospective juror.

As the ACCA found, criminal convictions, even for misdemeanors, have long been recognized as valid, race-neutral reasons for the exercise of a peremptory challenge. *See McNair v. Campbell*, 416 F.3d 1291, 1311–12 (11th Cir. 2005). It is unremarkable to conclude, as the ACCA did here, that a prosecutor reasonably would prefer not to have someone convicted of criminal mischief serving on a capital jury if it can be avoided. *See id*. Thus, contrary to petitioner's argument here, the ACCA did not rewrite history by allowing the State to offer a new, "alternative" reason for the State's challenge. It merely interpreted the voir dire transcript more broadly than does petitioner by finding in that transcript support for the State's contention that R.G. was struck because of his convictions *and* his perceived failure to volunteer those convictions. Petitioner has not established by clear and convincing evidence that the ACCA erred in doing so. Accordingly, to the extent the ACCA found that prosecutors struck R.G. because of his convictions or otherwise construed Maxwell's explanation as offering two reasons for the challenge, including the fact of the convictions, petitioner has failed to show that the ACCA unreasonably determined the facts.

Petitioner's claim that the ACCA unreasonably applied *Batson* and *Miller-El* pursuant to § 2254(d)(1) also fails. He appears to assert two ways in which the

---

Nor has petitioner demonstrated that any publicly accessible portal, like Alacourt, reflects that prosecutors failed to strike any white venireperson with criminal convictions.

ACCA unreasonably applied those decisions.  *First*, he argues that the ACCA unreasonably applied *Miller-El* because it concluded that prospective juror A.H. and R.G. were not similarly situated, and thus the strike of R.G. was not pretextual.  He maintains the ACCA should have concluded that A.H.'s and R.G.'s dissimilarity favored a strike of A.H. rather than R.G. because, unlike R.G., A.H. attempted to conceal the fact of her son's convictions.  (Doc. 1, ¶¶ 91–93; doc. 57 at 33–35).  *Second*, petitioner argues that the ACCA unreasonably applied *Miller-El* because it permitted the State to provide an "alternative" explanation for its strike of R.G. after the *Batson* hearing.  (Doc. 1, ¶¶ 94–95).

Taking the second contention first, because the ACCA did not unreasonably determine the facts when it concluded that the State peremptorily challenged R.G., at least in part, because of his criminal convictions, the ACCA did not unreasonably apply *Batson* or *Miller-El* by permitting the State to offer a new, alternative reason for its strike that was not presented at the *Batson* hearing.

As for the first contention, the ACCA did not unreasonably apply *Batson* or *Miller-El* when it concluded that A.H. and R.G. were not similarly situated due to R.G.'s previous convictions.  Petitioner has not shown that A.H. (or any other prospective juror not challenged by the State) had previous convictions of which prosecutors were aware.  Given that R.G.'s convictions provided prosecutors with a

59

legitimate, race-neutral basis for his peremptory challenge, and given the ACCA's finding that prosecutors indeed relied upon that reason in striking him, fairminded jurists can agree that A.H. and R.G. were not similarly situated despite A.H.'s son's convictions.   Thus, the ACCA reasonably concluded that prosecutors' failure to challenge A.H. does not suggest pretext.  *See Parker*, 565 F.3d at 1271 (quoting *United States v. Novaton*, 271 F.3d 968, 1004 (11th Cir. 2001)) ("The prosecutor's failure to strike similarly situated jurors is not pretextual, however, 'where there are relevant differences between the struck jurors and the comparator jurors.'").

> iii.   *The ACCA did not unreasonably apply clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, when it held that the strike of B.D. did not violate Batson.*

Petitioner alleges that the ACCA unreasonably applied *Miller-El* when it held that prosecutors' strike of B.D. did not violate *Batson* notwithstanding the lack of meaningful voir dire about B.D.'s relationships with the several persons cited by Maxwell when explaining why she was struck.  (Doc. 1, ¶¶ 103–09).  He maintains that the absence of meaningful voir dire demonstrates that the State's concern with B.D.'s relationships was "'a sham and a pretext for discrimination.'"  (Doc. 1, ¶ 109) (quoting *Miller-El*, 545 U.S. at 246)).

60

The ACCA referenced Maxwell's explanation for the strike of B.D., in which he invoked B.D.'s relationship with, among others, members of petitioner's family, Geneva Cull, who visited with petitioner at the jail, and Reverend Jones, who pastored a church petitioner previously attended and was listed as a potential witness on petitioner's behalf for the penalty phase of trial. *Benjamin*, 156 So. 3d at 436 (state court record citation omitted). The ACCA cited its previous authority holding that a venireperson's relationship to or acquaintance with the defendant, defendant's family, or defense witnesses suffices as a race neutral basis for the exercise of a peremptory challenge. *Id.* (citations omitted). Addressing petitioner's argument about the lack of meaningful voir dire of B.D., the ACCA found that, even if B.D. had been "rehabilitated"—meaning, presumably, that "meaningful" voir dire demonstrated that B.D.'s relationships with the cited persons were minor or would not influence her ability to be fair and impartial—B.D.'s "initial response supported the prosecutor's use of a peremptory strike." *Id.* at 437. Consequently, the ACCA held, "the prosecutor's reason for striking juror B.D. did not violate *Batson*." *Id.*

For purposes of review under § 2254(d)(2), the ACCA reasonably, and correctly, found that B.D. indicated that she knew Geneva Cull, Hugh Jeffrey (petitioner's grandfather), and Reverend Jones. In his updated briefing, petitioner highlights that Maxwell erroneously asserted that B.D. knew petitioner's sister and

61

mother despite that B.D. only claimed to know petitioner's deceased grandfather. (Doc. 57 at 37). While it is true that Maxwell indeed erroneously stated that B.D. claimed to know petitioner's mother and sister, (*see* doc. 19-3 at 56–57), the ACCA did not find that B.D. claimed any relationship or acquaintance with petitioner's mother or sister and therefore limited its analysis to B.D.'s acknowledged relationships with Cull, petitioner's grandfather, and Reverend Jones. *Benjamin*, 156 So. 3d at 437. Likewise, the ACCA reasonably found that prosecutors' concern with B.D.'s relationships or acquaintance with those persons was legitimate.[15] Neither the petition nor petitioner's updated briefing identifies and challenges as unreasonable any finding of fact supporting the ACCA's decision on this claim.

Petitioner's claim respecting B.D. is really about whether, pursuant to § 2254(d)(1), the ACCA unreasonably applied the Supreme Court's *Batson* precedents

---

[15] Each of the three persons known by B.D. and cited by the ACCA were sufficiently close to petitioner to give prosecutors pause. Petitioner's grandfather raised petitioner after his mother's untimely death until his own death. Geneva Cull was a family friend who visited petitioner in jail. Reverend Jones was a potential defense witness likely to testify in the penalty phase about petitioner's character. Petitioner dismisses prosecutors' concern with identifying prospective jurors who knew persons connected to North Highland Baptist as a pretext because petitioner "had been to the church many years ago when he was a small child." (Doc. 1, ¶ 105 n.7). But Reverend Jones himself testified that petitioner attended North Highland Baptist, and sang in the youth choir, when he returned to Dothan as a teenager after living with his uncle in New Jersey and Georgia. (Doc. 19-6 at 60). This testimony grounds petitioner's affiliation with North Highland Baptist Church much closer in time to the murder of Mr. Lewis and therefore validates prosecutors' concern with identifying jurors who knew or were connected to people at North Highland. As Maxwell recounted at the *Batson* hearing, B.D. knew several people connected to North Highland, including Reverend Jones.

when it found that prosecutors did not violate *Batson* by peremptorily challenging B.D. without conducting "meaningful" voir dire about her relationships with Cull, petitioner's grandfather, and Reverend Jones.  Petitioner cites no case in which the Supreme Court has held that the lack of "meaningful voir dire" alone establishes pretext, and the Eleventh Circuit has specifically rejected such an argument.  *See Trawick v. Allen*, 520 F.3d 1264, 1268 (11th Cir. 2008) (quotation marks and citation omitted) ("However, the mere fact that  . . . counsel decided to exercise peremptory challenges against jurors who had not been extensively questioned during voir dire does not establish a discriminatory purpose.").

More importantly, reasonably construed, *Miller-El*, the decision petitioner specifically alleges the ACCA unreasonably applied, does not command such a conclusion.  To be sure, in *Miller-El*, the Supreme Court determined that prosecutors' failure to voir dire the prospective juror Fields about a topic they cited as a reason for his challenge was indicative of pretext.  545 U.S. at 246.[16]  But context matters: the lack of "meaningful voir dire" was significant in *Miller-El* because the prosecutors failed to "meaningfully" interrogate Fields about his brother's criminal convictions but then offered that as a reason for his challenge only after Miller-El's

_____

[16] Incidentally, the "meaningful voir dire" phrasing employed by the Supreme Court in *Miller-El*, and adopted by lower courts in the succeeding years, originated in a decision of the Alabama Supreme Court.  *See Miller-El*, 545 U.S. at 246 (quoting *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000)).

63

counsel impugned prosecutors' first reason, *i.e.*, Fields's purported inability to vote for a death sentence where rehabilitation was possible. *Id*. Thus, according to the Supreme Court, in the absence of meaningful voir dire, the *Miller-El* prosecutors' reliance on Fields's brother's convictions "reek[ed] of afterthought." *Id*. So, it is not merely the failure to "meaningfully" voir dire a juror that indicates pretext, it is the failure to meaningfully voir dire the juror when surrounding circumstances are suggestive of pretext.

The Supreme Court confirmed this principle in *Flowers* when it cited prosecutors' failure to meaningfully voir dire three white prospective jurors, whom they did not strike, about their relationships with as many as 31 people connected to the case while claiming to have struck a black venireperson, Wright, because she knew 34 people involved. 588 U.S. at 312. The Court in *Flowers* stressed the importance of "meaningful voir dire" as an adjunct tool of the comparative juror analysis the Court performed in *Miller-El*. For example, prosecutors in *Flowers* claimed they struck Wright because, in addition to her acquaintance with several defense witnesses, she once worked at a Wal-Mart store with the defendant's father. *Id*. at 312. Prosecutors, however, did not ask Wright "follow-up questions to determine the nature of their relationship." *Id*. The absence of such follow-up questioning was significant because two white prospective jurors "also had

relationships with members of Flowers' family[,]" yet prosecutors did not "meaningfully" probe those relationships and did not peremptorily challenge those prospective jurors as they had Wright. *Id*. at 313. The absence of "meaningful" voir dire in *Flowers* was suggestive of pretext precisely because prosecutors claimed to care about Wright's relationship with the defendant's father but they did not ask questions to learn more about that relationship, and they did not similarly challenge, and also did not "meaningfully voir dire," white prospective jurors who also disclosed relationships with members of the defendant's family. So, where strikes are employed disparately, the lack of "meaningful voir dire" illuminates discriminatory motive.

No similar circumstance is apparent here, and petitioner does not contend otherwise. Once again, as with his claim respecting the peremptory challenge of C.B., petitioner does not point to any white prospective juror who was not challenged by prosecutors despite his or her relationship or acquaintance with members of petitioner's family, Geneva Cull, Reverend Jones, or any other person similarly situated by virtue of their connection to petitioner, his family, or the defense. In sum, petitioner has not shown through comparative juror analysis, or any other method, that prosecutors were not actually and reasonably concerned about the constellation of B.D.'s relationships with persons connected to petitioner, including

his grandfather, Geneva Cull, and Reverend Jones.  Because the circumstances surrounding the challenge of B.D. are not otherwise suggestive of pretext, the absence of "meaningful" voir dire of B.D. does not, alone, indicate that her challenge was pretextual under *Miller-El* and *Flowers*.  *See Trawick*, 520 F.3d at 1268 (finding the Alabama Supreme Court did not err in rejecting Trawick's gender bias in jury selection claim, notwithstanding prosecutors' failure to meaningfully voir dire female prospective jurors, "particularly because Trawick does not allege that the prosecutor only failed to question members of either gender").  Accordingly, the ACCA did not unreasonably apply *Batson* or its progeny.

### d.    Conclusion

For all the foregoing reasons, the ACCA did not contravene, or unreasonably apply clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, when it held that petitioner's trial counsel was not ineffective in presenting and arguing petitioner's *Batson* motion at trial. Accordingly, petitioner's *Batson*-ineffectiveness of trial counsel claim is due to be denied.

### B.    Appellate Counsel Ineffectively Failed to Adequately Present Petitioner's *Batson* Claim on Direct Appeal (Claim III.B).

#### 1.    Petitioner's Allegations

Petitioner claims that his direct appeal counsel, Crespi, was ineffective in

failing to address, in his initial appellate brief, the alleged *Batson* violation at petitioner's trial. (Doc. 1, ¶ 116). He alleges several circumstances surrounding Crespi's representation on direct appeal demonstrate his deficient performance, including the following: Crespi missed the deadline for filing the initial appellate brief; he filed a "pathetically bad" brief nine weeks after his initial deadline; he raised only five issues in the initial brief and completely failed to present the *Batson* claim; and the initial brief consisted of only six pages of argument. (Doc. 1, ¶ 113). He maintains that Crespi "had no strategic reason for not including the *Batson* argument" in the initial appellate brief. (Doc. 1, ¶ 117). As for prejudice, petitioner contends that, had Crespi presented and adequately argued his *Batson* claim on direct appeal, there is a reasonable probability that the ACCA would have vacated his conviction because the claim had "obvious merit" given that "the *Batson* violation was 'apparent on the face of the transcript.'" (Doc. 1, ¶ 123 (quoting *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001)).

### 2. The State Court's Merits Adjudication

Petitioner raised his *Batson* ineffective-assistance-of-appellate-counsel claim in his Rule 32 petition. Following the Rule 32 evidentiary hearing, the Circuit Court denied the claim based upon its finding that, because petitioner's underlying claim of *Batson* error lacked merit, appellate counsel was not ineffective in failing to

67

present the claim on direct appeal.  (Doc. 19-19 at 9–10).  The ACCA affirmed, expressly stating that it "agree[d] with the circuit court" and that the "circuit court correctly denied relief on this claim." *Benjamin*, 156 So. 3d at 455.

### 3.    Analysis

Petitioner claims the ACCA's decision "rested upon an unreasonable determination of the facts in light of the evidence presented at the Rule 32 hearing and was also an unreasonable application of clearly established Federal law." (Doc. 1, ¶ 124).  Taking first his argument about the ACCA's factfinding under § 2254(d)(2), this court does not agree that the ACCA based its decision upon any unreasonable determination of the facts.  Petitioner specifically disputes the ACCA's reference to appellate counsel's discretionary authority to "winnow out" weaker arguments on appeal, *see Benjamin*, 156 So. 3d at 455, and challenges its implicit finding that Crespi simply "winnowed" the *Batson* claim from the direct appeal.  He asserts that the ACCA unreasonably determined the facts because Crespi testified at the Rule 32 hearing that he had no strategic reason for not including the claim in his initial appellate brief.  (Doc. 1, ¶¶ 119–20).

To be sure, Crespi's testimony at the Rule 32 hearing does not support any finding that he declined to include the *Batson* claim in his initial appellate brief because he perceived it to be lacking in merit.  While that might ordinarily be a

reasonable inference based upon the failure to include a given claim in an appellate brief, Crespi's testimony at the Rule 32 hearing indicated that he never reviewed the *Batson* hearing transcript to assess the validity of Maxwell's reasons for the prosecution's peremptory challenges, and he made no strategic judgment in failing to challenge Maxwell's reasons in the trial court or in his initial appellate brief. *See* (Doc. 19-50 at 117–20). Thus, to the extent the ACCA found that Crespi simply "winnowed out" the *Batson* claim on direct appeal because he believed it to be lacking in merit, it appears to have erroneously determined the facts.

It does not follow, however, that the ACCA's decision was based upon any unreasonable determination of the facts for purposes of § 2254(d)(2). This is so because the ACCA's implicit finding about Crespi's "winnowing" of the *Batson* claim was, even if erroneous, not important to its ultimate decision. *See Pye*, 50 F.4th at 1035. The ACCA's decision affirming denial of this claim plainly rested upon its determination that petitioner's underlying *Batson* claim lacks merit. *See Benjamin*, 156 So. 3d at 455. So long as the ACCA's decision, "'taken as a whole, doesn't constitute an unreasonable determination of the facts[,]'" it is "reasonable" and entitled to AEDPA deference. *Pye,* 50 F.4th at 1035 (quoting *Hayes v. Sec'y, Fla. Dep't of Corr*., 10 F.4th 1023, 1224–25 (11th Cir. 2021)).

For the reasons given in addressing petitioner's *Batson* ineffective-assistance-

of-trial-counsel claim, *supra*, the ACCA's decision here easily clears that hurdle. The ACCA's judgment about the merit of petitioner's *Batson* claim, and hence whether counsel could have been ineffective in failing to present the claim on direct appeal, is independent and not reliant upon any factfinding about whether Crespi dutifully evaluated the claim and strategically determined to "winnow" it from the direct appeal. As set forth previously, the ACCA's decision finding that petitioner's *Batson* claim lacks merit did not unreasonably apply clearly established federal law and was not based upon any unreasonable determination of the facts. The state courts reasonably determined that, respecting each black prospective juror whose strike petitioner challenged, the prosecution did not violate *Batson* and, accordingly, trial counsel was not ineffective in failing to adequately argue the *Batson* motion at trial. Petitioner's ineffective assistance of appellate counsel claim adds nothing new, contending only that appellate counsel was ineffective in failing to present an "obviously" meritorious *Batson* claim that was "apparent on the face of the transcript." (Doc. 1, ¶ 122). Because the ACCA reasonably concluded otherwise, petitioner failed to demonstrate deficient performance of his appellate counsel or prejudice. Accordingly, this claim is due to be denied.

    **C.**    **Trial Counsel Failed to Conduct a Reasonable Investigation and Present Evidence During the Guilt-Innocence Phase of Trial (Claim III.C).**

70

### 1.    Petitioner's Allegations

Petitioner claims Crespi "fail[ed] to conduct any investigation and present readily available evidence during the guilt-innocence phase." (Doc. 1, ¶ 130). In particular, he alleges Crespi failed to develop evidence supporting the defense theory that petitioner lacked intent to kill Mr. Lewis. (Doc. 1, ¶ 131). He identifies several ways in which he alleges Crespi performed deficiently, resulting in prejudice during the guilt phase of trial. *First*, petitioner argues Crespi failed to interview witnesses other than petitioner and retain experts in firearm forensics, pathology, crime scene reconstruction, "gunshot residues, blood, or firearm mechanics." (*Id*.). Had Crespi properly interviewed witnesses and retained defense experts, petitioner contends, he would have discovered "operating characteristics and deficiencies" of the firearm used in Mr. Lewis's murder that would have supported the defense. (*Id*.). Likewise, petitioner alleges that, had Crespi examined the victim's pants, "he would have seen that gunpowder particles were visible to the naked eye, and an expert could have advised him that this indicated that the gun was very close when fired." (*Id*.). Petitioner submits this evidence would have supported the defense theory that petitioner did not intend to kill Mr. Lewis and that, instead, Mr. Lewis was shot accidentally during a struggle for petitioner's firearm. (*Id*.). Furthermore, petitioner asserts that Crespi failed to introduce evidence that petitioner "had a bump on his

71

head and a cut on his hand after the crime, which corroborated [his] statement to the police that the gun discharged during a struggle." (*Id.*).

*Second*, petitioner claims Crespi "never investigated the blood in Mr. Benjamin's car[.]" (Doc. 1, ¶ 132). He points out that trial evidence showed that investigators found Mr. Lewis's blood "on the upper back driver's seat" of petitioner's car. (*Id.*). According to petitioner, the placement of the victim's blood in petitioner's car "provided strong corroboration of Mr. Benjamin's statement that Mr. Lewis was on Mr. Benjamin's back when the gun discharged." (*Id.*).

*Third*, petitioner alleges that Crespi failed to "investigate the State's expert's theory as to the causes of a trigger to be pulled." (Doc. 1, ¶ 133). Specifically, Crespi failed to call any expert witness who could explain to the jury how a trigger may be pulled accidentally and thereby "corroborate Mr. Benjamin's description of the incident to the police." (*Id.*).

Petitioner maintains that Crespi's alleged errors prejudiced the outcome of the guilt phase of trial: "If the readily available evidence contradicting the State's version of events had been discovered and presented to the jury by Mr. Benjamin's trial counsel, there is a reasonable probability that the jury would have had reasonable doubt regarding whether the shooting was intentional." (Doc. 1, ¶ 136). He claims the state courts' denial of this claim "is an unreasonable determination of

fact and unreasonable application of federal law, including *Strickland* and its progeny." (Doc. 1, ¶ 137).

## 2.    The State Court's Merits Adjudication

Petitioner raised this claim of ineffective assistance in his Rule 32 petition. Following the Rule 32 evidentiary hearing, the Circuit Court denied the claim on the merits. (*See* Doc. 19-18 at 180–88). On appeal of that decision, the ACCA affirmed. *Benjamin*, 156 So. 3d at 437–45. The ACCA first recited the Circuit Court's findings and reasoning in denying this claim and held that the "circuit court's findings are supported by the record." *Id*. at 440. Then, as a preface to its own analysis, the ACCA reviewed Crespi's testimony at the Rule 32 hearing about his own experience, his appointment as petitioner's trial counsel, his investigation of the State's evidence (which included hiring a defense investigator), and how he arrived at his decision that petitioner's best defense would be to challenge the intent element of the State's capital murder charge. *Id*.

The ACCA proceeded to address petitioner's specific claims of error concerning Crespi's alleged failure to investigate and prepare the guilt phase defense. As to petitioner's claim that Crespi failed to interview the State's experts, including the forensic pathologist, Dr. Paredes, and the firearms expert, Ms. Richert, the ACCA first observed that there is no per se rule requiring that counsel interview

73

such witnesses. *Benjamin*, 156 So. 3d at 441–42. Because Crespi possessed those witnesses' expert reports, the ACCA reasoned, he was adequately prepared to cross-examine those witnesses and elicit points favorable to the defense through cross-examination without the need of additional interviews. *Id*. at 442.

The ACCA then addressed petitioner's claim that Crespi ineffectively failed to "inspect and obtain the services of an expert to test the pants that [Mr. Lewis] . . . was wearing at the time of the shooting for the presence of gunshot residue and to hire a pathologist and a firearms expert." *Benjamin*, 156 So. 3d at 442. The ACCA recounted Crespi's testimony at the Rule 32 evidentiary hearing that he was concerned that testing of the victim's pants for gunpowder or gunshot residues was risky because of "the possibility that it might not reveal any gunshot residue." *Id*. at 443 (record citation omitted). Thus, the ACCA concluded, Crespi plainly considered having the pants independently tested but made a strategic judgment not to do so. *Id*.

Finally, the ACCA compared the evidence petitioner presented at the Rule 32 evidentiary hearing, which included expert testimony from a forensic pathologist and an expert in firearms and shooting-scene reconstruction, with the evidence and points Crespi developed and presented during his cross examination of the State's experts at trial. Respecting Crespi's alleged failure to adequately investigate the

74

victim's pants, the ACCA found as follows:

> At the postconviction evidentiary hearing, Benjamin presented the testimony of Matthew Noedel, a forensic and firearms expert. Noedel testified that he examined Benjamin's[17] pants and that his examination revealed the presence of gunpowder. In order to understand the pattern of this residue, he said, he obtained a gun similar to the one used by Benjamin and ammunition similar to what was used and conducted tests. Noedel said that his tests revealed that when the shot that entered the victim's leg was fired from approximately 12 inches away from the victim, it left a residue pattern like that was found on the victim's pants. He said that his tests could vary because of the age of the ammunition and the fact that the actual gun was not used.

> Benjamin also presented the testimony of Dr. Michael Doberson, a forensic pathologist. Dr. Doberson testified that he examined the photographs of the body and the autopsy report and a gun similar to the one used in the murder. It was his opinion that the wound to the victim's head was not caused by the end of the gun but that it could have been caused by hitting a rearview mirror on a vehicle as he fell between two vehicles.[18] Dr. Doberson further testified that it was impossible to say which injury occurred first and that the wound to the victim's leg could have been caused during a struggle.

> In rebuttal, the State introduced Benjamin's statements to police and a transcript of a conversation between Benjamin and Michael Baker that was audiotaped when Baker wore a body wire. Benjamin told police that he took his gun to the shopping mall, that the gun was loaded, that he followed the victim and approached the victim from behind, that they wrestled, that the gun went off twice as they were

---

[17] The ACCA erred in stating that Noedel "examined Benjamin's pants." Noedel testified that he examined the victim's pants for gunshot residues. (Doc. 19-49 at 184–85). Benjamin's pants were not in evidence at the trial. Noedel's testimony and the context of the ACCA's analysis reveal this to be a scrivener's error with no possible effect on the outcome of the ACCA's decision.

[18] At trial, the forensic pathologist, Dr. Paredes, testified that injuries to the back of Mr. Lewis's head and his face were consistent with having been hit with various surfaces of the firearm petitioner used to rob and shoot Mr. Lewis. (Doc. 19-4 at 29–30).

wrestling, and that when the victim fell he took the victim's wallet and left in his car.

[ . . . ]

The record of Benjamin's trial establishes that Crespi thoroughly cross-examined the State's forensic pathologist, Dr. Alfredo Parades, about the victim's injuries. Crespi concentrated on the fact that the victim's pants had not been examined for the presence of gunpowder residue,[] that the pathologist could not determine the precise order of the victim's injuries, that the shot to the victim's chest was a contact wound, that the shot to the victim's leg was not a contact wound, and that based on the evidence it was possible that the shooting took place during a struggle.

*Benajmin*, 156 So. 3d at 443–44.

As for petitioner's contention about counsel's inadequate investigation into petitioner's gun, the ACCA found that petitioner "presented no evidence at the postconviction hearing that the gun involved in the murder was defective." *Id*. In sum, the ACCA found as follows:

The omitted evidence that was not presented at Benjamin's trial but was presented at the postconviction evidentiary hearing was evidence indicating that there was gunshot residue on the victim's pants. Given the strength of the State's evidence, which included incriminating statements made by Benjamin, we cannot say that Benjamin suffered any prejudice as a result of the exclusion of this evidence.

The vast majority of the remaining evidence that Benjamin presented at the postconviction hearing was presented at trial, albeit via cross-examination of the State's experts. Crespi vigorously cross-examined the State's experts. We agree with the circuit court that Benjamin failed to satisfy the *Strickland* test in regard to this claim.

76

*Id*. at 445.

### 3.   Analysis

Although petitioner alleges the ACCA's decision "unreasonably determined three uncontested points of fact" (Doc. 1, ¶ 130), he does not plainly identify which facts the ACCA unreasonably determined.   Rather, his subsequent allegations present three ways in which he alleges counsel failed to adequately investigate and present evidence during the guilt phase.   (Doc. 1, ¶¶ 131–33).   Specifically, he cites counsel's failure to interview witnesses and retain experts, failure to investigate the victim's blood in petitioner's car, and failure to investigate the State's expert's theory of how the trigger was pulled.   He then asserts that, "[i]n light of these three uncontested facts, Mr. Crespi's failure to investigate constituted objectively unreasonable performance under *Strickland*."   (Doc. 1, ¶ 133).

Petitioner therefore does not appear to challenge any of the ACCA's essential fact findings respecting this claim, including the following: that Crespi retained an investigator to investigate the State's case; that Crespi arrived at the defense's theory of the case based upon information he learned from the defense investigator, his own interviews with petitioner, and his review of the State's evidence, including petitioner's police statement and the Baker wire recording; that Crespi reviewed the State's experts' reports and prepared his cross-examination of those experts based

on their reports; that Crespi feared obtaining an independent examination of the victim's pants for the presence and concentration of gunpowder or gunshot residues because doing so could lead to evidence unfavorable to the defense; that Crespi emphasized through his cross-examination of Dr. Paredes that the State had failed to test the victim's pants for gunshot residue; that Crespi obtained on cross-examination Dr. Paredes's concession that "it was possible that the shooting took place during a struggle"; and that petitioner did not present evidence during the Rule 32 hearing that the firearm he used to shoot Mr. Lewis was defective. Petitioner also does not allege that the ACCA unreasonably determined the facts in its review of the substance and import of his experts' testimony at the Rule 32 hearing.

What petitioner really appears to argue in this claim is that, pursuant to § 2254(d)(1), the ACCA unreasonably applied *Strickland* in failing to find either deficient performance or prejudice due to counsel's alleged errors in his guilt phase preparation and presentation. Applying the "doubly deferential" standard governing review of this claim under AEDPA, however, it is apparent the ACCA reasonably applied *Strickland*. Specifically, fairminded jurists can agree with the ACCA's decision that petitioner failed to show that he suffered prejudice under *Strickland*.

Recall that the ACCA found that the State's evidence of guilt was sufficiently strong that the omitted evidence of gunpowder on Mr. Lewis's pants did not result

78

in prejudice, while most of the remaining evidence petitioner presented at the Rule 32 hearing "was presented at trial, albeit via cross-examination of the State's experts." *Benjamin*, 156 So. 3d at 445. Petitioner's only rebuttal to the ACCA's prejudice analysis is his claim that "[i]f the readily available evidence contradicting the State's version of events had been discovered and presented to the jury by [Crespi], there is a reasonable probability that the jury would have had reasonable doubt regarding whether the shooting was intentional." (Doc. 1, ¶ 136). Examining each point of evidence petitioner cites in support of this contention, however, demonstrates that petitioner's conclusory claim of prejudice is unavailing.

The first, and most significant, piece of omitted evidence cited in the petition is the presence of gunpowder on the victim's pants. (Doc. 1, ¶ 131). Petitioner alleges Crespi's failure to investigate and present this favorable evidence was significant because the omitted evidence "indicated the gun was very close when fired." (*Id*.). But, as found by the ACCA, the evidence petitioner presented at the Rule 32 evidentiary hearing does not substantially alter the evidentiary picture that was before petitioner's trial jury.

At trial, the State's firearms expert, Richert, told the jury that, while she did not perform "distance testing" on the specific firearm used by petitioner, a .380 caliber handgun normally deposits soot "out to around six inches," "stippling, which

79

is burning powder, would be produced out to about twenty inches," and "gunpowder particles, which are unburnt, can be deposited out to over three feet." (Doc. 19-4 at 134). The State's forensic pathologist, Dr. Paredes, testified that he "did not see evidence of gun smoke or gunpowder residue" surrounding the entrance wound on Mr. Lewis's leg. (Doc. 19-4 at 32, 34). This caused Dr. Paredes to classify the wound to Mr. Lewis's leg as a "distant shot" in which "the residue did not impact upon the skin." (Doc. 19-4 at 32). Dr. Paredes also testified that, although he did not see gunpowder on Mr. Lewis's pants, "that doesn't mean that it's not there[.]" (Doc. 19-4 at 34). In addition, based upon his observations of Mr. Lewis's entrance and exit wounds, Dr. Paredes opined that Mr. Lewis was "not standing up" when he was shot in the leg and that he "could have been on the floor and raised his leg, and he could have been shot right there at time." (Doc. 19-4 at 73–74).

The ACCA balanced the above trial evidence with the evidence petitioner presented at the Rule 32 hearing. Petitioner's firearms and shooting-scene reconstruction expert, Mr. Noedel, testified that, while he could see gunpowder particles on Mr. Lewis's pants with good lighting, a layperson might not identify those particles as gunpowder. (Doc. 19-49 at 186–87). After microscopically confirming the presence of gunpowder particles on the pants, Noedel did an overlay whereby he mapped each particle of gunpowder he microscopically detected on the

80

pants, as well as the location of the bullet hole. (Doc. 19-49 at 188). This allowed him to determine the density and distribution of gunpowder particles on the pants. Noedel then obtained a firearm "identical" to the one used by petitioner along with a newer production of the same brand of ammunition that was fired from petitioner's gun.[19] Noedel test fired this firearm at various distances until he found a range of distribution that was "a similar distribution as what [he] saw on the pants of Mr. Lewis." (Doc. 19-49 at 191).

Comparing the overlay with his test results, Noedel opined that the distributions best matched "at approximately 12 inches." (Doc. 19-49 at 194). He further testified that he did not "think that it would have been much further than approximately 16 inches." (Doc. 19-50 at 28). On cross-examination, Noedel testified, consistent with Richert's trial testimony, that the firearm he tested deposited soot at about six inches and that he would expect to see stippling of the skin at about twelve inches with no intermediate object, like clothing, but that stippling can occur even when there is clothing. (Doc. 19-50 at 31–32). He conceded that Dr. Paredes found no evidence of soot or stippling around the leg entrance wound during the autopsy of Mr. Lewis. (Doc. 19-50 at 33). He also

---

[19] Noedel confirmed that his inability to conduct his testing with the actual firearm and ammunition—especially the ammunition—used by petitioner failed to remove "variables" that could have affected the accuracy of his findings. (Doc. 19-49 at 190–91; doc. 19-50 at 25–26).

confirmed that he did not see visual evidence of soot on Mr. Lewis's pant leg during his own inspection of the pants, although he believed the nature of the fabric and its contamination with Mr. Lewis's blood might have rendered any soot particles difficult to discern without destructive testing, which he was not permitted to perform. (Doc. 19-50 at 33).

So, in essence, based upon the evidence admitted at the Rule 32 hearing, had Crespi succeeded in demonstrating the presence of gunpowder on Mr. Lewis's pants, he would have established, at best, that petitioner's firearm was 12-16 inches distant from Mr. Lewis's right leg when he shot Mr. Lewis, with no evidence of a closer firing due to the lack of soot or stippling on Mr. Lewis's leg or his pants. Petitioner fails to explain how this fact makes it reasonably probable that the jury would not have convicted him of capital murder. Valeska argued only that the shooting of Mr. Lewis, including in his leg, was not accidental. The State's theory of intent is not defeated, or even appreciably impacted, by testimony that might have shown that petitioner's firearm was twelve to sixteen inches from Mr. Lewis's leg when it was fired. After all, Dr. Paredes testified that Mr. Lewis was likely lying on the ground with his leg raised in the air when he was shot. Valeska only argued to the jury— consistent with the evidence produced at trial and in Rule 32 proceedings—that the pants did not have "soot or burn" around the bullet hole. (Doc. 19-5 at 98). He

82

conceded the range at which the gun was fired was "undetermined" but argued only that it "was not close proximity" because of the lack of soot or stippling. (Doc. 19-5 at 98–99). Petitioner fails to show how Noedel's opinion of a twelve to sixteen inch range of distance seriously undermines the State's evidence or Valeska's theory of intent.

Because petitioner's Rule 32 evidence about the gunpowder on Mr. Lewis's pants therefore impacts only on the margins of the State's theory of intent, it remains that the best evidence of intent was the Baker wire recording and petitioner's police statement and all the reasonable inferences the jury could draw from those items. Petitioner plainly admitted shooting Mr. Lewis in the leg in the Baker wire recording. (Doc. 19-47 at 178–79 ("So then I walked up to him you know what I'm saying and told him straight up and he wrestled with me. . . . Now me, I ain't gonna lie to you. I didn't shoot the dude like that. I shot the dude in the leg and I (unintelligible) got out. . . . I didn't kill the dude. I shot him in the leg.")). The jury could reasonably infer intent from petitioner's admission to Baker that he shot Mr. Lewis in the leg because petitioner did not describe that shooting as accidental and because it demonstrates that, on a rainy evening in a dark parking lot, supposedly during a struggle with Mr. Lewis, petitioner was cognizant of a very specific injury

83

he inflicted on Mr. Lewis.[20]   This fact, coupled with petitioner's admission that he carefully planned his robbery, that he had no conscience, and that he clipped a newspaper article about the murder as a keepsake, provided ample support for the jury's finding that he intended to kill Mr. Lewis.   Accordingly, fairminded jurists can agree with the ACCA's conclusion that petitioner failed to show prejudice due to counsel's failure to obtain evidence about the gunpowder residues on Mr. Lewis's pants.

The next item of evidence petitioner claims Crespi ineffectively failed to present to the jury was that petitioner "had a bump on his head and a cut on his hand after the crime, which corroborated Mr. Benjamin's statement to the police that the gun discharged during a struggle." (Doc. 1, ¶ 131).   Petitioner does not allege how Crespi should have presented this evidence; he does not claim, for instance, that Crespi failed to obtain and present medical records or photographs depicting petitioner's injuries.   In any event, evidence of petitioner's injuries was before the jury in the Baker wire recording, in which petitioner explained that he both cut his

---

[20] In addition, the jury could have reasonably inferred petitioner's intent because petitioner himself theorized that the murder of Mr. Lewis was intentional.  Although petitioner admitted to Baker that he shot Mr. Lewis in the leg, he denied that he took Mr. Lewis's wallet and denied that he delivered the fatal gunshot to Mr. Lewis's upper body.  He told Baker someone else must have come along, completed the robbery he started, and then fatally shot Mr. Lewis to avoid leaving a witness. (Doc. 19-47 at 185 ("What I think, someone . . . saw him back there and pretend like they was gonna help him or whatever, . . . saw his wallet, and he must have seen they face or something, and decided to bust him, you know what I'm saying, (unintelligible) he saw someone else face. And then when he saw they face, that's when they'd had to (unintelligible) or whatever.")).

hand and got a knot on his head during the scuffle with Mr. Lewis.  (Doc. 19-47 at 180–82).

Because of this evidence from the Baker wire, Valeska told the jury in his opening statement that the evidence would show that petitioner cut his hand and received a bump on his head during a fight with Mr. Lewis.  (Doc. 19-3 at 66).  So, the jury received the available evidence about petitioner's injuries and prosecutors did not dispute its veracity or accuracy.  With no additional allegation about what Crespi should have done to present this evidence, the ACCA's conclusion that petitioner failed to demonstrate deficient performance is reasonable.  Likewise, because the evidence was before the jury, the ACCA reasonably determined that petitioner cannot show prejudice.

Petitioner next claims Crespi failed to investigate "the blood in Mr. Benjamin's car," which the crime lab report indicated was that of Mr. Lewis.  (Doc. 1, ¶ 132).  The record does not support petitioner's contention that Crespi failed to investigate this evidence, however.  Crespi asked Doug Johnson, the Dothan Police Department's lead investigator, about the discovery of blood stains in petitioner's car on the "backrest, so to speak, of the seat[.]"  (Doc. 19-5 at 51–52).  On re-direct examination of Johnson, Valeska elicited Johnson's confirmation that investigators swabbed the blood stains and sent them to the crime lab for DNA testing, and that

the lab report reflecting the presence of Mr. Lewis's DNA in one of the blood stains was provided to the defense.  (Doc. 19-5 at 57–58).[21]  Crespi referenced the blood evidence from the car in his closing and asked the jury to consider why petitioner, an employee at a car wash, would not have cleaned the blood out of the car if he had been disposing of the evidence, as he had claimed he did in the Baker wire recording. (Doc. 19-5 at 91–92).

So, the record affirmatively indicates that Crespi knew of the blood located in petitioner's car and at least implicitly indicates that he knew the blood was that of Mr. Lewis.  At the Rule 32 hearing, Crespi simply could not remember what he had done with respect to the blood evidence taken from petitioner's car.  (Doc. 19-50 at 91–92).  The record therefore does not substantiate petitioner's claim that Crespi "never investigated the blood[.]"  (Doc. 1, ¶ 132).  What this claim really appears to allege is that Crespi should have presented better argument about the significance of the placement of Mr. Lewis's blood on the backrest.  Perhaps, in hindsight, he should have.  But that is a different claim than the one petitioner alleged—that Crespi "never investigated the blood" evidence.  Accordingly, fairminded jurists can agree with the ACCA's conclusion that petitioner failed to demonstrate deficient performance. Likewise, given the myriad other events which a juror could infer might have caused

---

[21] Petitioner does not allege in the petition, and has not otherwise contended, that the prosecution failed to disclose the lab report confirming the presence of Mr. Lewis's blood in petitioner's car.

the transfer of Mr. Lewis's blood to petitioner's car seat, fairminded jurists can agree that Crespi's failure to better highlight the significance of the blood evidence did not result in prejudice.

Finally, petitioner complains that Crespi "did nothing to investigate the State's expert's theory as to the causes for a trigger to be pulled." (Doc. 1, ¶ 133). At trial, Valeska asked the State's firearm expert, Richert, who had test fired petitioner's gun, "what part of [her] body, if any, told [her] to squeeze the trigger to make it fire?" (Doc. 19-4 at 147). Richert responded, "I would imagine that my brain told me to pull the trigger." (Doc. 19-4 at 147). On cross-examination, Crespi caused Richert to admit that she had no trouble firing the weapon and that the trigger could be pulled in a tussle over the weapon, regardless of whether one's brain was instructing his finger to pull the trigger. (Doc. 19-4 at 155–56). In other words, Richert's testimony on cross-examination confirmed that, while she intentionally fired the weapon because her brain told her to do so, the gun could be fired unintentionally as well. Thus, to the extent the State offered through Richert any "theory" about "the causes for a trigger to be pulled," that theory was quickly qualified by Crespi's cross-examination of Richert.

Ultimately, the fact that a trigger could accidentally or incidentally be pulled during a physical struggle is well within the common knowledge of jurors and

required no particular expertise to convey. That Richert conceded this as a possibility on cross-examination only further demonstrates that Crespi adequately challenged the State's "theory." Accordingly, fairminded jurists can agree with the ACCA's determination that petitioner failed to show how Crespi deficiently "failed to investigate the State's expert's theory as to the causes for a trigger to be pulled." (Doc. 1, ¶ 133). Likewise, fairminded jurists can agree that petitioner suffered no prejudice due to Crespi's failure to offer expert testimony about accidental or unintentional trigger pulls.

For all the foregoing reasons, petitioner has failed to demonstrate that the ACCA unreasonably applied *Strickland* or based its decision upon any unreasonable determination of the facts, in denying petitioner's claim that he received the ineffective assistance of counsel due to counsel's alleged failure to adequately investigate and present evidence during the guilt phase of trial.

### D.    Trial Counsel Failed to Prepare and Present an Adequate Mitigation Case for the Penalty Phase (Claim III.D).

Petitioner claims that his trial counsel inadequately investigated and prepared for the penalty phase of his trial, and that counsel therefore presented inadequate evidence in mitigation of his sentence. He alleges the ACCA unreasonably applied *Strickland* and based its decision upon unreasonable determinations of fact in holding otherwise. (Doc. 1, ¶¶ 138–40).

88

Discussion of this claim will proceed as follows: 1) a summary of the factual allegations of the petition; 2) discussion of the federal law governing counsel's duty to investigate and present mitigating evidence in a capital trial; 3) a summary of the mitigating evidence counsel presented at trial; 4) discussion of the state court findings and conclusions on this claim; and 5) analysis of whether Petitioner has satisfied the standard of review governing his claim.

### 1.     The petition's allegations.

Petitioner first alleges that counsel's preparation and investigation was insufficient.  His allegations are summarized as follows: Crespi "conducted virtually no mitigation investigation"; he failed to interview numerous lay witnesses identified as potentially relevant to mitigation; he retained a mitigation investigator, Cheryl Pettry, to conduct the mitigation investigation; Pettry felt Crespi thwarted her investigation by failing to timely obtain and provide her with requested documents and records; Pettry was so unprepared to assist with presenting petitioner's mitigation case at trial due to Crespi's negligence that she submitted an affidavit explaining this circumstance to Judge White before trial; Crespi acknowledged the veracity of Pettry's claims before Judge White; Crespi delegated responsibility for the penalty phase to his junior co-counsel, Kalia Lane, who had never before represented a capital defendant; Lane's investigation consisted of interviewing two

witnesses, petitioner's sister and a friend of petitioner's uncle; Lane presented four witnesses at the penalty phase, whom she did not prepare for cross-examination; and counsel failed to sponsor the testimony of a neuropsychologist that Crespi had retained earlier in the case. (Doc. 1, ¶¶ 143–151).

Petitioner next identifies several witnesses counsel should have interviewed and presented during the penalty phase, including the following: Graylain Arnold (petitioner's "best friend in high school"); Reverend Ozzie Bigham ("a minister who had a jail ministry at the Houston County Jail"); Geneva Cull ("petitioner's godmother"); Artnase McClain (petitioner's paternal aunt); Tiffany Boger (a high school classmate); Wanda Emblem (a high school teacher); Patricia Benjamin (petitioner's paternal aunt); Sharelle Wyatt (a paternal family member); Donald Doss (a family friend with whom petitioner was living at the time of the murder); "Sergeants Larue and Reynolds at the Houston County Jail would have testified to Mr. Benjamin's exemplary behavior while in jail"; and Jay Ochman (who supervised petitioner during his employment in Louisiana). (Doc. 1, ¶¶ 160–70).

Petitioner alleges the testimonies of these witnesses "would have established several critical mitigating factors and circumstances supporting a sentence of life rather than death[,]" including the following: that the shooting of Mr. Lewis was out of character for petitioner and, therefore, likely the result of a struggle as petitioner

90

had told police; that petitioner was a "pleasant, well-liked, and hardworking individual" with "personal, educational, and work accomplishments"; that he was "quiet and nice"; that he attended church as a child; that he made good grades in school despite instability and several moves; that he had aspirations of going to college and joining the military; that he was a reliable employee; that he was not involved with gangs or violent behavior; that he strived to better himself and assist others in their spiritual development while detained in Houston County; that he was a good inmate who did not cause trouble; that the bad influence of Baker filled a void in petitioner's life which opened up after he left behind the structure of school and the "presence of family members in his daily life"; that Baker "encouraged and prodded Mr. Benjamin to attempt the robbery"; that petitioner sought Baker's approval because throughout his life he repeatedly lost or was rejected by male authority figures; and that petitioner's rejection by his father in Louisiana set petitioner on the path to his rendezvous with Baker, who easily corrupted petitioner. (Doc. 1, ¶¶ 174–79).

Finally, petitioner alleges that the ACCA's finding that the mitigation evidence he submitted in Rule 32 proceedings was largely cumulative of the evidence presented at trial was unreasonable because, while the trial presentation "focused primarily on Mr. Benjamin's life through middle school[,]" the Rule 32

91

evidence "included people associated with Mr. Benjamin in his later years" who provided "new information" about petitioner's life closer-in-time to the murder of Mr. Lewis. (Doc. 1, ¶¶ 185–88).

### 2. The duty to investigate and present mitigating evidence.

"[I]t is well established that counsel's obligation to render competent performance includes 'a duty to make reasonable investigations' of potential mitigating evidence 'or to make a reasonable decision that makes particular investigations unnecessary.'" *Raheem v. GDCP Warden*, 995 F.3d 895, 909 (11th Cir. 2021) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). Where an attorney decides not to investigate certain mitigating evidence, or to curtail such investigation, that decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521–22 (quotation omitted). While the duty to investigate mitigating evidence "'does not necessarily require counsel to investigate every evidentiary lead[,]'" *Raheem*, 995 F.3d at 909 (quoting *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008)), the decision to forego further investigation of mitigating evidence is reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. In other words, a decision to limit the investigation of mitigation

evidence must be based on reasonable, informed judgment. In "assessing the reasonableness of an attorney's investigation," this court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Where the claim alleges counsel's failure to adequately investigate and present mitigating evidence, the prejudice inquiry under *Strickland* asks "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. A reviewing court applying *Strickland* to a claim of this type must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam) (quotation omitted).

### 3.   Counsel's presentation of mitigation evidence at trial.

As noted previously, the defense presented four witnesses during the penalty phase of Petitioner's trial: 1) Khrystyna Severson, petitioner's sister; 2) Elizabeth Gordon, a friend of petitioner's uncle who knew petitioner from a young age; 3)

Reverend Jones; and 4) Phillip Lester, a school counselor who knew petitioner while he lived in New Jersey with his uncle.   The testimonies of these witnesses are summarized below.

### a.   *Khrystyna Severson*

Severson told the jury about petitioner's reaction to his mother's death when he was a young boy. (Doc. 19-5 at 176).  Prior to his mother's death, petitioner was "always happy, running around, always had something to say.  Just full of energy." (*Id*. at 187).  Afterward, he would try to keep his emotions to himself, but she could hear him cry at night in his bedroom for several months. (*Id*. at 176, 181).  Petitioner was so devastated by his mother's death that he tried to climb in his mother's casket at the funeral. (*Id*. at 176).  After their mother's death, Khrystyna and petitioner lived with their maternal grandparents in Dothan.   (*Id*. at 176–77).   Their grandmother died two years after their mother.  (*Id*. at 177).  Then, two more years later, their grandfather died. (*Id*.).  At that point, Khrystyna and petitioner were sent to live with their maternal uncle, Hugh Jeffrey, Jr., in New Jersey.  (*Id*.).

According to Khrystyna, life in New Jersey was difficult.  She and petitioner had little day-to-day interaction with their uncle, as he mostly kept to himself except when doling out punishment. (Doc. 19-5 at 181–82).  As an example, she stated that she and petitioner got in trouble with their uncle for placing long distance calls back

to Dothan.  Once, petitioner took the blame for such a call that had been placed by Khrystyna and was "whooped" by Mr. Jeffrey as a result. (*Id.* at 178–79).  Khrystyna and petitioner were "whooped" two or three times a week with belts, switches, and the like. (*Id*. at 179).  Mr. Jeffrey also sometimes insulted the children, calling them "dumb," "stupid," and the like.  *Id*.  In addition, Mr. Jeffrey favored his son, Kamahne, who did not live with him in New Jersey, but who visited often.  Mr. Jeffrey lavished Kamahne with gifts and praise which he denied Khrystyna and petitioner. (*Id*. at 183).

After about a year of living in New Jersey, following a bad fight with her uncle, Khrystyna was sent back to Dothan, while petitioner continued living with Mr. Jeffrey in New Jersey. (Doc. 19-5 at 179–80).  She stated that she was about ten or eleven years old when Mr. Jeffrey bought her a Greyhound ticket, gave her twenty dollars, and sent her back to Dothan alone without alerting any family members in Dothan that she was returning. (*Id*. at 179).  Some time later, Khrystyna asked Mr. Jeffrey if she could return to New Jersey, but he refused, accusing her of being a bad influence on her brother. (*Id*. at 185).  Khrystyna did not see or speak with petitioner for about four or five years after she left New Jersey. (*Id*. at 183–85).

95

According to Khrystyna, petitioner was about fourteen to sixteen when Mr. Jeffrey died of a heart attack.[22]  (Doc. 19-5 at 186).  It was petitioner that discovered Mr. Jeffrey's body.  (*Id*. at 187).  After his uncle died, petitioner returned to Dothan and lived with a maternal aunt, Mary Turner.  (*Id*. at 188).  Khrystyna claimed that Ms. Turner collected petitioner's social security survivor's benefit checks and used them for her own ends, even to the point that petitioner could not get his seizure medication one month.  (*Id*. at 188–90).  Petitioner lived with his aunt for a few months before he moved in with Donald Doss.  (*Id*. at 190).

Khrystyna told the jury about her father's near total absence while she and petitioner were young.  She explained that neither she nor petitioner saw their father from the time their mother died until petitioner moved to Louisiana to live with his father after finishing high school.  (Doc. 19-5 at 192).  She stated that she would not know her father if he appeared in the courtroom.  (*Id*.).  She testified that, after completing high school, petitioner moved to the New Orleans area to try to reconnect with their father and establish residency in Louisiana so that he could attend college there with in-state tuition.  (*Id*.).  However, he and his father had a dispute after petitioner lost his job, so petitioner returned to Dothan.  (*Id*.).  After petitioner's arrest, Khrystyna contacted their father and told him "that he needed to be there for

---

[22] At this point, Mr. Jeffrey and petitioner had moved to the Atlanta area, where petitioner attended high school.

his child." (*Id*. at 192–93).  Mr. Benjamin never traveled to Dothan to visit petitioner and did not attend petitioner's trial.

Khrystyna testified that she trusted petitioner more than anyone and that he would often take the blame for things she did. (Doc. 19-5 at 184–85).  She had never known him to be violent. (*Id*. at 185).  After petitioner's arrest, he asked Khrystyna to write a letter to Mr. Lewis's family expressing his remorse for what he had done. (*Id*. at 191).  He also expressed his remorse to her in conversations. (*Id*.).  She never wrote the letter because she was told it was not a good idea. (*Id*.).

b.      *Elizabeth Gordon*

Gordon was a close friend of petitioner's uncle, Hugh Jeffrey, Jr., from high school in Dothan. (Doc. 19-6 at 23).  She reconnected with Mr. Jeffrey at the funeral of petitioner's mother. (*Id*. at 23–24).  She met petitioner at that funeral. (*Id*. at 24).  She too recollected that petitioner had tried to climb in his mother's casket at the funeral. (*Id*. at 24–25).

Gordon visited with petitioner and Mr. Jeffrey in New Jersey several times over the years.  On her first visit following the arrival of petitioner and his sister in New Jersey, she observed that they did not have adequate or appropriate clothing. (Doc. 19-6 at 25–26).  She bought boxes of clothing and shipped them to New Jersey from her home in Georgia. (*Id*. at 26–27).  She confirmed Khrystyna's testimony

97

that Mr. Jeffrey doted upon his son and did not allow petitioner to do things his son could do. (*Id*. at 31). As an example, she told the jury about an instance in which Mr. Jeffrey obtained three tickets to a New Jersey Nets basketball game and planned to take his son and petitioner to the game. (*Id*. at 32). Because Mr. Jeffrey's son wanted to bring his girlfriend, however, Mr. Jeffrey decided not to take petitioner to the game. (*Id*.).

Gordon confirmed Khrystyna's account of being sent away from New Jersey on a Greyhound bus, and that Mr. Jeffrey would often leave petitioner alone at the house in New Jersey, especially on the weekends. (Doc. 19-6 at 28). She told the jury that Mr. Jeffrey left Khrystyna and petitioner alone at the house on their first Thanksgiving in New Jersey while he went to visit friends in Delaware. (*Id*. at 31). In addition, she said Mr. Jeffrey beat petitioner for "sneaking candy and things like that," that he was not affectionate with petitioner, and that Mr. Jeffrey would sometimes insult petitioner's intelligence. (*Id*. at 29). Gordon described taking petitioner for a doctor's visit, at which the doctor said petitioner was malnourished based on the results of a blood test. (*Id*. at 37–38).

Gordon told the jury about an incident that occurred during one of her visits to New Jersey. When petitioner was about nine or ten, he experienced a sort of "trance" episode while working on a project in the school library. (Doc. 19-6 at 34).

98

He urinated on some papers and was not responsive when the librarian attempted to speak with him. (*Id*. at 34–35). The librarian contacted the police, who found petitioner walking down the street outside the school. (*Id*. at 35). Petitioner gave the police a fake name and told them he was homeless. (*Id*.). After they learned his name and address, they took him to Mr. Jeffrey's home. When Gordon asked petitioner why he told police he was homeless, he explained that he felt like he did not have anybody who cared for him. (*Id*. at 36). That night, Gordon told Mr. Jeffrey that he needed to contact the school librarian and principal to discuss the situation. (*Id*. at 37). Mr. Jeffrey refused and, instead, wanted to beat petitioner with a belt. (*Id*.). Gordon stood in the way and kept Mr. Jeffrey from beating petitioner. (*Id*.).

Gordon also told the jury about another incident in which she phoned petitioner one morning and found him in tears. (Doc. 19-6 at 30). She was so worried for him that she flew to New Jersey that evening to visit with him. (*Id*.). She said Mr. Jeffrey was "outraged" that she had come to visit petitioner without his knowing. (*Id*.). Gordon stated that she advised Mr. Jeffrey to get petitioner grief counseling, but that Mr. Jeffrey refused. (*Id*. at 38). Gordon considered reporting Mr. Jeffrey to the authorities over child abuse concerns but did not do so. (*Id*. at 33). She expressed feelings of guilt for not doing more to intervene on petitioner's behalf. She testified that she had wanted to adopt petitioner, but Mr. Jeffrey told her to leave

them alone. (*Id*. at 36). She was removed from petitioner's life by Mr. Jeffrey. She had no contact with petitioner when he lived in Georgia with his uncle, despite that she too lived in the Atlanta area at that time. (*Id*. at 51).

### c.      Reverend Robert Jones

Reverend Jones first met petitioner when petitioner moved to Dothan with his mother around the age of four or five. (Doc. 19-6 at 57). Petitioner attended North Highland Baptist with his mother and continued attending with his grandfather, who was a church deacon, after his mother's death. (*Id*.). He described petitioner as a nice, playful child who regularly attended church and caused no trouble before he moved to New Jersey. (*Id*. at 58). After petitioner returned to Dothan from New Jersey and Georgia, he was obviously more withdrawn. (*Id*. at 59). He would still attend North Highland Baptist, but Reverend Jones did not know if he attended with anyone. (*Id*. at 60).

Addressing some of petitioner's statements recorded in the Baker wire—such as his claim to have no conscience—Reverend Jones stated that, in his experience, young men often brag about things they have not done because of low self-esteem. (Doc. 19-6 at 62–63). He had not been around youth who bragged about killing people, however. (*Id*. at 63).

### d.      Phillip Lester

100

Mr. Lester was petitioner's guidance counselor during sixth and seventh grade in New Jersey. (Doc. 19-6 at 65). He also served as a student assistance counselor, in which he did "crisis counseling" for children referred to him. (*Id.*). He became involved with petitioner due to concerns about petitioner's poor academic performance. (*Id.* at 65–66). It appeared to Mr. Lester that petitioner was capable of doing well, but that something was "blocking him." (*Id.* at 66). He stated that petitioner was never a troublemaker, but he obviously was troubled by something. (*Id.*). When Mr. Lester asked petitioner about living with his uncle, petitioner broke down in tears. (*Id.* at 67). Petitioner felt that he could not talk with his uncle about his problems and that, if he did so, Mr. Jeffrey would insult him, call him stupid, and compare him unfavorably to his cousin. (*Id.* at 67–68). Petitioner missed seeing his sister and told Mr. Lester that his uncle forbade him to see her. (*Id.* at 68).

When Mr. Lester delicately approached Mr. Jeffrey to discuss petitioner's problems, Mr. Jeffrey "played it down." (Doc. 19-6 at 68–69). He said Mr. Jeffrey stated that he needed to instill discipline that petitioner had not received while living in Dothan. (*Id.* at 69). Mr. Jeffrey did not follow-up on Mr. Lester's recommendation that petitioner receive counseling for all the losses in his life. (*Id.* at 70). Like Gordon, Mr. Lester regretted not doing more on petitioner's behalf. (*Id.*). Like Reverend Jones, Mr. Lester confirmed his experience with children "who

lie to boast their ego." (*Id*. at 72–73).  He explained that someone who is "starving for love" and "starving to belong, wants to be accepted" will engage in such behavior.  (*Id*. at 73).  He believed that petitioner fit the profile of someone striving to be accepted.  (*Id*.).  He cited petitioner's frequent moves as a result of the loss of his caregivers and how the resulting "emotional instability" can lead to coping mechanisms like lying to peers in order "to feel belonging and to survive."  (*Id*.).

Mr. Lester also told the jury about his visit with petitioner while petitioner was detained awaiting trial.  (Doc. 19-6 at 86).  He expressed his firm belief that petitioner was "not a threat to society.  If anyone could be rehabilitated, it would be someone like Brandyn."  (*Id*. at 89–90).

### 4.    The state court's merits adjudication.

Petitioner presented his ineffective assistance claims respecting counsels' investigation and presentation of mitigation evidence in his Rule 32 petition. Following the evidentiary hearing, at which numerous witnesses testified respecting this claim, the Rule 32 court denied the claim.  (Doc. 19-19 at 5–9).  The ACCA affirmed in a reasoned decision.  As the last reasoned state court decision addressing this claim on the merits, this court reviews the ACCA's decision pursuant to AEDPA.

After reviewing the Rule 32 court's key findings respecting this claim, which

the ACCA stated were "supported by the record," the ACCA set out its findings of

fact respecting counsel's preparation for the penalty phase of trial:

> Crespi testified at the postconviction evidentiary hearing that he requested and was granted funds to hire a mitigation expert to investigate for the penalty phase and that he hired Cheryl Pettry in October 2002.  Crespi said:
>
>> "Ms. Pettry was to interview people who had potentially helpful evidence on the issue of penalty in this case, should there be a conviction of capital murder.
>> "She was to be part of the defense team in terms of discussion of trial strategy and the relationship between the guilt or innocence phase of the trial and the sentencing phase, if one should be necessary, and to develop some sort of timeline or narrative that would tie together the different forms of mitigating evidence that might turn up in the course of investigation."
>
> Pettry billed the State $10,004 for her services on Benjamin's case.
>
> Lane testified that Crespi did not inform her until one week before Benjamin's trial that she was going to be in charge of the penalty phase.  She said that she told Crespi that she could not prepare in one week, that she contacted Pettry and that Pettry was upset, that Pettry provided her with an affidavit to give the trial judge expressing her concern that she was not prepared, that she gave the affidavit to Judge White, that Judge White was upset and did not believe that Crespi was not prepared, that as a result of the affidavit he continued the penalty phase, and that the penalty phase was held on July 6, 2004, after the guilt phase had ended on May 27, 2004.  On cross-examination, however, Lane said that after examining her time sheet she realized that she did talk with several mitigation witnesses in 2001, that she did receive notes from Pettry one year before trial, and that Pettry conducted several interviews and copies of those interviews were provided to her. She also said:

"[Lane]: I did as much as I could from the time the trial ended. I really didn't have time to do anything prior to the trial starting.  But after the trial ended, I tried to subpoena medical records, school records.  And a lot of times, people would tell me, 'I need more time.'  They could not send it out as fast, you know, as I wanted it.  But I did get some records in. I got some school records, I think, from at least one school and maybe a portion of his medical records.

"I spoke to as many people as I could between that time.  I was unsuccessful in reaching some of the people.

". . . .

"Well, I wanted to basically let the jury know about B.J.'s life, the hard time that he had had growing up, how he had been sent from home to home, his mother dying, things of that nature.  That's what I wanted to present, you know, and whatever else I could.  His age, all the other factors.  That's what I wanted to present."

Pettry did not testify at the postconviction evidentiary hearing even though the circuit court went out of its way to continue proceedings to secure her testimony.  After the postconviction evidentiary hearing Benjamin attempted to introduce an affidavit executed by Pettry but the circuit court refused to allow that affidavit to be admitted.[]

*Benjamin*, 156 So. 3d at 447–48 (footnotes and record citations omitted).

The ACCA next made the following findings respecting counsel's presentation of evidence at the penalty phase:

At Benjamin's penalty phase, counsel presented the following witnesses in mitigation: Khrystyna Severson, Benjamin's sister; Elizabeth Gordon, a friend who had known Benjamin since he was six years old; Reverend Robert Jones, the pastor at North Highland Baptist Church, the church Benjamin attended when he lived in Dothan; and Phillip Lester, Benjamin's middle-school guidance counselor.[] The record also shows that detailed letters were written on Benjamin's

104

behalf to the circuit court by Willie Burks, a longtime friend of Benjamin's, and Roberta Grehl, one of Benjamin's middle-school teachers. These individuals asked that the circuit judge spare Benjamin's life.

Severson testified that Benjamin was her younger brother by one year, that their mother died when she was four years old and they moved in with their grandmother and grandfather, that their grandmother died in 1988 when Benjamin was 7 years old, that their grandfather died in 1990, that the two of them then moved to New Jersey to live with their uncle, that their uncle was strict and would spank them with a belt or belt buckles two or three times a week, that their uncle frequently called them stupid or idiots, that she and her uncle had a bad fight when she was 10 or 11 and that he put her on a bus to Dothan, that they had to make their own food at their uncle's house, that after she left New Jersey when she was 10 or 11 she did not see her brother until she was 16, that Benjamin was a good brother and to protect her he often would take the blame for things she did, that she asked her uncle if she could come back about one year after she left and he refused, that when Benjamin was about 14 or 15 their uncle had a heart attack and died, that Benjamin discovered his body, that after the uncle died Benjamin moved back to Dothan and lived with his aunt, that their aunt did not give Benjamin the money he needed for his medicine, that Benjamin stayed about 6 months and moved to live with another uncle, and that Benjamin was very remorseful for what had happened. She then testified:

> "[Defense counsel]: Did you make contact with your father regarding this case?
> "[Severson]: Yes,
> "[Defense counsel]: And what did you tell him?
> "[Severson]: I told him that he needed to be there for his child right now, and that it's not about him at this moment.
> "[Defense counsel]: What did he say?
> "[Severson]: He said, 'I understand what you're saying, and I'm going to try to come.'
> "[Defense counsel]: And was anything else discussed?
> "[Severson] I told him that he hasn't been there for him or

105

nothing like that, and that he should be trying to come down here for his case. You haven't been down here to visit him or anything.

"[Defense counsel]: And have you see him—

"[Severson]: No.

"[Defense counsel]:—since?

"[Severson]: Huh-uh.

"[Defense counsel]: Do you know if he is here today?

"[Severson]: No."

Gordon testified that she had known Benjamin since he was six years old, that his mother's death had a great impact on him, that at his mother's funeral Benjamin tried to get in the coffin with his mother, that she developed a relationship with Benjamin after his mother died, that over the years she tried to see that Benjamin and his sister were okay, that when the children lived with their uncle they did not have adequate clothes, that she had seen Benjamin's uncle beat Benjamin, and that their uncle paid little attention to Benjamin and his sister.

Reverend Jones testified that he met Benjamin when he was four years old, that his mother and then his grandparents brought him to church, that when he returned from New Jersey he was different and withdrawn, and that Benjamin actively participated in church activities.

Lester testified that he was Benjamin's guidance counselor when he was in the sixth and seventh grades, that Benjamin had a difficult time with his uncle, that Benjamin needed help, that Benjamin barely saw his uncle, that his uncle paid no attention to Benjamin, and that Benjamin made D's and F's in school.

*Benjamin*, 156 So. 3d at 448–49 (footnotes and record citation omitted).

The ACCA was required to consider the totality of the mitigating evidence, including all the "new" evidence petitioner presented at the Rule 32 evidentiary hearing, to properly assess whether his trial counsel were deficient in failing to

106

investigate and present mitigating evidence and whether he suffered prejudice due

to its absence.   To that end, the ACCA made the following findings respecting

petitioner's Rule 32 evidence:

> At the postconviction evidentiary hearing, counsel presented the following testimony that, he asserts, should have been presented in mitigation at the penalty phase of Benjamin's trial.
>
> Celestine Bullock, a friend of Benjamin's who lived across the street from Benjamin from 1990 to 1994 when he was living with his uncle, testified that she picked Benjamin up from school and that he frequently was around her children.  She said that Benjamin was nice, kind, and responsible, and that he was never a disciplinary problem.  She was shocked, she said, when she discovered he had been charged with committing capital murder.
>
> Geneva Pickett,[23] a friend of Benjamin's, testified that she had been a member of North Highland Baptist Church in Dothan for 40 years, that she met Benjamin when he first came to Dothan when he was a baby, that Benjamin's mother died in a car accident, that Benjamin was then sent to live with his grandparents, that Benjamin's grandmother then died, that Benjamin's grandfather also died, and that Benjamin was then sent to live in New Jersey with his uncle.  As a child, she said, Benjamin was sweet and mannerly.  Pickett testified that when Benjamin came back to live in Dothan with his aunt he joined the choir at the church.  She said that Benjamin had little supervision in his aunt's house.  She also read a letter that Benjamin had sent her from prison.
>
> Graylain Arnold, a friend of Benjamin's, testified that she went to high school with Benjamin, that they were good friends, that he had a lot of friends, that he was low key, that he never got into fights, that he had told her that he wanted to join the military when he graduated,

---

[23] Geneva Pickett is referred to as Geneva Cull in other portions of the state court record.

107

and that he could not join because of his seizures.[24]

Donald Doss, a friend of Benjamin's, testified that he grew up down the street from Benjamin in Dothan, that Benjamin lived with him during his senior year in high school, that when Benjamin was living with his aunt the household was a good house to grow up in, that the year Benjamin lived with him Benjamin got into no trouble, and that Benjamin was a nice and mannerly young man.

Norene Daniels, Benjamin's first cousin, testified that she lived in New Jersey when Benjamin lived there with his uncle. She said that Benjamin was a quiet, polite, and smart and that she was shocked when she heard that he was arrested.

Ozie Bigham, the owner and operator of a halfway house and prison ministry, testified that he befriended Benjamin when Benjamin was in the Houston County jail sometime in 2001. He testified that Benjamin experienced great remorse for what had happened, that Benjamin attempted to minister to other inmates, and that Benjamin cared about others.

Julian Bruce Adams, one of Benjamin's high-school teachers, testified that Benjamin was a student in his engineering-technology class in 1998 or 1999, that Benjamin was very quiet and introverted, and that Benjamin was very polite and obedient.

Wanda Emblom, a former teacher at Northview High School in Dothan, testified that Benjamin was one of her students in her biology class, that he was quiet and an average student, that he once had a epileptic seizure in her classroom, and that she was surprised to learn that Benjamin had been arrested.

Stuart Reese Corbitt, a friend of Benjamin's, testified about the various locations Benjamin had lived while growing up and that he talked to Crespi before trial but that Crespi never contacted him about

---

[24] The ACCA appears to have erred in using feminine pronouns in reference to Graylain Arnold. He was addressed as "Mr. Arnold" in his testimony at the evidentiary hearing. (Doc. 19-50 at 195).

testifying.

Willie Burks, a friend of Benjamin's, testified that he frequently saw Benjamin when he lived in New Jersey with his uncle, that Benjamin was a quiet, polite, and mannerly, that Benjamin's uncle was a disciplinarian, that his uncle was not abusive to Benjamin, that after his uncle died Benjamin moved back to Dothan, and that he was shocked to learn that Benjamin had been arrested.

Kamanhnee Jeffrey, Benjamin's cousin, testified that Benjamin came to live with her father in New Jersey, that she visited her father about three times a year, that when she was in New Jersey she and Benjamin spent a lot of time together, that Benjamin was a "good kid, well adjusted," that her father and Benjamin had a good relationship, and that she was shocked to learn that Benjamin had been arrested.[25]

Leslie Benjamin, Benjamin's father, testified that none of his 12 siblings had been contacted before Benjamin's trial, that he was contacted by Pettry and spoke to her [for] about 10 minutes [sometime] before his son's trial, and that neither Crespi nor Lane contacted him before Benjamin's trial.  He said that he married Benjamin's mother, Hilda Jeffrey, in 1978, that Khrystyna was born in 1979 and Benjamin was born in 1981, that Hilda got involved with drugs, that when Benjamin was about three or four he and his sister were sent to live with Leslie's sister, the children's aunt, that Hilda went and picked up the children and took them back to Dothan, that she died shortly after that in a car accident, that he had no contact with his children until after Benjamin had graduated high school, that after Benjamin graduated he moved in with him in New Orleans for about two or three years, that Benjamin did have a job while living with him, that after Benjamin lost his job he went back to Dothan, and that he learned from his daughter that Benjamin had been arrested for murdering Jimmie Lewis.

*Benjamin*, 156 So. 3d at 449–50.

---

[25] The ACCA appears to have erred in referring to Kamahne Jeffrey with feminine pronouns. Witnesses at trial, such as Ms. Gordon and petitioner's sister, described Kamahne as Mr. Jeffrey's son.

Based upon its review of this evidence, the ACCA first rejected petitioner's contention that counsel were ineffective for failing to present the testimony of his father in the penalty phase. The ACCA noted that Lane testified that she unsuccessfully tried to reach Mr. Benjamin before trial, but that Pettry's notes of her interview with Mr. Benjamin were available to trial counsel. *Benjamin*, 156 So. 3d at 450. The ACCA cited Eleventh Circuit authority which rejected a similar claim challenging trial counsel's failure to present the testimony of the defendant's father in mitigation because, in part, the defendant "had grown up apart from his father" and, consequently, the father's testimony "would not be helpful[.]" *Id*. at 451 (quoting *Williams v. Head*, 185 F.3d 1223 (11th Cir. 1999)).

As for petitioner's other witnesses, the ACCA found that, while petitioner presented considerably more witnesses at the Rule 32 evidentiary hearing, "this is not the standard for determining whether counsel's actions constitute ineffective assistance." *Benjamin*, 156 So. 3d at 452. Because "the testimony presented at the postconviction hearing was largely cumulative of testimony that had been presented on Benjamin's behalf at the penalty phase of his capital murder trial[,]" the ACCA reasoned, counsel could not have been deficient in failing to present such evidence and petitioner could not have been prejudiced by the failure to present "cumulative evidence. *Id*. at 453 (citation omitted). The ACCA concluded as follows:

110

In this case, the circuit court found one aggravating circumstance: that the murder was committed during the course of a robbery. The court found two statutory mitigating circumstances: that Benjamin did not have a significant history of prior criminal activity and that Benjamin was 19 years of age at the time of the murder. As nonstatutory mitigation, the circuit court found 20 different circumstances dealing with Benjamin's upbringing and his remorse for the murder.[26] We are confident that the omitted mitigation evidence, largely cumulative of evidence that had been presented, would have had no impact on the jury's verdict in the penalty phase. The circuit court correctly denied relief on this claim of ineffective assistance of counsel.

---

[26] To the extent the ACCA found in petitioner's Rule 32 appeal that the trial court "found 20 different circumstances" mitigating at sentencing, it appears to have mischaracterized the trial court's findings. While the defense at trial indeed argued that the evidence supported twenty non-statutory mitigating circumstances, the trial court found that only one did exist, while eighteen "did not" or "does not exist," and one was "not an appropriate mitigating circumstance. Doc. 19-6 at 190–92.

Even if the ACCA factually erred in characterizing the trial court's findings, such error does not warrant relief pursuant to § 2254(d)(2). When the ACCA was tasked with reviewing the sufficiency of the trial court's findings respecting non-statutory mitigating circumstances on direct appeal, it well understood the trial court's findings: it recited, verbatim, each of the trial court's twenty separate findings about the existence of non-statutory mitigating circumstances. *Benjamin*, 940 So. 2d at 386–87. Furthermore, the ACCA's error, if any, in the Rule 32 appeal was not important to its ultimate decision. *Pye*, 50 F.4th at 1036. The essential question before the ACCA in the Rule 32 appeal was not whether the trial court deemed a particular item of evidence a "mitigating circumstance." Rather, the issue before the ACCA at that time was whether the mitigating evidence petitioner presented during Rule 32 proceedings established that it is reasonably probable that he would not have received a sentence of death had counsel presented such evidence at trial. In order to resolve that inquiry, the ACCA was required to consider and weigh the totality of the mitigating evidence admitted at trial and in Rule 32. The ACCA's opinion, in which it recounted the substantive testimony of every witness presented at trial and in Rule 32, reflects that it plainly did so. Hence, the mitigating evidence was duly considered by the ACCA in the Rule 32 appeal even if it erred in how it characterized the trial court's findings about some of that evidence at sentencing.

This opinion will further discuss the trial court's findings respecting non-statutory mitigating circumstances in addressing Claim III.F, petitioner's claim that his sentence violates the Eighth Amendment. *See infra*, pp. 153–87.

*Id*.

> ### 5. The ACCA did not unreasonably apply *Strickland* and did not base its decision upon an unreasonable determination of fact.

Petitioner alleges three ways in which the ACCA unreasonably applied clearly established federal law or based its decision upon unreasonable determinations of fact. Specifically, he claims: 1) the ACCA's finding that trial counsel adequately investigated mitigation evidence unreasonably applied Supreme Court precedent (Doc. 1, ¶¶ 141–57); 2) the ACCA's finding that counsel adequately investigated and presented mitigation evidence was based upon an unreasonable determination of the facts because the ACCA "considered only the omission of [petitioner's father] as a mitigation witness" and failed to consider counsel's failure to interview and present the testimony of other witnesses (Doc. 1, ¶¶ 158–84); and 3) the ACCA's finding that petitioner was not prejudiced due to counsels' alleged inadequate investigation and presentation of mitigation evidence unreasonably applied Supreme Court precedent and was based upon an unreasonable determination of the facts (Doc. 1, ¶¶ 185–92).

*Strickland* establishes that a claim of ineffective assistance may be resolved on either prong of its test. *See* 467 U.S. at 697 (remarking, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the

112

inquiry if the defendant makes an insufficient showing on one"). "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id*. Here, this court need not assess whether the ACCA reasonably determined that petitioner's trial counsel did not perform deficiently because fairminded jurists can agree with the ACCA's determination that there was no reasonable probability that petitioner would not have been sentenced to death had counsel not performed deficiently.

Start with the ACCA's findings of fact. The ACCA meticulously reviewed the totality of the mitigating evidence, both that produced at trial and the Rule 32 evidentiary hearing. *See Benjamin*, 156 So. 3d at 448–50. Both the ACCA, and the Rule 32 court before it, summarized the testimonies of every witness who testified at trial and at the Rule 32 hearing, rendering factual findings about the substance of each witness's testimony. Petitioner does not allege or argue that the ACCA clearly and convincingly erred in any of its findings about what these trial and Rule 32 witnesses stated regarding mitigation. Rather, his only contention is that the ACCA "ignore[d] the facts laid out in the lower court's own summary" when it found that the Rule 32 evidence was "largely cumulative" of the trial evidence. (Doc. 1, ¶ 188). He insists the Rule 32 witnesses were not "cumulative" of the trial witnesses

113

because, while the trial witnesses "focused primarily on Mr. Benjamin's life through middle school[,] . . . the postconviction mitigation witnesses included people associated with Mr. Benjamin in his later years[.]" *Id.* Indeed, according to petitioner, it was his counsels' alleged failure to "include[] evidence describing Mr. Benjamin in the years just prior to the crime" that most acutely prejudiced petitioner. (Doc. 1, ¶ 186; *see also* doc. 57 at 54 ("Here, the mitigation evidence that Mr. Benjamin's trial counsel failed to discover and present paints a vastly different picture of his life circumstances leading up to the shooting than was presented at trial.")).

"'[N]o prejudice can result from the exclusion of cumulative evidence.'" *Raheem*, 995 F.3d at 925 (quoting *Dallas v. Warden*, 964 F.3d 1285, 1310 (11th Cir. 2020)). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Holsey v. Warden*, 694 F.3d 1230, 1260–61 (11th Cir. 2012). The question, therefore, is whether the ACCA reasonably determined that petitioner's postconviction evidence was "largely cumulative of testimony that had been presented on Benjamin's behalf at the penalty phase of his capital murder trial." *Benjamin*, 156 So. 3d at 453.

114

It is undeniable that trial counsel presented in the penalty phase of trial evidence that petitioner faced significant instability in his life.  Most pertinently, petitioner suffered a series of tragedies, as his mother, his grandparents, and then his uncle all died while serving as his primary caregivers.  He attended school in at least three states as he shuffled between caregivers.  After all this death, he ended up back in Dothan living with his Aunt Mary and then a family friend, Donald Doss, whom his sister likened to an uncle, while completing high school.  His father was not present in his life until a brief period after he finished high school.  His primary caregiver during his most formative years, his uncle, Mr. Hugh Jeffrey, Jr., was a stern disciplinarian who mostly kept to himself and, while he provided a roof over petitioner's head, witnesses explained that he did not provide petitioner with emotional support.  Petitioner was not afforded grief counseling or other interventions that his school crisis counselor, Mr. Lester, and Ms. Gordon, a schoolteacher who spent much time with petitioner, both surmised that he needed.  Petitioner also struggled with a seizure disorder that required medication for treatment.

Counsel further presented evidence that, notwithstanding these many hardships, petitioner completed high school, attended church, where he sang in the choir, moved to Louisiana after high school in an attempt to forge a relationship with

115

his father, and had aspirations of going to college.  Counsel also presented witnesses who testified that petitioner was not a troublemaker, that he stood up for his sister and sometimes took the fall for her actions, that he was not violent and would not pose a threat to others, that he was remorseful for what happened to Mr. Lewis, that he likely lied and embellished his past in an effort to pose and "fit-in" with the likes of Baker, and that he was uniquely amenable to being rehabilitated.

As noted above, petitioner's attack on the ACCA's "largely cumulative" finding centers on his assertion that the witnesses who testified at the Rule 32 hearing "paint[ed] a vastly different picture of his life circumstances leading up to the shooting than what was presented at trial.  The evidence would have provided context for Mr. Benjamin falling under Mr. Baker's negative influence and would have rebutted the prosecutor's attempt to cast Mr. Benjamin as an 'evil heart' killer." (Doc. 57 at 54).  In his updated brief, he specifically identifies three witnesses who would have testified about his "life in the time preceding the shooting": 1) his father, Leslie Benjamin; 2) Donald Doss, with whom he lived when he finished high school and, later, at the time of the murder of Mr. Lewis; and 3) his high school friend, Graylain Arnold. (*Id.* at 49).  Close review of these witnesses' testimonies, however, fails to reveal substantial and material "new" information that would render the ACCA's "largely cumulative" finding unreasonable.

116

Petitioner claims his father, Leslie Benjamin, "would have offered perhaps the most critical social and emotional history for Mr. Benjamin, including during the period leading up to the shooting that was entirely omitted from the mitigation presentation." (Doc. 57 at 49). But his support for his sweeping claim about the import of Leslie Benjamin's testimony is lacking. He asserts as follows:

> [Leslie Benjamin] would have testified that [petitioner] came to live with him after he graduated from high school (less than a year before the shooting), and that during that time [petitioner] was "quiet," non-violent, and had a stable job and future plans. Most critically, [petitioner's] father would have testified about several setbacks [petitioner] experienced during this time, including losing his job; his rejection from the military due to his seizure disorder; and the falling out between Mr. Benjamin and his father, which precipitated [petitioner's] return to Dothan.

(*Id*. (record citations omitted)).

There is some irony in petitioner's positing that Leslie Benjamin "would have offered perhaps the most critical social and emotional history" about petitioner's life considering that the trial evidence, especially the testimony of petitioner's sister, persuasively showed that Leslie Benjamin had essentially nothing to do with petitioner as he was moving around the country to live with caregivers other than his father. Petitioner's sister testified to profound effect that, prior to petitioner moving to Louisiana after high school, neither she nor her brother had seen their father since their mother died, and that she would not know him if he walked in the courtroom

117

at that moment.  (Doc. 19-5 at 192).[27]  She also testified that she reached out to Leslie

Benjamin about supporting petitioner during his trial, to no avail:

> Q    Did you make contact with your father regarding this case?
> A    Yes.
> Q    And what did you tell him?
> A    I told him that he needed to be there for his child right now, and that it's not about him at this moment.
> Q    What did he say?
> A    He said, I understand what you're saying, and I'm going to try to come.
> Q    And was anything else discussed?
> A    I told him that he hasn't been there for him or nothing like that, and that he should be trying to come down here for this case. You haven't been down here to visit him or anything.
> Q    And have you seen him --
> A    No.
> Q    --since?
> A    Huh-uh.
> Q    Do you know if he is here today?
> A    No.

(Doc. 19-5 at 192–93).  The notion that Leslie Benjamin could have provided much

in the way of a "critical social and emotional history" of petitioner is belied by the

record.

In any event, petitioner's jury was informed through other witnesses of the

essential points about which he asserts Leslie Benjamin would have testified.  The

---

[27] Khrystyna's testimony about her father's absence was no embellishment and was not the product of grievance.  Leslie Benjamin confirmed in his Rule 32 testimony that he had no contact with his children from their mother's funeral, when they were small children, until Khrystyna found him on the internet, and she and petitioner cold-called him after petitioner graduated high school. (Doc. 19-51 at 185–86).

118

jury knew that petitioner had moved to Louisiana to live with his father, that he had been employed during some of that time, that he hoped to establish residency so that he could go to college there, and that, after he lost his job, he and his father "had it out about something" before he moved back to Dothan. (Doc. 19-5 at 192).[28]  While Leslie Benjamin's Rule 32 testimony included a few additional details, such as the benefits petitioner enjoyed at his job in Louisiana and how he interacted with his family members in Louisiana, it is clear the jury was informed of the essential points of Leslie Benjamin's testimony.

Likewise, the jury was informed of the essential points of Donald Doss's Rule 32 testimony.  Petitioner asserts Doss would have told the jury that he "moved to New Orleans after high school to 'try and have a relationship with his father.'" (Doc. 57 at 49).  As discussed above, however, the jury was aware of this fact.  More importantly, petitioner asserts, Doss "would have testified about [petitioner's] life following his return to Dothan, including that Mr. Doss had concerns about Michael Eric Baker's negative influence on [petitioner] given their substantial age difference

---

[28] Leslie Benjamin's testimony about the substance of his dispute with petitioner would not have burnished petitioner's mitigation case.  He explained that, after he belatedly learned that petitioner lost his job, he told petitioner that he would have to find a new job and that he would have a midnight curfew. (Doc. 19-51 at 192).  Petitioner apparently decided to return to Dothan rather than live with his father under those conditions.

119

(10 years) and that Mr. Baker encouraged and prodded [petitioner] to attempt the robbery." (*Id.*).

The jury knew that petitioner lived with Doss both during high school and after he returned to Dothan following his time in Louisiana, including at the time of his arrest. (Doc. 19-5 at 190). The jury also knew that Baker was involved with drugs and had felony convictions and pending charges, and that, therefore, he was potentially a negative influence on the younger petitioner.[29] While the jury may not have known that Doss worried specifically about Baker's potential negative influence on petitioner, there was ample evidence in the record from which the jury could infer such influence or, minimally, that petitioner sought to impress and earn the approval of Baker.

On the Baker wire recording, Baker alluded to a previous conversation in which petitioner apparently stated that he had killed people in New Orleans. (Doc. 19-47 at 183). Petitioner's reply was that he had no conscience about such things. (*Id.*). Through Reverend Jones and Mr. Lester—men with extensive professional experience dealing with the false bravado of young men—the defense obtained testimony in the penalty phase about how young men sometimes lie due to low self-esteem or to cope with instability and attempt to fit-in with peer groups. Doss's

---

[29] Recall that, during voir dire, prosecutors sought to identify jurors who responded negatively to the State's cooperation with Baker.

specific testimony that he worried that Baker was a bad influence adds little to this milieu of testimony about Baker and his relationship with petitioner.

Finally, petitioner does not provide any record support for his contention that Doss would have testified that "Baker encouraged and prodded Mr. Benjamin to attempt the robbery." (Doc. 57 at 49). Doss's testimony was simply that he told petitioner that "if he kept messing with [Baker], based on what I've heard and some of the things that I know, he was going to wind up getting in trouble with [Baker]." (Doc. 19-51 at 24–25). None of the testimony cited by petitioner establishes Doss's belief that Baker specifically "encouraged and prodded" petitioner to commit the robbery, and petitioner cites no other evidence in the record establishing that Baker did so.

Distinct from petitioner's contentions about Doss's testimony, what is most striking about Doss's Rule 32 testimony is not the light it sheds on Baker but, rather, how much it centers and reiterates the mitigation case trial counsel presented in the penalty phase of petitioner's trial. At the Rule 32 hearing, the following exchange occurred:

> Q. Why did B. J. move in with you when he was in high school?
> Were there other people he could have moved in with?
> A. Yes.
> Q. Why did you take him?
> A. Because I had known him all his life, and I refused to have him out the door.

121

Q.      You know, when we were talking in the hallway earlier, you had
        said -- you said to me that if I could live one day in Mr. Brandyn's
        shoes, I would know what it's like.  Remember telling me that a
        few minutes ago?
. . .
Q.      Mr. Doss, what did you mean by that when you said that?
A.      Brandyn has been bounced around all of his young adult life.  His
        mother died.  Two, three years later, his grandmomma, who
        loved him, died.  Five, six years after that, his grandfather died.
        Then he was bounced to New Jersey with Hugh.  Then he moved
        to Atlanta.  When he got to Atlanta, at 17, 16, he found Junior
        dead in the bed.  Then, all of a sudden, here we come with Mary
        and her drama.  And like I said, all you have to do is just be one
        day.  I'm not saying that -- I just don't understand -- I don't
        understand where he was coming from.  You know.

(Doc. 19-51 at 30–31).  Doss's poignant description of the instability petitioner

experienced throughout his life echoes the exact mitigation case counsel presented

at the penalty phase of petitioner's trial.

The final witness highlighted in petitioner's brief whose omission resulted in

the jury failing to learn about his "life in the time preceding the shooting" is his high

school friend, Graylain Arnold, who "would have testified about [petitioner's] post-

graduation plans to join the military and get further education[,]" as well as

petitioner's "rejection from the military due to his seizure disorder." (Doc. 57 at 49–

50).  While the jury was not informed of any specific military rejection petitioner

might have received due to a seizure disorder, the jury was certainly informed of his

seizure disorder, including that he was required to take medicine daily for the

122

condition.  (Doc. 19-5 at 190; doc. 19-6 at 34, 38).  Likewise, as discussed above, the jury was informed about petitioner's hopes to further his education when he moved to Louisiana.  Arnold's testimony therefore would not have added significant new and material information to what was presented to the jury.

Ultimately, petitioner discounts the extent to which the trial evidence supports the mitigation case he claims should have been presented, and he overstates the extent to which the Rule 32 evidence he presented enhances that case.[30]  The Rule 32 evidence does not, as petitioner asserts, "paint[] a vastly different picture of his life circumstances leading up to the shooting than what was presented at trial."  (Doc. 57 at 54).[31]  Rather, at best, most of the Rule 32 evidence simply told "a more

---

[30] While petitioner's brief draws specific attention to the Rule 32 testimonies of Leslie Benjamin, Donald Doss, and Graylain Arnold in attempting to demonstrate prejudice, the petition cites as additional witnesses Ozie Bigham and Wanda Emblom.  (Doc. 1, ¶ 188).  These additional witnesses, however, do not appreciably advance petitioner's theory that he was prejudiced by trial counsel's failure to explain the circumstances of his life just prior to the murder of Mr. Lewis.  Mr. Bigham, "a  prison minister who encountered Mr. Benjamin after his arrest," *id*., plainly could offer no testimony about what was going on in petitioner's life prior to his arrest.  Ms. Emblom's testimony was limited in that area as well.  She testified that petitioner was a "quiet" and "average" student who was not violent and did not cause disciplinary problems, but that he "had epilepsy and had a grand mal seizure in [her] classroom" (Doc. 19-51 at 113–14).  The petition also includes a summary checklist of "new information" that was offered in Rule 32, with entries including, *inter alia*, that petitioner was quiet, nonviolent, attended church and sang in the choir, completed high school, did not cause trouble, relocated to "New Orleans to go to college and to get to know his father," was employed in New Orleans, was exposed to Baker while living with Doss, and was remorseful.  (Doc. 1, ¶ 188).  As detailed in this opinion, however, most of this information simply was not "new" even if it was presented with more or better examples and in greater detail at the Rule 32 hearing.

[31] In fact, several of the witnesses petitioner presented at the Rule 32 evidentiary hearing testified about his years in New Jersey—the time petitioner faults his trial counsel for focusing on in their

123

detailed version of the same story told at trial or provide[d] more or better examples or amplifie[d] the themes presented to the jury." *Holsey*, 694 F.3d at 1260–61. Accordingly, the ACCA's "largely cumulative" finding is reasonable because "[m]uch (although not all) of the 'new' testimony introduced [in Rule 32 proceedings] would simply have amplified the themes already raised at trial[.]" *Boyd v. Allen*, 592 F.3d 1274, 1298 (11th Cir. 2010). While some of petitioner's Rule 32 witnesses may have "presented more details or different examples of the[] unfortunate aspects of [his] life, these aspects were nonetheless known to the sentencing jury and judge. Thus, no significant prejudice can result from the exclusion of cumulative evidence, meaning [petitioner's] counsel's failure to present cumulative evidence was not prejudicial." *Ferguson*, 69 F.4th at 1261; *see also Guardado v. Sec'y, Fla. Dep't of Corr.*, 112 F. 4th 958, 985–86 (11th Cir. 2024) (affirming under AEDPA the state appellate court's conclusion that the habeas petitioner could not establish *Strickland* prejudice because much of his postconviction evidence was cumulative of his penalty phase evidence).

If the ACCA did not unreasonably determine the facts when it assessed the totality of the mitigating evidence and found petitioner's postconviction mitigation evidence to be "largely cumulative" of the trial evidence, the remaining question is

---

presentation—rather than the time preceding the murder of Mr. Lewis. These witnesses included Celestine Bullock, Norene Daniels, Willie Burks, and Kamahne Jeffrey.

whether, pursuant to § 2254(d)(1), the ACCA's decision that petitioner failed to show prejudice under *Strickland* unreasonably applied clearly established federal law. The petition repeatedly cites the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000), in support of petitioner's claim that the ACCA in fact did so. (Doc. 1, ¶¶ 185, 189, 192). *Williams*, however, is easily distinguishable.

After Terry Williams was convicted of robbery and capital murder for killing a gentleman with a "mattock" in order to rob him of money, the prosecution at his sentencing hearing adduced substantial evidence of Williams's other violent conduct, including "two auto thefts and two separate violent assaults of elderly victims perpetrated after" the murder for which he had been convicted. 529 U.S. at 368. In one attack, he had "started a fire outside one victim's residence before attacking and robbing him." *Id*. In the other, he "had brutally assaulted an elderly woman" who was left "in a 'vegetative state' and not expected to recover." *Id*. "Two expert witnesses employed by the State testified that there was a 'high probability' that Williams would pose a serious continuing threat to society." *Id*. at 368–69.

In the face of this highly aggravating evidence, Williams's trial counsel at the sentencing hearing presented "the testimony of Williams' mother, two neighbors, and a taped excerpt from a statement by a psychiatrist." 529 U.S. at 369. "The three [lay] witnesses briefly described Williams as a "nice boy" and not a violent person.

125

The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone." *Id*. "The jury found a probability of future dangerousness and unanimously fixed Williams' punishment at death." *Id*. at 370. The trial court imposed the sentence and the Virginia Supreme Court affirmed. *Id*.

In subsequent state habeas corpus proceedings, Williams presented substantial mitigating evidence his trial counsel failed to investigate and present, including social services records "that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." 529 U.S. at 370.[32] Williams even demonstrated that the two State experts who opined about his future dangerousness at trial "believed that Williams,

---

[32] The Supreme Court found that the mitigation evidence Williams's trial counsel failed to present included the following:

> that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

529 U.S. at 395 (footnote omitted).

if kept in a 'structured environment,' would not pose a future danger to society." *Id*. at 370–71.

The Supreme Court held that the totality of the mitigating evidence established prejudice because "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id*. at 398 (citation omitted). The Court explained why it is reasonably probable that Williams might have received a different sentence had this evidence been presented at his trial:

> The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.

*Id*. Because the Virginia Supreme Court "did not entertain that possibility," it unreasonably applied *Strickland* when it rejected Williams's ineffective assistance claim in state habeas corpus proceedings. *Id*.

The ACCA plainly did not unreasonably apply *Williams* in finding that petitioner failed to establish prejudice. Williams's trial counsel did little more than offer lay witness testimony that Williams was "nice" and was not violent. Williams's jury, of course, was presented with highly aggravating evidence that Williams indeed was violent, including his murder of one victim with a mattock and

127

two brutal assaults on elderly victims occurring after the murder. Counsel wholly failed to present substantial evidence potentially bearing on Williams's moral culpability for these actions, including his own lifetime of severe abuse and privation and his borderline intellectual disability. And the Virginia Supreme Court failed to consider whether it is reasonably probable that this evidence could have altered the jury's sentencing verdict even if it did not "undermine or rebut the prosecution's death-eligibility case." 529 U.S. at 398.

Here, by contrast, trial counsel effectively informed the jury of many hardships petitioner faced in his life, how he endured those hardships and tried to make a better life for himself, and how he had expressed remorse for what happened to Mr. Lewis. To be sure, there was still more that could have been done, but that is not the rule of *Williams*. Trial counsel did not, as in *Williams*, wholly fail to present substantial, highly relevant evidence about their client's background and moral culpability. Also unlike in *Williams*, here the ACCA reviewed the totality of the mitigating evidence and determined that petitioner did not present in the Rule 32 proceedings such additional evidence that it is reasonably probable that the jury would have reached a different sentencing verdict had it been presented at trial. Fairminded jurists can agree with that assessment. Accordingly, the ACCA did not unreasonably apply *Williams*.

The same can be said of other cases in which the Supreme Court has held that the failure to present mitigation evidence at trial resulted in prejudice. In *Wiggins v. Smith*, for example, Wiggins's attorneys advised the jury that they would be presenting evidence about Wiggins's difficult life, but then "introduced no evidence of Wiggins' life history." 539 U.S. at 515. This failure to follow through with their assurances to the jury was especially damaging considering the extensive mitigation evidence that was available. The Supreme Court summarized this evidence as follows:

> [Wiggins's] mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, . . . [and] the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id*. at 517 (record citations omitted). That Wiggins's counsel promised to deliver mitigating evidence about Wiggins's life but then wholly failed to deliver any of the abundant, compelling evidence that was available, explains the Court's conclusion

129

that Wiggins was prejudiced: "Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions.  Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id*. at 537.[33]

As set forth above, it simply cannot be said that petitioner's jury and the sentencing judge were similarly deprived.  Counsel presented considerable evidence about the instability and hardships faced by petitioner and his efforts to overcome those hardships.  Again, while petitioner has demonstrated that there was still more to present in support of those themes, he falls far short of demonstrating the uniquely prejudicial effect of attorneys who presented nothing where copious "powerful" evidence was available, as the Supreme Court confronted in *Wiggins*.

Beyond *Williams* and *Wiggins*, other Supreme Court decisions similarly impose a high threshold for a showing of prejudice.  *See,e.g*., *Rompilla v. Beard*, 545 U.S. 374, 392–93 (2005) (counsel failed to discover and present evidence of extreme parental abuse, including regular beatings, being locked in a "wire mesh dog pen

---

[33] The Supreme Court's prejudice analysis in *Wiggins*, unlike here, was not "circumscribed" by AEDPA.  *See* 539 U.S. at 534.  As such, *Wiggins* provides "no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking." *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (emphasis in original).  *See, e.g*., *Gavin v. Comm'r, Ala. Dep't of Corr*., 40 F.4th 1247, 1269 (11th Cir. 2022).

that was filthy and excrement filled," denial of basic needs like shelter and clothing, the effects on Rompilla of fetal alcohol syndrome, and that "Rompilla's IQ was in the mentally retarded range"); and *Porter v. McCollum*, 558 U.S. 30, 33–42 (2009) (counsel failed to investigate and present evidence about Porter's uniquely mitigating "heroic military service in two of the most critical—and horrific—battles in the Korean War," regular beatings by his father, an incident where his father attempted to shoot Porter, and evidence of organic brain damage and diminished capacity).

Upon review of these decisions, it is evident the ACCA did not unreasonably apply clearly established federal law in its own findings about petitioner's failure to establish prejudice. In short, the evidence petitioner presented to establish prejudice at the Rule 32 evidentiary hearing falls far short of the threshold for a showing of prejudice established by the Supreme Court. The ACCA had before it all the evidence produced by petitioner in the Rule 32 proceedings, it compared that evidence to that which was presented at trial, and it reweighed all such mitigating evidence against the aggravating evidence introduced at trial. As set forth above, the ACCA *reasonably* determined that petitioner's "new" mitigating evidence was "largely cumulative" of the trial evidence and that the aggravating evidence outweighed the totality of the mitigating evidence. Fairminded jurists can agree with

131

those assessments.  Thus, in concluding that petitioner was not prejudiced by his counsel's investigation and presentation of mitigating evidence at trial, the ACCA did not unreasonably apply *Strickland* and it did not base its decision on an unreasonable determination of the facts.  Accordingly, petitioner is not entitled to relief on Claim I.D, and such claim is due to be denied.

### E.    Trial Counsel Failed to Object to Repeated and Egregious Prosecutorial Misconduct (Claim III.E).

Petitioner claims his counsel was ineffective in failing to object to instances of prosecutorial misconduct throughout his trial.  He alleges Valeska engaged in objectionable misconduct when he "vouched for the integrity of the State's investigation, including its deal with informant Michael Eric Baker"; "elicited the lead investigator to express an opinion that Mr. Benjamin was guilty"; "urged the jury to consider non-statutory aggravating factors, including victim impact"; presented arguments calculated to inflame the passions of the jury"; "argued facts not in evidence"; "made statements recounting other events that were unsupported by the evidence in the record and represented the prosecutor's speculations about Mr. Benjamin's actions"; "used victim impact evidence during the guilt-innocence phase of the trial"; and "misled the jury as to the law and the jury's responsibility." (Doc. 1, ¶ 193 (record citations omitted)).

In addition, petitioner claims his trial counsel was ineffective for failing to object to the prosecution's suppression of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  (Doc. 1, ¶¶ 275–81).  Specifically, he alleges prosecutors withheld the complete recording and transcript of the Baker wire recording, which, he asserts, "was material as to punishment because it contradicts Mr. Valeska's repeated and improper assertions that Mr. Benjamin 'bragged and laughed about' the shooting to Michael Eric Baker." (Doc. 1, ¶ 277).  He asserts that, because Crespi "failed to investigate the tape, he failed to discover that the transcript was grossly inaccurate or that the tape had an additional 37 minutes of dialogue between Mr. Benjamin and Mr. Baker."  (Doc. 1, ¶ 281).

Respondent argues that these IAC claims are procedurally defaulted and, therefore, are barred from federal habeas corpus review.  (Doc. 29 at ¶¶ 55–56).  Alternatively, respondent asserts that, to the extent the state courts adjudicated these claims on their merits, that decision survives review under § 2254(d)(1) and (2).  (*Id*.).

### 1.    State Court Proceedings

Petitioner presented this IAC claim in his amended Rule 32 petition.  (Doc. 19-11 at 201–Doc. 19-12 at 39).  Following the evidentiary hearing, the Rule 32 court denied the claim on the merits in a detailed written order.  (Doc. 19-18 at 190–

Doc. 19-19 at 4).  Except for petitioner's *Brady*-IAC subclaim,[34] the Rule 32 court

made extensive findings of fact about petitioner's prosecutorial misconduct-IAC

claims, carefully reviewing each allegation of prosecutorial misconduct by

examining the trial transcript and assessing counsel's alleged error in the full context

of the trial.

> Based upon this review of the transcript, the Rule 32 court found as follows:

> The Defendant asks this Court to grant the Rule 32 petition on this ground by isolating statements of the prosecutor and labeling it as "prosecutorial misconduct."  This Court does not view every question or argument that is sustained, or could have sustained, by an objection to be a case of "misconduct."  There is an ocean of difference between objectionable statements and questions and misconduct by a lawyer. This Court has carefully reviewed the transcript as well and finds that the statements cited by the Defendant and attributed to the prosecutor did not infect the trial with unfairness to the degree that the Defendant was deprived of a constitutionally fair trial.  The overwhelming majority of quotations concern the prosecutor's arguments and most were unobjectionable because they are a reply in kind, valid appeals to justice and permissible commentary on the evidence and the drawing of legitimate inferences consistent with the State's theory or attempt to rebut the Defendant's theory.

---

[34] It does not appear that the Rule 32 court specifically addressed petitioner's *Brady*-IAC subclaim in the portion of its order disposing of the remaining prosecutorial misconduct-IAC claims.  Citing Rule 32.9(d) of the Alabama Rules of Criminal Procedure, however, the Rule 32 court's order explained that "[a]ny other issue raised by the Defendant in his Rule 32 petition or amendments not addressed by this Order is deemed denied for failure to submit evidence during the [Rule 32 evidentiary hearing]."  (Doc. 19-19 at 28).  Petitioner does not point to any evidence adduced at the Rule 32 evidentiary hearing bearing on his *Brady*-IAC subclaim.  Accordingly, this court concludes that the Rule 32 court denied the *Brady*-IAC subclaim on its merits for lack of proof of the claim.

(Doc. 19-18 at 192).  Even if some prosecutorial comments or statements were objectionable, the Rule 32 court reasoned, "Defendant failed to establish that the cumulative effect when viewing the entire record proves prosecutorial misconduct." (*Id*.).  Hence, the Rule 32 court concluded, "there is no evidence that the outcome would have been different if the quoted statements did not occur or if Mr. Crespi had objected." (*Id*.).

Petitioner appealed the Rule 32 court's order denying this claim to the ACCA. His brief on this claim was approximately 1.5 pages, consisting almost entirely of eight bullet points broadly describing the general kinds of alleged prosecutorial misconduct to which his counsel should have objected.  None of the alleged prosecutorial misconduct was specifically described in the appellate brief.  Rather, the brief included approximately forty trial transcript citations pointing the ACCA to specific instances of alleged misconduct, "as detailed in the Amended Petition[.]" (Doc. 19-52 at 152–53).[35]  His argument in support of his claim of lower court error, in its entirety, was as follows:

> Mr. Crespi's failure to object to this repeated misconduct was unreasonable.  It fell beneath the prevailing norm for performance of Alabama criminal defense counsel in Alabama cases.  Worse, Mr. Crespi failed to preserve these objections on appeal, and created the impression that the prosecutor's antics were appropriate.

---

[35] Petitioner did not include the prosecution's alleged suppression of exculpatory evidence among the claims of prosecutorial misconduct he identified in his appellate brief.

The Circuit Court's conclusion that this conduct was not improper, and that Mr. Crespi's inaction was reasonable, was erroneous and should be reversed.

(*Id*. at 153).  The appellate brief cited no authority—whether pertaining to alleged prosecutorial misconduct or ineffective assistance of counsel—to demonstrate how the Rule 32 court erred in denying petitioner's prosecutorial misconduct-IAC claims. Furthermore, while the appellate brief nominally appeared to challenge the Rule 32 court's findings about trial counsel's deficient performance, it made no charge of error, or supporting argument, respecting the Rule 32 court's conclusion that petitioner failed to show prejudice under *Strickland*.

The ACCA determined that petitioner's appellate brief was inadequate pursuant to state procedural rules:

> Benjamin next argues that the circuit court erred in denying his claim that his trial counsel was ineffective for failing to object to various prosecutorial arguments.  In this section of Benjamin's brief, he makes no specific argument concerning any of the eight contentions, he merely cites a laundry list of claims in a two-page argument and various page numbers from the record.

> The State asserts in its brief that this section of Benjamin's brief fails to comply with the requirements of Rule 28(a)(10), Ala. R. App. P., because it fails to contain any specific argument in regard to any of the eight identified claims.

>> "'It is not the job of the appellate courts to do a party's legal research. . . . Nor is it the function of the appellate courts to "make and address legal arguments for a party based on undelineated general propositions not supported by sufficient

136

authority or argument." *Pileri Ind., Inc. v. Consolidated Ind.*, Inc., 740 So. 2d 1108, 1110 (Ala. Civ. App. 1999), quoting *Dykes v. Lane Trucking, Inc.*, 652 So. 2d 248, 251 (Ala. 1994). Because Jennings has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that the he has failed to comply with Rule 28(a)(10) and that this issue is therefore, deemed to be waived."

*Jennings v. State*, 965 So. 2d 1112, 1136 (Ala. Crim. App. 2006). We agree that this section of Benjamin's brief fails to comply with the briefing requirements of Rule 28(a)(10), Ala. R. App. P.

*Benjamin*, 156 So. 3d at 453–54.

The ACCA further held that, "even if Benjamin's brief on this issue complied with Rule 28(a)(10), Ala. R. App. P., we would find that this claim has no merit."

*Benjamin*, 156 So. 3d at 454. The ACCA explained as follows:

This Court has carefully reviewed the challenged arguments. We agree with the circuit court that no argument so infected the trial with unfairness that Benjamin was denied due process. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." *Lee v. State*, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009).

*Id*.

### 2.    Respondent's Procedural Defense

Respondent asserts that petitioner's prosecutorial misconduct-IAC claim, including all subparts or subclaims excepting the *Brady*-IAC misconduct claim, is "procedurally defaulted from this Court's review because it was dismissed under an independent and adequate state procedural rule[,]" namely, Rule 28(a)(10) of the

137

Alabama Rules of Appellate Procedure. (Doc. 29, ¶ 55). Further, respondent asserts the *Brady*-IAC subclaim is procedurally defaulted because petitioner "abandoned this claim by failing to raise it on collateral appeal." (*Id*., ¶ 56). "Because Benjamin did not present this claim to the [ACCA] or to the Alabama Supreme Court (in a petition for writ of certiorari), Benjamin failed to avail himself of all available state remedies that are a part of normal appellate procedure in Alabama." (*Id*. (citation omitted)). Thus, respondent maintains, petitioner failed to exhaust the claim in the state courts "and he is procedurally barred from raising this claim in a federal habeas petition." (*Id*. (citation omitted)). Furthermore, because Alabama law precludes petitioner from raising and exhausting the claim in the state court at this time, the "claim is procedurally defaulted from habeas review." (*Id*.).

### 3. This Claim, Including All Subparts or Subclaims, is Procedurally Defaulted.

#### a. The adequacy and independence of Rule 28(a)(10).

Rule 28 of the Alabama Rules of Appellate Procedure is the state analogue to Rule 28 of the Federal Rules of Appellate Procedure and, like the federal rule, it governs the parties' briefing in Alabama's state appellate courts. The provision at issue here, Rule 28(a)(10), requires that the appellant's brief include an "Argument" section "containing the contentions of the appellant with respect to the issues

presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10).

"The purpose of Rule 28 . . . is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So. 3d 940, 943 (Ala. 2007) (citation omitted). In general, "waiver of an argument for failure to comply with Rule 28(a)(10) . . . has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions." *Id.* at 944. The core question when considering whether an argument is waived under Rule 28(a)(10) is whether the appellant's brief is "sufficient to apprise" the appellate court of the appellant's contentions. *Id.* at 943.

Though not onerous, Rule 28(a)(10) requires the appellant to marshal a cohesive argument out of the applicable facts and law when explaining why the lower court committed reversible error: "To obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal." *Alonso v. State*, 228 So. 3d 1093, 1108 (Ala. Crim. App. 2016); *see also Hamm v. State*, 913 So. 2d 460,

139

485–86 (Ala. Crim. App. 2002) (finding appellate brief inadequate to warrant appellate review of the petitioner's ineffective assistance allegations where it "cited no legal authority to support his specific allegations" and, instead, invited the ACCA to examine the pleading of his claims in his Rule 32 petition); *id*. at 486 ("Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.").[36]

The Eleventh Circuit recently recognized that, where it is properly applied, Rule 28(a)(10) is a state procedural rule that constitutes an adequate and independent ground to support the procedural default of a federal habeas claim. *Ferguson v. Comm'r, Ala. Dept. of Corr.*, 69 F.4th 1243, 1259 (11th Cir. 2023) (finding that a claim rejected by the ACCA pursuant to Rule 28(a)(10) was "abandoned . . . during state post-conviction proceedings and thus it is procedurally defaulted"). The question is thus reduced to whether petitioner's Rule 32 appellate brief indeed failed to adequately apprise the ACCA of his contentions with respect to his prosecutorial misconduct-IAC claims, and, consequently, the ACCA's application of Rule 28(a)(10) was not "arbitrary," "unprecedented," or "manifestly unfair." *See Bailey v. Nagle*, 172 F.2d 1299, 1302 (11th Cir. 1999) (explaining that procedural default may arise in federal court "where the state court correctly applies a procedural

---

[36] *Hamm* analyzed Rule 28(a)(5), the predecessor to Rule 28(a)(10). *See Hamm v. Comm'r, Ala. Dep't of Corr.* 620 F. App'x 752, 758 n.5 (11th Cir. 2015).

default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred"); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citation omitted) (stating test for "adequacy" of state procedural rule).

### b.    The ACCA properly applied Rule 28(a)(10).

Petitioner asserts that his brief to the ACCA "more than adequately explained his prosecutorial misconduct claims, and indeed, both Respondent and the [ACCA] understood his claims well enough to address them on the merits." (Doc. 36 at 11). In essence, he maintains that, because his appellate brief identified the issue—his trial counsel's failure to object to prosecutorial misconduct—and "also identified several specific instances of misconduct" by citation to the state court record, the ACCA "*misapplied* its own procedural default rule" in deeming his brief inadequate. (*Id*. at 13–14 (emphasis in original)).

One can scarcely imagine a more cursory argument—if one can even fairly call it "argument"—than what petitioner presented in his appellate brief on this claim. He did not specifically describe the approximately forty discrete instances of alleged prosecutorial misconduct he cited in the brief. How did the prosecution "vouch" for the integrity of the State's investigation and its deal with Baker? Which prosecutorial arguments "urged the jury to consider non-statutory aggravating factors" or sought to "inflame the passions of the jury?" What facts not in evidence,

141

or unsupported by the evidence, were argued by the prosecution?  What victim impact evidence was presented by the prosecution in the guilt phase?  How did the prosecution mislead the jury about the law and its responsibility?  The appellate brief did nothing more than invite the ACCA to plumb the amended Rule 32 petition's roughly forty pages pleading this claim to find answers to these questions.

Nor did the appellate brief specifically address the Rule 32 court's reasoning in denying this claim on the merits.  The Rule 32 court's final order included about fifteen pages of findings and conclusions denying this claim.  There is not one citation to any part of that order in service of petitioner's "argument" that the Rule 32 court erred.  Did the Rule 32 court err when it held that the "overwhelming majority" of prosecutorial arguments cited by petitioner in the Rule 32 petition were "unobjectionable?"  (Doc. 19-18 at 192).  How?  For instance, petitioner did not explain how the Rule 32 court erred in its finding that the prosecution did not improperly vouch for the credibility of Baker but that, instead, Valeska had "commented on the circumstances of the 'deal' with Baker for preferential treatment." (*Id*. at 194).  Likewise, petitioner did not explain how the Rule 32 court erred in relying upon Alabama appellate authority when it determined that Valeska's occasional description of the defendant as a "menace to society" or "wicked" did not warrant reversal.  (*Id*. at 197).  How did the Rule 32 court err in concluding that

142

most, if not all, of Valeska's alleged "inflammatory" arguments were "legitimate inferences of the evidence in a way favorable to the State[?]" (*Id*. at 201). Did the Rule 32 court err in finding "a lack of evidence of any prejudice to the Defendant to a degree that he had an unconstitutional trial" due to Valeska's argument of facts not in evidence? (*Id*. at 202). What, specifically, is the evidence of prejudice the Rule 32 court failed to apprehend? How did the Rule 32 court err in concluding that Valeska had not, in fact, misled the jury about the law or its responsibility? (Doc. 19-19 at 4). Petitioner's appellate brief did not even acknowledge the Rule 32 court's various findings, much less make any arguments respecting his claim of lower court error.

When an appellant argues that the lower court reversibly erred, Rule 28(a)(10) contemplates, and the ACCA reasonably expects, that the appellant will identify those findings and conclusions that warrant reversal. What petitioner presented to the ACCA, instead, was a super-condensed version of his amended Rule 32 petition: a conclusory claim that Valeska "repeatedly committed misconduct," to which Crespi unreasonably failed to object, supported by dozens of mostly unexplained trial transcript citations, and concluded by the charge that the Rule 32 court's decision "was erroneous and should be reversed." It is as if petitioner was presenting his claim anew to the ACCA, with no need to explain to the ACCA how the lower

143

court erred when it rejected his claim.  Rule 28(a)(10) demanded more, and the ACCA reasonably required more.

Finally, the appellate brief is devoid of citation to "cases" or other "authorities" upon which petitioner was relying in arguing that the Rule 32 court reversibly erred.  Ala. R. App. P. 28(a)(10).  Specifically, what authorities demonstrate that the Rule 32 court fell on the wrong side of the divide when it stated that, even if some of Valeska's conduct was objectionable, "[t]here is an ocean of difference between objectionable statements and questions and misconduct by a lawyer[,]" and that, viewed cumulatively, Valeska's conduct "did not infect the trial with unfairness to the degree that the Defendant was deprived of a constitutionally fair trial[?]" (Doc. 19-18 at 192).  Petitioner cites no such authority.

Petitioner appears to argue here that his brief cited the requisite authority because, "on the first page of the argument section, . . . [he] directed the [ACCA] to *Strickland v. Washington*, the Supreme Court's seminal case on ineffective-assistance of counsel claims." (Doc. 36 at 13).  He cites page 92 of his appellate brief for this contention.  (*Id.*).  While one can infer that page 92 of the brief indeed concerns *Strickland* because it references petitioner's claim to have been deprived of effective assistance, one searches in vain for any reference to, or citation of, *Strickland* on page 92 of the appellate brief.  (*See* Doc. 19-52 at 152).  Even if the

144

brief had specifically cited *Strickland*, however, it does not follow that petitioner's brief satisfied Rule 28(a)(10).

Petitioner provides no authority for his contention that his appellate brief's reference to *Strickland* functioned as a sort of incantation which foisted upon the ACCA the obligation to examine his Rule 32 petition to discern the specifics of his claim, comb the state court record to learn the factual context for those claims, and then assiduously examine the lower court's order for *Strickland* error absent any specific argument by petitioner. Alabama's state courts have long recognized that merely invoking a general legal principle[37] without adequate explanation of how the principle applies to the facts developed in the lower court does not satisfy Rule 28(a)(10). *McWhorter v. State*, 142 So. 3d 1195, 1236 (Ala. Crim. App. 2011). Indeed, the ACCA has applied this principle in the specific context of appellate review of a Rule 32 court's dismissal of a prosecutorial misconduct-IAC claim in which the appellate brief merely cited *Strickland* as its source of authority. *See Bryant v. State*, 181 So. 3d 1087, 1120 (Ala. Crim. App. 2011) ("Here, too, we find that Bryant's cursory summary of the claims in his petition with no specific discussion of the facts or law in the form of an argument as to why he believes these claims were improperly summarily dismissed, with only citations to page or

---

[37] It is well established that the "*Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105.

145

paragraph numbers, and with only a single citation to general legal authority is not sufficient to comply with Rule 28(a)(10).").

Myriad authorities therefore indicate that Alabama's state courts routinely apply Rule 28(a)(10) to find waiver where an appellate brief presents only a generalized claim of error supported by mostly unexplained record citations and a vague, unadorned appeal to some general authority. Notably, petitioner does not present any authority, whether state or federal, holding that Rule 28(a)(10) is not properly applied in such circumstances. Instead, he hangs his hat on *Ex parte Borden*, contending that his "brief was sufficient to apprise Respondent of [his] argument and the responsive points Respondent '[was] obliged to make.'" (Doc. 36 at 14 (quoting *Ex parte Borden*, 60 So. 3d at 943); *id*. at 16). But review of the ASC's decision in *Ex parte Borden* shows that it provides no support for the brief petitioner filed in the ACCA.

In *Ex parte Borden*, the ACCA applied Rule 28(a)(10) to find that Borden had waived appellate review of his ineffective assistance of counsel claims. 60 So. 3d at 942. The ACCA observed as follows:

> Borden's argument consists of a single paragraph of general propositions of law; a lengthy recitation of the facts of his life and the facts of the offense; and an eleven-page list of ineffective-assistance-of-counsel allegations. The list of claims is unsupported by legal authority, and it is almost entirely devoid of citations to the record.

146

*Id*.  The ASC, however, explained why Borden's brief was sufficient under Rule 28(a)(10):

> Borden's brief to the Court of Criminal Appeals regarding his ineffective-assistance-of-counsel claims included 22 pages of facts addressing why the trial court erred in summarily dismissing the ineffective-assistance-of-counsel claims in his Rule 32 petition. Borden's brief included 11 pages of argument regarding ineffective assistance of counsel, including some 25 citations to caselaw, along with explanations and quotations from the cited cases.

*Id*. at 944.  With "22 pages of facts addressing why the trial court erred," "11 pages of argument," and "25 citations to caselaw, along with explanations and quotations from the cited cases," it is unsurprising that the ASC found Borden's appellate brief "sufficient to apprise the Court of Criminal Appeals of Borden's contentions with regard to his ineffective-assistance-of-counsel claims."  *Id*.  Petitioner's 1.5 page conclusory "argument" about Valeska's many alleged instances of "egregious" prosecutorial misconduct, with essentially no specific facts about his claims, no analysis of the lower court's order, and no citations of authority, pales in comparison to the brief deemed adequate in *Ex parte Borden*.[38]

---

[38] It also pales in comparison to the argument petitioner himself submitted in his updated briefing in this court.  (*See* Doc. 57 at 55–60).  In only five pages of argument in that brief, petitioner cited authorities discussing Valeska's misconduct in other cases (*id*. at 56), related how specific instances of alleged misconduct prejudiced his principal defense in the guilt phase (*id*. at 57–58), provided specific examples of Valeska's alleged inflammatory arguments and commentary, as well as his vouching for the integrity of the State's case and eliciting opinion evidence about petitioner's guilt (*id*. at 58–59), and cited several Supreme Court and subordinate federal court authorities for the proposition that these actions constitute reversible misconduct to which counsel should have been objecting all along.  An essential tenet of AEDPA is that the ACCA deserved

147

In sum, by inviting the ACCA to review the amended Rule 32 petition to learn the specifics of his claim and then apply *Strickland* to the Rule 32 court's order with no specific argument about how the Rule 32 court erred, petitioner demanded that the ACCA "do [his] legal research" and "make and address legal arguments for [him] based on undelineated general propositions not supported by sufficient authority or argument." *Ex parte Borden*, 60 So. 3d at 943 (quotation omitted).  Rule 28(a)(10), as interpreted in *Ex parte Borden*, forbids precisely this and imposes a procedural finding of waiver as a consequence.  The ACCA therefore did not misapply Rule 28(a)(10) in finding that petitioner waived his prosecutorial misconduct-IAC claim. Because that claim was waived in the state court pursuant to an adequate and independent state procedural rule, it is procedurally defaulted for purposes of federal habeas review.  Accordingly, petitioner's prosecutorial misconduct-IAC claim is due to be dismissed.[39]

---

the same effort petitioner provided in this court.  Petitioner cannot reasonably contend that his brief in the ACCA conveyed the factual or legal argument he presents here.

[39] Because petitioner insists that his prosecutorial misconduct-IAC claim is not procedurally defaulted, he does not contend that he has demonstrated cause or prejudice relating to the procedural default, or that this court should consider the claim pursuant to the "fundamental miscarriage of justice" exception to procedural default.

c.    *Petitioner did not exhaust his Brady-IAC subclaim.*

As set forth above, petitioner did not include his counsel's failure to object to the prosecution's alleged suppression of *Brady* material in his claim of prosecutorial misconduct-IAC in his appellate brief before the ACCA.  Petitioner concedes that he did not include the subclaim in his brief to the ACCA.  (Doc. 36 at 11 n.3). Nevertheless, he maintains the subclaim was fairly presented to the ACCA because the prosecution's alleged *Brady* violation was "a subpart of the broader constitutional violation underlying the prosecutorial misconduct claim that is properly before this Court for review."  (*Id*.).  He submits that, while he "may not have emphasized this specific failure to object in his brief to the [ACCA], . . . he was not required to repeat verbatim every allegation in his Rule 32 petition."  (*Id*.).

This court finds that petitioner failed to exhaust the *Brady*-IAC subclaim because he did not present the claim to the ACCA.  The *Brady*-IAC subclaim is different-in-kind from petitioner's allegations of trial-related prosecutorial misconduct presented in the amended Rule 32 petition.  While *Strickland* governs all IAC claims, *Brady* violations present a different framework for analyzing the underlying error for which counsel's performance is challenged. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (describing the "three components of a true *Brady* violation").  Petitioner's claim that counsel failed to object to repeated

149

improper prosecutorial argument and commentary at trial presented the state courts

with a different standard for examining the alleged error underlying counsel's

deficient performance and can in no way be viewed as having exhausted his claim

challenging counsel's failure to object to an alleged violation of *Brady*.

Accordingly, since, by his own admission, petitioner did not present the *Brady*-IAC

subclaim to the ACCA, he failed to exhaust the claim in the state courts. Because

state procedural law precludes him from now returning to state court to exhaust the

claim—he does not contend otherwise—the claim is procedurally defaulted in

federal habeas corpus review.[40]

### 4. The ACCA's Alternative Merits Adjudication did not Contravene, or Unreasonably Apply, Clearly Established Federal Law and was not Based Upon any Unreasonable Determination of the Facts.

As discussed previously, the ACCA determined that, "even if [petitioner's]

brief on this issue complied with Rule 28(a)(10), . . . we would find that this claim

has no merit." *Benjamin*, 156 So. 3d at 454. Citing the Supreme Court's decision

in *Darden v. Wainright*, 477 U.S. 168, 181 (1986), and having reviewed all of

---

[40] Even if petitioner's brief in the ACCA somehow could have exhausted his *Brady*-IAC subclaim, then, for the reasons given above, the *Brady*-IAC subclaim is nevertheless procedurally defaulted because petitioner's prosecutorial misconduct-IAC claim was found by the ACCA to have been waived pursuant to an adequate and independent state procedural rule and is therefore procedurally defaulted in federal habeas review. Thus, the *Brady*-IAC subclaim is procedurally defaulted regardless of whether it was presented to the ACCA.

petitioner's "challenged arguments," the ACCA noted its agreement with the Rule 32 court's conclusion that " no argument so infected the trial with unfairness that Benjamin was denied due process." *Id*. Thus, the ACCA held, "'[b]ecause the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.'" *Id*. (quoting *Lee v. State*, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009)).

Petitioner's presentation of his prosecutorial misconduct-IAC claim in his habeas petition stretches over approximately 42 pages, with 94 separately numbered paragraphs setting out the claim. (Doc. 1, ¶¶ 193–287). The overwhelming majority of these paragraphs describe the discrete instances in which, it is alleged, Valeska's arguments and commentary constitute some form of prosecutorial misconduct. Upon review, there is only one paragraph in which petitioner pleads some allegation directed toward this court's review of the ACCA's alternative merits decision under AEDPA. He alleges as follows:

> This Court should grant Mr. Benjamin's habeas petition because the state court's decision conflicts with prior decisions of the United States Supreme Court. Specifically, Mr. Benjamin was not required to demonstrate that prosecutorial misconduct occurred, as the Court of Criminal Appeals suggests. Rather, Mr. Benjamin's burden was to demonstrate that his attorney's performance was deficient and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 687. Mr. Benjamin easily carried this burden.

(Doc. 1, ¶ 196).

Petitioner cites no Supreme Court authority holding that, where prosecutorial misconduct-IAC is alleged, the petitioner need not demonstrate that the underlying claim of prosecutorial misconduct has merit. Recent Circuit precedent, however, runs contrary to his argument. *See Carruth*, 93 F.4th at 1357–59. Petitioner's claim of prosecutorial misconduct-IAC required the Rule 32 court to consider whether due process was violated by the prosecution's conduct at his trial *and* whether counsel ineffectively failed to object to such violation. *Id*. The underlying due process inquiry asks whether "the prosecution's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. at 1357 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Where the underlying due process claim lacks merit, "the attached ineffective assistance of . . . counsel claim is also meritless; counsel could not have been ineffective for omitting a nonmeritorious point from their argument and, similarly, their performance also could not have been prejudicial." *Id*. at 1359 (citing *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2024)). Accordingly, the ACCA did not contravene *Strickland* in its alternative merits ruling on this claim.

To be sure, petitioner's extensive pleading of this claim explicates why he believes his trial was infected with prosecutorial misconduct. But this court is not reviewing a claim of prosecutorial misconduct, or prosecutorial misconduct-IAC, *de*

152

*novo*.  To the extent the ACCA decided this claim on the merits, this court's review is cabined by the provisions of § 2254(d)(1) & (2).  Petitioner does not set out in the habeas petition any contention that the ACCA based its alternative merits decision on any unreasonable determination of the facts, and, other than his contention that the ACCA erroneously determined that he needed to demonstrate that prosecutorial misconduct occurred, he does not contend that the ACCA contravened, or unreasonably applied, clearly established federal law.  Accordingly, this court must conclude that he is not entitled to relief under § 2254(d)(1) & (2).

## II.   Petitioner's Death Sentence Violates the Eighth Amendment (Claim III.F)

Petitioner claims that his death sentence violates his rights under the Eighth Amendment because Alabama does not have "statutory procedures that adequately channel the sentencer's discretion[,]" resulting in a death sentence imposed "without a comparative proportionality review."   (Doc. 1, ¶ 288).   He explains that the "substance of the claim is that appellate review of the proportionality of [his] death sentence was inadequate because the circuit court's factual findings concerning the aggravating and mitigating circumstances were wholly unreasonable and incomprehensible, and that appellate counsel was ineffective when he failed to appeal the issue." (Doc. 1, ¶ 290).

## A.    Petitioner's Allegations

Petitioner alleges that Alabama's appellate courts were required on direct review of his sentence to conduct a "comparative proportionality review" because, in his view, Alabama's statutory sentencing procedures "failed to adequately channel the sentencer's discretion." (Doc. 1, ¶ 292).[41]  He appears to submit two reasons Alabama's statutory procedures failed to perform their required narrowing function in his case.  *First*, he argues "the trial court failed to enter specific written findings regarding the mitigating circumstances[,]" as required by Alabama law. (Doc. 1, ¶ 293).  Petitioner contends that the trial court's amended sentencing order, in which Judge White found that most of petitioner's proffered non-statutory mitigating circumstances "did not exist," was unclear and incomprehensible, precluding meaningful appellate review of the trial court's findings. (Doc. 1, ¶ 294). *Second*, the trial court based its findings about the "nonexistence of several mitigating factors . . . upon a mitigation case prepared by ineffective counsel.  A sentence that relied upon findings from [a] mitigation case prepared by ineffective counsel is not a sentence imposed under a system that adequately channeled the sentencer's discretion." (Doc. 1, ¶ 297).

While petitioner acknowledges that the ACCA indeed "did conduct a form of proportionality review" of his sentence, he alleges such review "was inadequate

154

because the [ACCA] relied upon the trial court's erroneous factual findings made with respect to mitigating factors." (Doc. 1, ¶ 299). Since Alabama's capital sentencing statute required the ACCA to "consider both the crime and the defendant" in its proportionality review of petitioner's sentence, the ACCA could not have properly considered petitioner's circumstances "because the information it had concerning Mr. Benjamin was incomprehensible." (*Id*.); *see also* Doc. 1, ¶ 301 (alleging that, because "the trial court's findings with respect to the mitigating factors were nonsense[,] . . . the appellate court's review of the proportionality of Mr. Benjamin's sentence failed to consider the defendant as required by the statute")).

Petitioner further alleges that, because Alabama's statutory sentencing scheme failed to "focus[] discretion [on] the particularized characteristics of the individual defendant, there is no presumption that [his] sentence was not 'wantonly and freakishly' imposed." (Doc. 1, ¶ 302). He submits that several circumstances demonstrate such "wanton and freakish" imposition of his death sentence, including the alleged ineffective assistance of his appellate counsel, the prosecutor's alleged discriminatory peremptory challenges, alleged prosecutorial misconduct, the trial

---

[41] Petitioner specifically alleges the Supreme Court's decision in *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987), clearly establishes that adequate comparative proportionality review was constitutionally required in his case. (Doc. 1, ¶¶ 288, 292, 300).

court's failure to "consider all mitigating circumstances," and an alleged violation of petitioner's Sixth Amendment confrontation rights respecting the admission of the Baker wire recording.  (*Id*.).

With the presumption that his sentence was not "wantonly and freakishly" imposed removed, petitioner claims, under *McCleskey*, he can now "show a constitutional violation by demonstrating that other similarly situated defendants did not receive the death penalty."  (Doc. 1, ¶ 302).  To that end, he argues "[o]ther defendants convicted of capital murder during the course of a first degree [robbery] . . . have not been sentenced to death."  (Doc. 1, ¶ 303).  He goes on to cite three examples of defendants convicted of capital murder during the course of first degree robbery who did not receive death sentences.  (*Id*. (citations omitted)).

Finally, petitioner alleges that, to the extent his appellate counsel could have, but did not, raise this Eighth Amendment challenge on direct appeal, which resulted in the state courts' finding of procedural bar when this claim was presented on collateral review, counsel was ineffective.  (Doc. 1, ¶¶ 304–05).  Petitioner submits that, had the claim properly been presented, "it is reasonably probable that the Court of Appeals would have reversed [his] death sentence."  (Doc. 1, ¶ 306).

## B.     State Court Proceedings

As set forth in the above summary of petitioner's allegations, this claim is broad in scope.  Properly contextualizing the claim requires review of state court actions at multiple levels of the state court system in both direct and collateral review.  To begin, following the judicial sentencing hearing, Judge White entered his sentencing order imposing petitioner's death sentence.  (Doc. 19-2 at 11–16). That order specifically found that the jury's verdict established the existence of one statutory aggravating circumstance—the robbery-murder aggravator—but made no findings respecting the existence or nonexistence of the remaining statutory aggravating circumstances.  (*Id*. at 13).  The order next addressed seven statutory mitigating circumstances, finding that the evidence established two such circumstances:  petitioner's lack of any significant criminal history, which circumstance Judge White stated was "present," and petitioner's age at the time of the crime, nineteen, which Judge White stated was "duly considered."  (*Id*. at 13–14).  The order then claimed to address the nonstatutory mitigating circumstances offered by petitioner, listing twenty separate proposed mitigating circumstances but making no findings about the proof, existence, or nonexistence of such circumstances. (*Id*. at 14–15).  The order concluded with Judge White's finding that, having given "full measure and weight to each of the aggravating and mitigating

157

circumstances, . . . the aggravating circumstance outweighs the mitigating circumstances." (*Id*. at 15–16).  Accordingly, Judge White sentenced petitioner to death.  (*Id*. at 16).

Petitioner filed a motion for new trial, in which he argued that the "written sentencing order failed to state the weight given to each mitigating circumstance and to state whether each was supported by the evidence."  (Doc. 19-6 at 179).  Judge White denied the motion.  (*Id*. at 181).  On direct appeal, petitioner repeated his argument that Judge White's sentencing order "failed to determine the existence or non-existence" of mitigating circumstances and otherwise failed to comply with Alabama law.  (Doc. 19-7 at 53–54).  The ACCA agreed that Judge White's order did not comply with Alabama's capital sentencing statute because "the trial court did not make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A–5–49, Ala. Code 1975; the existence or nonexistence of each mitigating circumstance enumerated in § 13A–5–51, Ala. Code 1975; and the existence or nonexistence of any additional, nonstatutory mitigating circumstances offered pursuant to § 13A–5–52, Ala. Code 1975."  *Benjamin*, 940 So. 2d at 383–84 (footnotes omitted).[42]  Accordingly, the

---

[42] The ACCA observed that, while Judge White's sentencing order listed several nonstatutory mitigating circumstances, the order "did not specifically state whether it determined that those nonstatutory mitigating circumstances did or did not exist." *Benjamin*, 940 So. 2d at 384 n.3.

ACCA remanded to the trial court "with instructions that the trial court amend its sentencing order to comply with the requirements" of Alabama law. *Id*. at 384.

On remand, Judge White entered an amended sentencing order addressing the defects identified by the ACCA. (Doc. 19-6 at 187–93). In pertinent part, the amended sentencing order found that two statutory mitigating circumstances existed—petitioner's lack of criminal history and his youth—while the other statutory mitigating circumstances did not exist. (*Id*. at 189–90). As for the twenty separate nonstatutory mitigating circumstances, Judge White specifically found the existence of only one such circumstance: "Every person who acted as defendant's caregiver died suddenly during his childhood; his mother, his grandmother, his grandfather and his uncle." (*Id*. at 190). Of the remaining nineteen nonstatutory mitigating circumstances, Judge White found that eighteen "did not exist," while one circumstance—that petitioner "is a human being"—was "not an appropriate mitigating circumstance." (*Id*. at 191–92). Judge White repeated his conclusion that the lone aggravating circumstance outweighed the mitigating circumstances and again sentenced petitioner to death. (*Id*. at 192–93).

"Shortly after the record on remand was certified," Crespi "submitted a brief to the [ACCA] attacking the circuit court's findings." (Doc. 36 at 21). The ACCA apparently rejected the brief, stating that it does not accept briefs on return to remand

159

"unless a formal motion is filed and a briefing schedule is set." (*Id.* (quotation marks omitted)).  According to petitioner, the ACCA cited no procedural rule or case law in support of this rejection. (*Id.*).[43]  Two days later, the ACCA issued its opinion on return to remand without the benefit of any new or updated appellate briefing from petitioner. (*Id.*).

In its decision on return to remand, the ACCA discharged its duty under Alabama law to "address the propriety of the appellant's conviction and sentence of death." *Benjamin*, 940 So. 2d at 386.  The ACCA noted Judge White's findings on the existence of one statutory aggravating circumstance and two statutory mitigating circumstances. *Id.*  It also recited Judge White's findings respecting the twenty nonstatutory mitigating circumstances. *Id.* at 386–87.  The ACCA concluded that the "sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death.  The record supports its decision, and we agree with its findings." *Id.* at 387.

The ACCA was required under Alabama law to "weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death." *Benjamin*, 940 So. 2d at 387.  Based upon its independent weighing, the ACCA concluded that petitioner's death sentence was "appropriate."

---

[43] Neither petitioner's rejected brief on return to remand nor the ACCA's communication rejecting the brief are part of the state court record.

*Id*. The ACCA also conducted a proportionality review, as required by Alabama law. Citing other cases in which death was imposed in Alabama following a conviction of capital murder during a robbery, the ACCA determined that petitioner's sentence was not "disproportionate or excessive when compared to the penalty imposed in similar cases." *Id*. at 387–88. Finally, the ACCA "searched the entire record for any error that may have adversely affected the appellant's substantial rights" and found none. *Id*. at 388. Accordingly, the ACCA affirmed petitioner's sentence. *Id*.

Petitioner filed an Application for Rehearing in the ACCA. (Doc. 19-7 at 114–34). In pertinent part, he raised three challenges pertinent to his current federal claim. *First*, he argued that he was improperly denied the opportunity to brief the ACCA on return to remand. (*Id*. at 144–46). *Second*, he argued that, contrary to state and federal law, Judge White had improperly "failed to consider and find the existence of numerous mitigating circumstances[.]" (*Id*. at 146–53). He submitted that the nonstatutory mitigating circumstances he presented at trial "were relevant to understanding him as a person[,]" and that, consequently, Judge White's repeated findings that such mitigating circumstances "did not exist" violated his constitutional

rights.   (*Id*. at 153).[44]   *Third*, he argued that his death sentence violated his constitutional rights because the "use of robbery as an elevator in the first phase and as aggravation in the second failed to narrow the class of death eligible defendants, resulting in the arbitrary imposition of the death penalty[.]" (*Id*. at 168–69).  He thus concluded that "[t]he death sentence in this case is arbitrary and disproportionate and violates his" constitutional rights.  (*Id*. at 169).  The ACCA denied petitioner's application for rehearing without addressing his arguments.

Petitioner thereafter filed a petition for certiorari review in the ASC.  (Doc. 19-8 at 2–100).  In that petition, among numerous other challenges, he again argued the following: the trial court failed to "consider and find the existence of numerous mitigating circumstances before it in violation of state and federal law" (*id*. at 51); the ACCA denied him the opportunity to brief his challenges to Judge White's amended sentencing order (*id*. at 86); and his death sentence is unconstitutional because Alabama's "double-counting" of robbery-murder as both an element of capital murder and an aggravating circumstance "failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty" (*id*. at 92–93).  The ASC denied certiorari review.

---

[44] Petitioner cited the Supreme Court's decision in *Hitchcock v. Dugger*, 481 U.S. 393 (1987), in support of his claim that the trial court's purported failure to consider his mitigating evidence violated his constitutional rights. (Doc. 19-7 at 153).

162

In his amended Rule 32 petition, petitioner first presented the claim he now presents in his federal petition, *i.e.*, that Alabama's sentencing procedures failed to "ensure the proportionality of his sentence" and his appellate counsel failed to present such claim on direct appeal. (Doc. 19-12 at 70–79). He preemptively alleged that, "[s]ince this issue was not, and could not have been fully addressed on direct appeal, it is not barred in a Rule 32 proceeding." (*Id*. at 71). The Rule 32 court disagreed, finding the claim "procedurally barred because the substance of the claim was raised and addressed on appeal." (Doc. 19-19 at 10). The ACCA affirmed, but found that "[a]ll the claims concerning this issue except the ineffective-assistance-of-counsel claim were procedurally barred in Benjamin's postconviction proceeding" pursuant to Rule 32.2(a)(5), which precludes Rule 32 review of claims which could have been, but were not, raised on appeal. *Benjamin*, 156 So. 3d at 457. In addition, the ACCA held, petitioner's appellate counsel was not ineffective because the ACCA conducted a proportionality review on direct appeal "and found that [petitioner's] death sentence was not" disproportionate. *Id*. "Thus, counsel was not ineffective in regard to this claim." *Id*.

## C.    Respondent's Procedural Defense

Citing the ACCA's ruling in petitioner's Rule 32 appeal, respondent contends petitioner's substantive proportionality claim is procedurally defaulted because the

ACCA found the claim procedurally barred pursuant to Rule 32.2(a)(5).  (Doc. 29 at 32–33; *see also* Doc. 35 at 13–14).

> **D.    Petitioner's Substantive Eighth Amendment Proportionality Claim is Procedurally Defaulted.**

To properly evaluate respondent's procedural default defense to petitioner's substantive claim, it is essential to first delineate the claims and arguments petitioner presented on direct appeal of his conviction in comparison to that which he presented in his Rule 32 petition and in the federal habeas petition.  This is especially so considering that petitioner has apparently taken conflicting positions on whether he presented his current claim on direct appeal.  In the federal petition, he alleges "the true nature" of his federal habeas claim "could neither have been raised on appeal nor was it considered by the Alabama Supreme Court on appeal[,]" because "the inadequacy of appellate review" is an issue that is not "available to raise on direct appeal."  (Doc. 1, ¶ 290).  Yet, in his brief in opposition to respondent's brief on procedural default, petitioner asserts he "raised this claim at trial and on direct appeal."  (Doc. 36 at 19; *id*. at 24–25).  The claim cannot be impossible to raise on direct appeal yet also have been raised on direct appeal.

As set forth above, petitioner first argued on direct appeal that Judge White's sentencing order failed to comport with Alabama law because it did not specify his findings on the existence or nonexistence of mitigating circumstances.  After the

ACCA affirmed petitioner's sentence following the entry of the amended sentencing order, petitioner argued, both in an application for rehearing in the ACCA and in his petition for certiorari to the ASC, that Judge White's amended sentencing order violated both state law and federal constitutional law because Judge White failed to consider and give effect to numerous nonstatutory mitigating circumstances petitioner had presented and argued in the penalty phase of his trial. He also argued in those two appellate submissions that Alabama's capital sentencing scheme violated the Eighth Amendment because, in permitting the "double-counting" of robbery-murder as both a capital offense and an aggravating circumstance, the statute failed to fulfill the Eighth Amendment's mandate that it meaningfully narrow the class of death-eligible defendants in Alabama.

Petitioner's proportionality claim in his amended Rule 32 petition, and in the instant federal petition, alleges a different Eighth Amendment violation. As set forth above, the instant proportionality claim presents a sort of circular claim of error: state law required the ACCA to conduct a proportionality review of petitioner's sentence which took into account his individual circumstances; because Judge White's findings about mitigating circumstances were "nonsense" and "incomprehensible," and were based upon a record developed by ineffective counsel, and produced in a trial burdened by *Batson* error and rampant prosecutorial

165

misconduct, it was impossible for the ACCA to properly assess proportionality; because Alabama's capital sentencing scheme produced a death sentence with these alleged infirmities, the "scheme did not adequately channel the sentencer's discretion"; since the scheme did not adequately channel the sentencer's discretion, clearly established federal law, as rendered in *McCleskey*, required Alabama's appellate courts to conduct "appellate proportionality review"; the statutorily-prescribed proportionality review conducted by the ACCA, but supposedly also required by *McCleskey*, was constitutionally inadequate because the trial court's findings on mitigating circumstances were "nonsense" and "incomprehensible"; and, finally, since some defendants convicted of capital murder during the course of robbery were not sentenced to death, petitioner's sentence is constitutionally disproportionate.[45]

Petitioner's best attempt to square the discordant theories of Eighth Amendment infirmity he presented on direct appeal and in Rule 32 is found in his brief in opposition to procedural default, in which he argues that he presented the instant challenge to the ACCA's proportionality review in Alabama's appellate

---

[45] This description of the self-proving, circular logic underpinning the instant claim is perhaps longer than needed. Petitioner himself succinctly summarizes the "premise of [his] proportionality claim" as follows: "(1) the circuit court needed to conduct a comparative proportionality review because its findings on the aggravating and mitigating circumstances were incoherent and unsupported; and (2) the [ACCA]'s proportionality review was wholly inadequate because it relied on the circuit court's unintelligible findings." (Doc. 36 at 24).

courts because he "attacked" "(1) the circuit court's failure to make specific written findings on the aggravating and mitigating circumstances on direct appeal; and (2) the sufficiency of the circuit court's eventual findings on appeal from the remand order, in the application for rehearing, and in the petition for a writ of certiorari." (Doc. 36 at 24). Of course, none of these arguments on direct appeal challenged the adequacy of Alabama's proportionality review in his case, nor did they argue that such comparative proportionality review was constitutionally required under *McCleskey*. Indeed, it does not appear that he cited *McCleskey* in any of his submissions on direct appeal. Rather, he argued simply that the Eighth Amendment was violated because of the "double counting" of robbery-murder in the guilt and penalty phases of his trial and the trial court's purported failure to consider and give effect to some of his mitigating evidence.

Petitioner's current claim—that the ACCA's proportionality review was inadequate under *McCleskey* because of its reliance upon "incomprehensible" circuit court findings—was available to him on direct appeal. Certainly, by the time of his certiorari petition to the ASC, he had all the information, lower court rulings, and Supreme Court authority necessary to present the claim he now presents. The claim was not presented, however, at any point on direct appeal. Thus, the ACCA's conclusion that the claim could have been, but was not, presented on direct appeal

167

was accurate, and that court's finding of a procedural bar pursuant to Rule 32.2(a)(5) was adequate and independent to establish procedural default of the claim in federal habeas corpus. *See Mason v. Allen*, 605 F.3d 1114, 1121 (11th Cir. 2010) (finding procedural default of claim adjudicated procedurally barred under Rule 32.2(a)(5)). Accordingly, this claim is procedurally defaulted.

### E. Petitioner Does Not Cite any Supreme Court Decision Holding that Proportionality Review is Required by the Eighth Amendment.

To the extent that petitioner's substantive Eighth Amendment claim is not procedurally defaulted, and this court must review the sufficiency of the state court's proportionality review under AEDPA, petitioner has failed to provide the court with clearly established federal law which the state courts have contravened or unreasonably applied. Petitioner's claim that the state courts erred in finding that his sentence is not disproportionate appears to be derived from a single passage in *McCleskey*, which petitioner cites multiple times for the proposition that "[a] death sentence is disproportionate, and therefore cruel and unusual under the Eighth Amendment, when, in the absence of statutory procedures that adequately channel the sentencer's discretion, it is imposed without a comparative proportionality review." (Doc. 1, ¶ 288 (citing *McCleskey*, 481 U.S. at 306); *id*. at ¶¶ 292, 300). *McCleskey* is the only Supreme Court decision petitioner cites in support of his claims that the Constitution required comparative proportionality review of his

168

sentence and that the proportionality review conducted by the ACCA was constitutionally inadequate.

The problem for petitioner is that *McCleskey* does not hold that comparative proportionality review is required under the Eighth Amendment, much less provide a test for the adequacy of proportionality review conducted by a state court. To be sure, *McCleskey* recognizes that the Eighth Amendment broadly requires "'that punishment for crime should be graduated and proportioned to offense[,]'" 481 U.S. at 300 (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)), and that the death penalty may be "disproportionate as applied to a certain class of cases," *id*. at 305, *i.e.*, cases involving offenses other than capital murder. But one does not find in *McCleskey* any holding about the constitutional necessity of comparative proportionality review of the sort described by petitioner.[46] Indeed, a few years prior to *McCleskey,* the Supreme Court specifically declined to hold that the Eighth Amendment required proportionality review of death sentences in capital murder cases. *See Pulley v. Harris*, 465 U.S. 37, 46–51 (1984). *McCleskey* did not purport to overrule that precedent; in fact, it recognized this holding of *Pulley*. *See* 481 U.S. at 306. Thus, the crucial language petitioner cites from *McCleskey* is *dicta*. This court cannot base a grant of the writ of habeas corpus upon a state court's purported

---

[46] The court will discuss the actual holding of *McCleskey* in greater detail below.

failure to follow Supreme Court *dicta*. *See Brown v. Davenport*, 596 U.S. 118, 136 (2022).

In any event, for the reasons that will be further explained below, the premise of petitioner's claim under *McCleskey*—that Alabama's statutory sentencing procedures failed to adequately channel the sentencer's discretion, thus necessitating comparative proportionality review—is flawed because there was no showing, in state court or here, that Alabama's procedures actually failed in their required Eighth Amendment function.

> **F.     The ineffective assistance of appellate counsel does not establish cause or prejudice to excuse petitioner's procedural default, and the ACCA did not contravene, or unreasonably apply, clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, in denying petitioner's claim that he received the ineffective assistance of appellate counsel respecting this claim.**

Petitioner claims that Crespi's ineffective assistance on direct appeal provides cause for his procedural default of this claim. Specifically, he alleges that Crespi's "apparent failure" to properly file his brief in the ACCA attacking Judge White's amended sentencing order on return to remand "was not the result of the competent exercise of professional judgment." (Doc. 1, ¶ 305). He points to Crespi's failure to "make the proper motions" to ensure that the ACCA considered his brief on return to remand. (*Id*.). He asserts that he was prejudiced by Crespi's failure to properly

170

file his appellate brief on return to remand because, had Crespi adequately challenged "the trial court's findings as to mitigating factors," "it is reasonably probable that the Court of Appeals would have reversed Mr. Benjamin's death sentence." (Doc. 1, ¶ 306).

There is, of course, significant tension in petitioner's dual allegations that "the true nature of this claim could [not] have been raised on appeal" (doc. 1, ¶ 290), but also that Crespi was ineffective for failing to raise the claim in a properly-filed brief in the ACCA (doc. 1, ¶ 306). How can Crespi have deficiently failed to raise a claim that could not have been raised on direct appeal? Petitioner's conflicting allegations here only confirm that the arguments about constitutional error he presented on direct appeal, both before and after the ACCA's decision on return to remand, are different from those he presented in Rule 32 and in the instant federal petition.

In any event, petitioner failed to establish that he received the ineffective assistance of appellate counsel due to counsel's failure to raise this claim, much less that the ACCA unreasonably rejected his claim of ineffective assistance of appellate counsel. To understand why, one must consider what the Eighth Amendment requires of a state's capital sentencing scheme and how those requirements relate to petitioner's claim.

In *Furman v. Georgia* and its companion cases, the Supreme Court invalidated two death sentences imposed in Georgia's state courts and one in Texas. 408 U.S. 238, 239–40 (1972). The Court ruled that the death sentences were imposed in violation of the Eighth and Fourteenth Amendments. *Id*. Through five separate concurring opinions, each Justice in the majority explained his reasoning, with some arguing that capital punishment is unconstitutional in any circumstance while others concluded only that the relevant state sentencing statutes were unconstitutional. *Id*. at 240–371. Accordingly, as recognized four years later in *Gregg v. Georgia*, 428 U.S. 153, 170 n.15 (1976), "the holding of the Court [in *Furman*] may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]" That position—*i.e.*, the holding of *Furman*, according to *Gregg*—is that, because "death is different in kind from any other punishment," "it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Id*. at 188; *see also id*. at 199 ("*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."). In short, therefore, "*Furman* mandates that where discretion is afforded a sentencing body on

a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

To comport with the Eighth Amendment, Alabama, like many other states, adopted a capital sentencing scheme in which, following a conviction of capital murder, the parties are tasked with providing evidence about the existence (or nonexistence) of aggravating and mitigating circumstances while the sentencer is charged with weighing the various aggravating and mitigating circumstances established by the evidence and determining, ultimately, whether the defendant should be sentenced to death.  The Supreme Court has specifically held that Alabama's capital sentencing scheme adequately channels the sentencer's discretion under the Eighth Amendment: "Consistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances." *Harris v. Alabama*, 513 U.S. 504, 511 (1995).

While Alabama law requires that state courts review death sentences for proportionality, *see* Ala. Code §13A-5-53(b)(3), as discussed previously, "[t]he Constitution does not require a proportionality review." *Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987) (citing *Pulley*, 465 U.S. 37).  *McCleskey*, cited by

173

petitioner as establishing the requirement of adequate proportionality review in his case, does not hold otherwise. There, the Supreme Court explained why a state's valid capital sentencing procedures eliminates the need for comparative proportionality review: "Because McCleskey's sentence was imposed under Georgia sentencing procedures that focus discretion 'on the particularized nature of the crime and particularized characteristics of the individual defendant,' we lawfully may presume that McCleskey's death sentence was not 'wantonly and freakishly' imposed, and thus that the sentence is not disproportionate within any recognized meaning under the Eighth Amendment." *Id*. at 308 (quoting *Gregg*, 428 U.S. 206–07).

Because the Supreme Court, in *Harris*, determined that Alabama's statutory procedures adequately channel the sentencer's discretion, this court may presume, as did the Supreme Court in *McCleskey*, that petitioner's sentence was not "wantonly and freakishly" imposed and that it is not constitutionally disproportionate. What petitioner is really arguing here is that Alabama's otherwise valid sentencing procedures "failed to adequately channel the sentencer's discretion in [his] case[,]" thus entitling him to a constitutionally-mandated "comparative proportionality review." (Doc. 1, ¶ 298). *McCleskey* presented a similar issue, as the petitioner there argued the facially valid "Georgia capital punishment system is arbitrary and

174

capricious in *application*, and therefore his sentence is excessive, because racial considerations may influence capital sentencing decisions in Georgia." 481 U.S. at 308 (emphasis in *McCleskey*).

It is here, however, that McCleskey and petitioner part ways in their arguments. McCleskey attempted to show that Georgia's system was "arbitrary and capricious" in application via a statistical study showing that, in Georgia, "black defendants . . . who kill white victims have the greatest likelihood of receiving the death penalty." *Id*. at 287. While the statistical study indicated "a discrepancy that appears to correlate with race[,]" the Supreme Court found that such discrepancy was "'a far cry from the major systemic defects identified in *Furman*.'" *Id*. at 312–13 (quoting *Pulley*, 465 U.S. at 54)). Thus, the Court in *McCleskey* held that the statistical study did not "demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process." *Id*. at 313.

Petitioner, unlike McCleskey, does not point to any evidence of a widespread or "systemic" failure of Alabama's capital sentencing scheme to avoid the arbitrary and capricious imposition of death sentences. Rather, he points only to alleged constitutional defects in his own sentencing to sustain his claim that *McCleskey* imposed a constitutional requirement to conduct adequate proportionality review of

his sentence.  But petitioner's showing of the purported failure of Alabama's statutory procedures in his case is lacking.

Petitioner's core contention about the supposed failure of Alabama's capital sentencing procedures in his case is that the trial court made findings about nonstatutory mitigating circumstances which he variously deems "incomprehensible," "unreasonable," "nonsensical," "erroneous," and "unintelligible," *etc*., thereby depriving him of an individualized sentencing determination and precluding the ability of the ACCA to conduct an adequate proportionality review.  (Doc. 1, ¶¶ 290–91, 299, 301).  The trial court's findings, however, are comprehensible and intelligible.  The trial court listed twenty separate submitted nonstatutory mitigating circumstances, of which it found that one "did exist," eighteen "did not exist," and one was "not an appropriate mitigating circumstance."  (Doc. 19-6 at 190–92).

Petitioner understood these findings well enough to argue in his application for rehearing in the ACCA, and in his petition for certiorari to the ASC, that the trial court had unconstitutionally failed to consider and give mitigating effect to his mitigation evidence.  It was only in postconviction filings—in his Rule 32 petition and in the instant federal petition—that petitioner changed tack to argue that it was impossible for the ACCA to make sense of the trial court's findings.  But the

procedural history of this case gives no reason to believe that the ACCA was unable to make sense of the trial court's findings. After all, the ACCA first remanded with the express instruction that the trial court amend its sentencing order to clarify its findings about the existence or nonexistence of nonstatutory mitigating circumstances. *Benjamin*, 940 So. 2d at 383–84. Thus, the ACCA was attuned to the need for the trial court to articulate specific, reviewable findings. In affirming the trial court's amended sentencing order, the ACCA recited Judge White's findings respecting the non-existence of mitigating circumstances and, at least implicitly, determined that Judge White's findings were intelligible and comprehensible, and that the record was sufficient for the ACCA to conduct its own prescribed independent weighing of aggravating and mitigating circumstances. *Id*. at 386–87.

Petitioner's attack on the trial court's many findings that nonstatutory mitigating circumstances "did not exist" boils down to a contention that the trial court's findings were unduly ambiguous:

> It is unclear what the trial court meant when it "specifically [found a] circumstance did not exist." One cannot determine from these findings whether the court made a determination that no facts supported the claimed statements, *e.g.*, the court found Mr. Benjamin did not receive a high school diploma, or if the court found that the facts underlying the statement existed but that the statement itself did not present a mitigating circumstance, *e.g.*, Mr. Benjamin did receive a high school diploma despite repeated moves but this was not a mitigating circumstance.

177

(Doc. 1, ¶ 294). He maintains that, to the extent the trial court might have found that his claimed circumstances were factually supported, but that such facts did not present a mitigating circumstance, "the record is completely absent of any reasoning supporting this conclusion." (Doc. 1, ¶ 295). Likewise, to the extent the trial court's "findings are determinations that facts supporting the claims did not exist, then several of the trial court's findings are factually incorrect." (Doc. 1, ¶ 296).

Regardless of any perceived ambiguity, the trial court's essential findings are abundantly clear: Judge White gave no mitigating effect to nineteen of the twenty nonstatutory mitigating circumstances petitioner offered. Petitioner does not point to any Supreme Court decision showing that the trial court, or the ACCA in its independent review, erred in doing so. Indeed, although he argued in his petition for rehearing in the ACCA, and in his petition for certiorari to the ASC, that the trial court's findings respecting mitigating circumstances violated the line of Supreme Court precedent including *Hitchcock*, no such argument is found in the federal petition. Had he presented such argument in the federal petition, it would be without merit.

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect

178

of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." In *Lockett*, the Supreme Court invalidated Ohio's capital sentencing statute because the statute did not "permit the type of individualized consideration of mitigating factors we now hold to be required by the Eighth and Fourteenth Amendments in capital cases." *Id*. at 606.

The Supreme Court has repeatedly applied this seminal rule to invalidate death sentences encumbered by some permutation of the kind of error forbidden by *Lockett*. In *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), for instance, the Court invalidated a death sentence because the trial court's fundamental misunderstanding of the law caused it not to even consider whether Eddings's compelling background evidence was mitigating. Indeed, the trial court in *Eddings* believed that it was precluded by law from considering such background evidence. *Id*. at 113 (finding, "it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence") (emphasis in *Eddings*). Likewise, in *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), the Supreme Court held that the trial court's exclusion of witness testimony about the defendant's "good adjustment" to incarceration "deprived petitioner of his right to place before the sentencer relevant

179

evidence in mitigation of his punishment."  And in *Hitchcock*, cited by petitioner in the state court, the Court invalidated a Florida death sentence because, at the time the sentence was entered, Florida's state courts interpreted its capital sentencing statute to preclude consideration of non-enumerated mitigating circumstances, including evidence of the petitioner's "family background and his capacity for rehabilitation[.]"  481 U.S. at  398–99.  Because "the advisory jury was instructed not to consider, and the sentencing judge refused to consider" such evidence, Florida's procedure violated the Eighth and Fourteenth Amendments as interpreted in *Lockett* and its progeny.  *Id*.

In essence, the constitutional rule animating this line of cases, from *Lockett* on down, is that, "in capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence."  *Hitchcock*, 481 U.S. at 394 (internal quotation marks omitted) (citing *Skipper*, 476 U.S. at 4).  Here, petitioner presents no evidence that the trial court failed to consider any evidence he offered in mitigation.  He does not argue that the trial court precluded him from offering any mitigating evidence, that Alabama law precluded the trial court and the state appellate courts from considering such evidence, or that Judge White incorrectly believed he was precluded by law from considering such evidence.  The court need not belabor the point since petitioner has apparently abandoned the

180

*Lockett/Hitchcock* argument he raised on direct appeal: there is no basis to conclude that the state courts unconstitutionally failed to consider petitioner's mitigation evidence.

The claim petitioner is left with is that the trial court and the ACCA failed to ascribe appropriate mitigating weight to the evidence he offered. But, under *Lockett* and its progeny, the sentencer, and an appellate court on review, "may determine the weight to be given relevant mitigating evidence." *Eddings*, 455 U.S. at 114–15. *See also Clark v. Attorney General, Fla.*, 821 F.23 1270, 1286 (11th Cir. 2016) (quoting *Schwab v. Crosby*, 451 F.3d 1308, 1309 (11th Cir. 2006)) ("[T]he Constitution 'does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.'").

Petitioner specifically identifies as problematic only four of the trial court's findings respecting the nonexistence of his nonstatutory mitigating circumstances. (*See* Doc. 1, ¶¶ 293–96). Review of petitioner's arguments and the evidence before the trial court fails to reveal any constitutional error, however. Three of petitioner's contentions—that the trial court failed to find mitigating that he did not receive grief counseling, that he got a high school diploma, and that some witnesses viewed him as "loving, kind, well-mannered, respectful, creative, and helpful"—appear to

181

challenge the trial court's presumed factfinding about the nonexistence of these circumstances. (Doc. 1, ¶ 296). But the evidence was not conclusive that these circumstances were present or that they were entitled to any weight.

As to the lack of grief counseling, although the defense had retained a psychologist, there was no professional medical opinion evidence suggesting that petitioner suffered due to the absence of grief counseling.[47] Certainly, Ms. Gordon and Mr. Lester, educational professionals, testified about their belief that petitioner needed counseling in his middle school years, but the trial court could have reasonably determined that more, and better, evidence was needed to show how petitioner's lack of grief counseling factored into an assessment of his "personal moral culpability" for the murder of Mr. Lewis. *Puiatti v. McNeil*, 626 F.3d 1283, 1314 (11th Cir. 2010). Likewise, there is no explanation, or cited authority, addressing why the fact that petitioner obtained a high school diploma despite the challenges he faced was due significant mitigating weight. Finally, while some witnesses indeed testified about petitioner's positive attributes, such as his capacity for kindness and helpfulness, the trial court had before it considerable evidence

---

[47] Crespi filed a pretrial motion "to authorize him to incur expenses for expert psychological assistance[,]" in which he specifically stated that the defense sought to retain Dr. Michael Passler, "a licensed psychologist," whom the defense expected would testify at the penalty phase of trial. (Doc. 19-1 at 33). Judge White granted the motion. (*Id.* at 35). Judge White later granted a motion to have petitioner transported to Dr. Passler's office for a psychological evaluation. (*Id.* at 46). Dr. Passler did not testify at trial.

182

which offset such testimony. Most pertinent were petitioner's own words on the Baker wire recording, in which petitioner stated that he had no conscience and that, even if he could, he would not undo what he had done to Mr. Lewis because it had made him "wiser." (Doc. 19-47 at 183, 193). It was well within the province of the trial court to afford little or no weight to these claimed mitigating circumstances, whether due to a lack of evidence or the fact that the evidence was not inherently mitigating in character in that it failed to meaningfully advance any assessment of petitioner's "personal moral culpability." *Puiatti*, 626 F.3d at 1314.

Petitioner also appears to challenge Judge White's finding that the mitigating circumstance that petitioner suffered abuse at the hands of his uncle "did not exist." (Doc. 19-6 at 191). He argues that, to the extent Judge White's finding on this circumstance represents a finding "that facts supporting the statement existed, but the statement itself did not present a mitigating circumstance," then Alabama's capital sentencing scheme did not "adequately channel" Judge White's discretion "if the sentencer can conclude that a defendant was abused as a child but that this abuse is not a mitigating factor without presenting reviewable reasons for that conclusion." (Doc. 1, ¶ 295).

As discussed above, a string of Supreme Court decisions, including *Eddings*, has recognized that evidence of childhood abuse can relate to the moral culpability

183

of a defendant and is, therefore, classical mitigation evidence necessary to the individualized sentencing determination required by the Eighth Amendment. Thus, the trial court may not exclude, and may not refuse to consider, evidence of this sort. Likewise, as also discussed above, a string of Supreme Court decisions has held that trial counsel's failure to present evidence of childhood abuse in a capital sentencing proceeding can result in the ineffective assistance of counsel. In short, federal constitutional law clearly establishes that evidence of childhood abuse can support the finding of a mitigating circumstance because of what such evidence imparts about the defendant's "moral culpability." *Williams*, 529 U.S. at 398. Neither the trial court nor the ACCA found otherwise.

While petitioner feigns incredulity about why the trial court rejected his proposed mitigating circumstance corresponding to alleged abuse by his uncle, it is at least implicit that the trial court found that the evidence did not persuasively establish the existence of childhood abuse perpetrated by petitioner's uncle. That decision, and that of the ACCA affirming it, was reasonable. While Ms. Gordon and petitioner's sister testified vaguely about incidents of corporal punishment and verbal insults, the evidence did not establish anything more than that petitioner's uncle was a stern disciplinarian who was emotionally distant and sometimes resorted to spanking or "whooping." There was no testimony about sustained, day-in-day-

184

out beatings unrelated to some disciplinary issue or incident. Nor was there any appreciable testimony about the severity of any of these "whoopings" that would place them on par with the abuse described in cases like *Williams*, *Wiggins*, and *Rompilla*.[48]

Moreover, both Ms. Gordon and Mr. Lester, educational professionals well-acquainted with the reporting of abuse concerns to appropriate authorities, testified that they did not report any abuse concerns relating to petitioner's uncle. (Doc. 19-6 at 44 (Ms. Gordon acknowledging that she had contacted authorities with abuse concerns for some of her students but did not do so for petitioner); *id.* at 79 (Mr. Lester discussing mandatory reporting requirements in New Jersey and acknowledging that he did not contact any authority with abuse concerns regarding petitioner)). In its totality, the evidence before the trial court did not reliably support the existence of childhood abuse of the sort recognized by the Supreme Court as essential to reaching an individualized sentencing determination under the Eighth Amendment. Accordingly, it was reasonable for the trial court to conclude that

---

[48] Furthermore, notwithstanding any contention about abuse inflicted by petitioner's uncle, petitioner's sister testified that she asked their uncle to allow her to return to his home in New Jersey after he sent her back to Dothan. (Doc. 19-6 at 185). To the extent petitioner's sister's testimony was intended to establish the existence of abuse as a mitigating circumstance, there were obvious limitations in that regard.

petitioner's evidence of childhood abuse at the hands of his uncle was too weak to establish a mitigating circumstance.

From all of the above, it is evident that, applying Alabama's valid capital sentencing scheme, the trial court did not preclude petitioner from offering mitigating evidence, did not refuse to consider any such evidence, and made findings about the existence or nonexistence of mitigating circumstances that were sufficiently definite to permit appellate review. Because Alabama's capital sentencing scheme therefore adequately channeled the sentencer's discretion, both on its face and in application in petitioner's case, there was no constitutional obligation of the trial or appellate courts to conduct a comparative proportionality review of petitioner's sentence.

Even so, the ACCA conducted a proportionality review pursuant to Alabama law and, as set forth above, that proportionality review was based upon the individualized sentencing determination required by the Eighth Amendment. Citing other cases in Alabama where persons convicted of robbery-murder were sentenced to death, the ACCA concluded that petitioner's sentence was proportional. *Benjamin*, 940 So. 2d at 387–88. The ACCA therefore reasonably concluded on appeal in Rule 32 proceedings that it is not reasonably probable that petitioner's sentence would have been reversed on direct appeal had petitioner's counsel argued

186

that the state court's proportionality review was constitutionally inadequate.  The ACCA did not contravene, or unreasonably apply, clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, when it denied this ineffective assistance of appellate counsel claim.

Accordingly, petitioner's procedural default of his substantive Eighth Amendment claim is not excused by the ineffective assistance of his appellate counsel, and his freestanding claim of ineffective assistance of counsel is due to be denied pursuant to § 2254(d)(1) & (2).

## III.    The Rule 32 Court Erroneously Excluded Evidence (Claim III.G)

### A.    Petitioner's Allegations

Petitioner claims the state courts unreasonably applied *Sears v. Upton*, 561 U.S. 945 (2010), and violated state evidentiary law, in excluding on hearsay grounds some of the mitigation evidence he sought to present at the Rule 32 evidentiary hearing.  (Doc. 1, ¶¶ 308–09).  He alleges that he offered "a variety of out-of-court statements by mitigation witnesses for the limited purpose of showing what mitigation evidence was available during the penalty phase."  (Doc. 1, ¶ 310).  He maintains the statements "were not offered for the truth of the matter asserted."  (Doc. 1, ¶ 311).  He asserts the state court's application of state law hearsay rules

187

constituted an "unreasonable application of federal law that hearsay is admissible during the penalty phase." (Doc. 1, ¶ 312 (citing *Sears*, 561 U.S. at 950 n.6)).

## B.    State Court Proceedings

Petitioner accurately recounts that, during the Rule 32 evidentiary hearing, the Rule 32 court excluded some witness testimony, as well as witness affidavits, on hearsay grounds. In his appeal of the Rule 32 court's final order, petitioner argued that the Rule 32 court erred in excluding the out-of-court statements because they were not offered for the truth of what they asserted. (Doc. 19-52 at 168). He challenged the Rule 32 court's reasoning as follows:

> The Court appears to have reasoned that, in fact, they were offered for their truth because, in order to grant the Amended Petition based upon them, the Court would have had "to find some degree of truthfulness" to the statements. But the Court's reasoning fails to account for the fact that hearsay is admissible during the penalty phase. *See, e.g.*, Ala. Code § 13A-5-45(d); *Roberts v. State*, 735 So. 2d 1244, 1265–66 (Ala. Crim. App. 1997) (reversible error to exclude hearsay evidence offered by defendant in support of mitigation at penalty phase). Thus, in offering the statements during the Rule 32 Hearing, Mr. Benjamin was attempting to do no more than present the evidence that could have been presented during the penalty phase at trial had counsel been effective. The Court should have admitted them for that limited purpose.

(*Id*. at 168–69 (record citation omitted)). Petitioner did not argue to the ACCA that the exclusion of evidence violated his constitutional rights.

The ACCA affirmed the Rule 32 court's application of state law, relying upon prior authority holding that the Alabama Rules of Evidence, which specifically

188

exclude hearsay evidence, apply in Rule 32 proceedings notwithstanding the lenient admission of hearsay evidence during the sentencing phase of a capital murder trial. *Benjamin*, 156 So. 3d at 457–58.

C. **The ACCA did not contravene, or unreasonably apply, clearly established federal law, and did not base its decision upon any unreasonable determination of the facts.**

To the extent petitioner challenges simply whether the state courts correctly characterized his excluded evidence as hearsay, *i.e.*, whether the state courts properly applied state evidentiary rules and law, he presents no viable claim for federal habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The exclusion of petitioner's evidence pursuant to state law must have deprived him of constitutional due process of law in order to be remediable in federal habeas corpus. *Id*. To be clear, although respondent does not assert any failure to exhaust this claim, it does not appear that petitioner presented any due process argument about the exclusion of his hearsay evidence in the state courts.

Nevertheless, assuming that this claim is properly before the court as a constitutional due process claim that was implicitly presented to the ACCA and was rejected on its merits, the ACCA's decision did not contravene, or unreasonably apply, clearly established federal law. To begin with, *Sears* did not hold that hearsay evidence must be admitted in state postconviction proceedings like a Rule 32

189

proceeding in Alabama.  Rather, the holding of *Sears* was simply that a Georgia state postconviction court "failed to apply the correct prejudice inquiry" to a *Strickland* claim challenging counsel's investigation and presentation of mitigating evidence at a capital trial.  561 U.S. at 956.  Although the Supreme Court "recognized," in a footnote, "that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule[,]" *id*. at 950 n.6 (citing *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam)), that observation is in no sense the holding of *Sears*.  Indeed, in that same footnote in *Sears*, the Supreme Court clarified that it expressed "no view on whether the evidence at issue" should have been admitted under due process principles or pursuant to state law.  *Id*.

In any event, even assuming that *Sears*, and the authority it cites, *Green*, "stand for the premise that mitigating hearsay evidence is always admissible at the postconviction stage," *Broadnax v. Comm'r, Ala. Dep't of Corr*., 996 F.3d 1215, 1228 (11th Cir. 2021), petitioner has failed to show that any of the hearsay evidence he sought to admit at the Rule 32 hearing meets the requirements for admissibility under *Sears* and *Green*.

*Sears* references, and *Green* explicitly applies, a requirement that hearsay evidence be reliable as a predicate to its admission under due process principles.  *See*

190

*Green*, 442 U.S. at 97. The habeas petitioner in *Green*, Roosevelt Green, attempted to present at his capital sentencing proceeding evidence that his co-defendant, Moore, had confessed to a witness that Moore had killed the victim. *Id*. at 96. Although the State had previously utilized this same witness's testimony to convict Moore of murder, the court at Green's trial excluded the witness's testimony on hearsay grounds. *Id*. The Supreme Court held that Green's due process rights were violated because the witness's testimony "was highly relevant to a critical issue in the punishment phase of the trial" and "substantial reasons existed to support its reliability." *Id*. at 97. Those reasons included the following:

> Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.

*Id*. It was the substantial indicia of reliability of the witness's testimony that provided the Supreme Court with the requisite "unique circumstances" to conclude that Green's due process rights required admission of the hearsay statements. *Id*.

Petitioner here presents no such arguments about the reliability of any of the hearsay statements he claims were erroneously excluded by the Rule 32 court. With no showing in state court, or here, that any of the declarants' statements were

191

reliable, as the court required in *Green*, this court cannot conclude that the state courts unreasonably applied *Sears* or *Green* even if those decisions clearly establish that due process may require the admission of hearsay evidence during Rule 32 proceedings. *See Broadnax*, 996 F.3d at 1228. Accordingly, this claim is due to be denied.

## IV. Claims Summarily Dismissed by the State Courts (Claim III.H).

Petitioner alleges the state courts unreasonably applied clearly established federal law by summarily dismissing several of his claims. The court will take each of the claims in order.

### A. Counsel Ineffectively Protected Petitioner's Sixth Amendment Confrontation Rights (Claim III.H.1).

#### 1. Petitioner's allegations

Petitioner alleges Crespi failed to effectively object to the prosecution's use of the Baker wire recording at trial. He cites several statements to which Crespi should have specifically objected, including Baker's reference to a newspaper article petitioner kept as a "trophy," Baker's recollection that petitioner wore "a hood" on the night of the murder, and Baker's statement that petitioner had previously told him that petitioner had killed people in New Orleans. (Doc. 1, ¶ 318). While he concedes that Crespi did object to the admission of the recording, he claims Crespi "failed to alert the court that these statements were played to establish the truth of

what Mr. Baker said, not just for 'context.'" (*Id.*). Furthermore, petitioner alleges that Crespi failed to effectively object when the prosecutor referred to Baker's statements at various points in his argument. (Doc. 1, ¶ 319). He asserts Crespi should have sought a curative instruction advising the jury "to disregard Mr. Baker's statements or to use them for the limited purpose of putting Mr. Benjamin's statements on the tape into context." (Doc. 1, ¶ 321). He maintains Valeska's repeated references to Baker's statements conveyed to the jury that they should consider Baker's statements as testimonial evidence rather than context for petitioner's own statements. (*Id.*).

Petitioner also alleges that Crespi's objection to the admission of the recording was deficient because it was untimely. While Crespi raised a confrontation objection at trial, he did not do so until the last day of the trial, "by which point the prosecutor had made it clear to the jury that a confidential informant had engaged in a tape-recorded conversation with Mr. Benjamin that 'solved' the case." (Doc. 1, ¶ 323). He claims effective counsel "would have successfully moved to exclude the tape prior to voir dire." (*Id.*).

Finally, petitioner alleges that Crespi ineffectively failed to adequately raise the confrontation issue on direct appeal. He states Crespi's appellate brief "presented a cursory, one-page analysis of why Mr. Benjamin's right to confront Mr.

193

Baker was violated, without ever pointing out to the court that several of the statements the prosecutor attributed to Mr. Baker were not on the body-wire; instead many of the statements . . . came from Mr. Baker's police interview, which the State never offered into evidence."  (Doc. 1, ¶ 328).

### 2.    State court proceedings

At trial, Valeska queried Dothan police investigator Douglas Johnson extensively about his meeting with Baker concerning Baker's information about the murder of Mr. Lewis and Johnson's eventual decision to have Baker wear a wire and engage petitioner in a recorded conversation about the murder.  (Doc. 19-4 at 192–Doc. 19-5 at 4).  When Valeska moved to enter the recording into evidence, Crespi objected, *inter alia*, on confrontation grounds.  (Doc. 19-5 at 36–37).  Judge White overruled the objection and admitted the recording.  (*Id*. at 38).

On direct appeal, Crespi argued that the recording should not have been admitted because it was authenticated by Johnson rather than either of the parties to the recorded conversation.  (Doc. 19-7 at 50).  He also argued that the "failure of the State to put up Baker to authenticate the recording violated" petitioner's Sixth Amendment confrontation rights, as explicated in *Crawford v. Washington*, 541 U.S. 36 (2004).  (Doc. 19-7 at 50–51).[49]

---

[49] In *Crawford*, the Supreme Court held that, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is . . . confrontation."  541 U.S.

194

The ACCA first upheld the recording's admissibility via authentication by Johnson. *Benjamin*, 940 So. 2d at 377–78. As for petitioner's constitutional challenge, the ACCA observed that petitioner's argument "appears simply to be an extension of his authentication argument, which we have already rejected, rather than an argument based on confrontation principles." *Id*. at 378. Nevertheless, analyzing the substance of the wire recording, the ACCA found that Baker was not an adverse witness for confrontation purposes:

> Further, we note that, during the audiotaped conversation, Baker did not make any statements that implicated the appellant. Rather, he simply asked the appellant about what happened and carried on a conversation with the appellant as the appellant talked about the incident. Among other things, the appellant said that he did not have a conscience; that, if he had not done it that night, he might have done it another night and gotten caught; and that he had gotten rid of the evidence. Baker's statements simply put the appellant's statements in context and made them recognizable as admissions. Therefore, even under the broadest definition, Baker would not be an adverse witness against the appellant.

*Id*. Finally, the ACCA found that petitioner's "reliance on *Crawford* is misplaced." *Id*. Following an extensive quotation of the decision of the United States Court of Appeals for the Third Circuit in *United States v. Hendricks*, 395 F.3d 173, 182–84

---

at 68–69. Hence, under *Crawford*, "testimonial evidence" may not be admitted except where the declarant is unavailable and the defendant had "a prior opportunity for cross-examination." *Id*. at 68.

(3d Cir. 2005), the ACCA explained why *Crawford* did not bar admission of the

Baker wire recording:

> Based on the reasoning in *Hendricks*, the appellant's statements on the audiotape were admissions that he certainly did not realize would be used prosecutorially. Therefore, they were not testimonial and would not be barred by *Crawford*.

> Also, the State did not offer Baker's statements during the audiotaped conversation as substantive evidence against the appellant. Rather, it simply used them to put the appellant's statements in perspective and to make them recognizable as admissions. Therefore, Baker's statements do not appear to be testimonial statements that would be barred by *Crawford*.

> Moreover, even if Baker's statements were testimonial, the State did not offer them to prove the truth of the matters asserted therein. Rather, as set forth above, it simply used them to put the appellant's statements in context. Therefore, as the court in *Hendricks* noted, "[T]he Confrontation Clause likewise 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' *Crawford*, 541 U.S. at 59 n.9." 395 F.3d at 183. For these reasons, the United States Supreme Court's decision in *Crawford* did not bar the admission of the audiotape.

*Id*. at 380–81.

In his amended Rule 32 petition, petitioner alleged the ineffective assistance

of trial and appellate counsel claims he now presents in his federal petition. (Doc.

19-11 at 196–201 (alleging ineffective assistance of trial counsel) & Doc. 19-12 at

68–69 (alleging ineffective assistance of appellate counsel)). The Rule 32 court

summarily dismissed these claims on the merits, prior to the evidentiary hearing,

196

pursuant to Rule 32.7(d).  (Doc. 19-13 at 60–61).  The Rule 32 court reasoned that, because the ACCA determined on direct appeal that admission of the Baker recording did not violate petitioner's confrontation rights pursuant to *Crawford*, "trial and appellate counsel could not be ineffective for failing to more effectively raise and argue this issue." (*Id*. at 61).  The ACCA affirmed, finding that the claim was "correctly summarily dismissed because it failed to state a claim upon which relief could be granted." *Benjamin*, 156 So. 3d at 460.

> 3.    *The ACCA did not contravene, or unreasonably apply, clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

Petitioner appears to concede that the state courts did not unreasonably apply *Crawford* in holding that admission of the Baker wire recording did not violate petitioner's Sixth Amendment confrontation rights.  (Doc. 1, ¶ 330–31).  He argues, instead, "[t]he fact that the recording was admissible, and that Mr. Baker's statements could be used for 'context,' does not change the fact that it was improper for the prosecutor to refer to Mr. Baker's statements for their truth and that it was ineffective for trial counsel not to object and seek a curative instruction." (Doc. 1, ¶ 331).  Petitioner fails, however, to establish that the ACCA unreasonably applied *Strickland* in concluding that he was not prejudiced.

Petitioner identifies several instances in which, he alleges, Baker's statements on the wire recording were presented to the jury for their truth, rather than as context for petitioner's own admissions on the recording. He first highlights Baker's reference "on the tape to a newspaper article about the crime that he [Baker] states Mr. Benjamin kept as a 'trophy.'" (Doc. 1, ¶ 318). Here is what the jury heard on the wire recording:

> [Baker]: I'm saying though . . . okay . . . remember you said . . . you cut the newspaper out and you said you want this for a souvineir [sic], right?
> [Petitioner]: Right. That kind of shit happens in Dothan. How many motherfuckers you know done shot a . . . at the mall.

(Doc. 19-47 at 179). Considering that police recovered the clipped newspaper article in the search of petitioner's room, and that the article was admitted into evidence, petitioner cannot show prejudice merely from Baker's reference to the newspaper article as a souvenir. Moreover, petitioner's explanation for why he clipped the article—the notoriety of the event—permits the reasonable inference that he viewed it as a sort of souvenir or trophy.

Petitioner also points to Baker's statement on the wire that it was raining and petitioner was wearing a "hood." (Doc. 1, ¶ 318). But many witnesses testified about the rainy conditions that evening, and petitioner himself admitted on the Baker wire recording that he, in fact, chose that night because it was raining and that he

had a "blue rag" and a "hood" on at the time of the murder. (Doc. 19-47 at 186–87). Even if Valeska had somehow offered Baker's statements for their truth, petitioner cannot show that Crespi's failure to object prejudiced him.

Petitioner also mentions instances in which Valeska referenced the portion of the Baker recording where Baker alludes to a prior conversation in which petitioner told Baker he had killed people in New Orleans. (Doc. 1, ¶¶ 318–19). He cites no instance, however, in which the prosecution argued to the jury that petitioner actually had killed people in New Orleans or that the jury should entertain whether he had done so. Moreover, petitioner admitted in his police statement, which was also admitted in evidence, that he had "bragged" to others about having killed people in New Orleans. (Doc. 19-47 at 175). Petitioner cannot show prejudice due to the prosecutor's reference to a purportedly "testimonial" statement of Baker which petitioner himself admitted in his own police statement.

Petitioner next highlights a portion of Valeska's opening statement in the penalty phase in which Valeska stated, "'Bragged about it. Laughed about it. Baker told you, I heard the sirens and the ambulances.'" (Doc. 1, ¶ 319). The full context of Valeska's argument shows that, in relevant part, he was fairly characterizing the evidence from the wire:

> You heard the tape. Baker asked him about -- Man, I didn't think you were going to do it. Benjamin says, I planned it out. I made sure it was

199

> dark.  I wasn't going to go when there was a lot of sun.  I was going to go at nighttime.  Ain't got no conscience.  Bragged about it.  Laughed about it.  Baker told you, I heard the sirens and the ambulances.

(Doc. 19-5 at 166).  Valeska's argument that petitioner "bragged" about the shooting of Mr. Lewis is a reasonable inference drawn from the recording in which petitioner both emphasized his careful planning of the crime[50] and admitted that he clipped a newspaper article describing the shooting to keep as a souvenir because shooting someone at the mall is a rare event in Dothan.  While petitioner correctly argues that Valeska's reference to Baker's having heard "sirens and ambulances" was improper because Baker did not mention hearing sirens on the wire recording, this error gets him no closer to a showing of prejudice because petitioner fails to explain how Valeska's reference to Baker having heard sirens and ambulances could have affected the outcome of his sentencing proceeding.[51]  Whether or not Baker heard sirens and ambulances shortly after petitioner murdered Mr. Lewis was of no import to resolving any question before the jury at the sentencing phase.

To be sure, as petitioner argues here, Valeska sometimes referred to the Baker recording with the intimation that Baker had offered testimony.  Petitioner highlights instances in which Valeska prefaced points of his argument with statements like

---

[50] (*See* Doc. 19-47 at 186 ("People don't realize, I think shit out before I do it.")).

[51] Valeska's reference to "sirens and ambulances" appears to be derived from Baker's police interview, which was not admitted in evidence.

200

"Mr. Baker said," "Mr. Baker told you," and "you will hear from Michael Baker" before referencing some portion of the recording. (Doc. 1, ¶ 324). While Crespi might have successfully objected and curtailed this practice by Valeska, or obtained an appropriately-tailored curative instruction, as the ACCA found on direct appeal, *see Benjamin*, 940 So. 2d at 378, it remains that there is no testimonial statement on the Baker wire in which Baker implicated petitioner or provided the jury with probative evidence of guilt or intent that petitioner did not himself admit either in his end of the conversation with Baker or, separately, in his police statement. Thus, even to the extent Valeska's argument might have improperly portrayed parts of the recording as a testimonial statement by Baker, petitioner failed to allege persuasive facts in the state court showing how it is reasonably probable that he would not have been convicted, or sentenced to death, or had his conviction or sentence reversed on appeal had counsel objected to Valeska's argument at the time it was made or on direct appeal. Accordingly, the ACCA did not contravene, or unreasonably apply, *Strickland* in deciding that petitioner's ineffective assistance of trial and appellate counsel claims were without merit.

> **B.    Counsel Ineffectively Failed to Object to Incorrect Jury Instructions (Claim III.H.2).**
>
> > *1.    Petitioner's allegations*

201

Petitioner claims Crespi was "ineffective in allowing the jury to be improperly instructed and that trial counsel was ineffective in failing to raise these issues on appeal under *Strickland*." (Doc. 1, ¶ 334). Specifically, he attacks Crespi's performance respecting the trial court's instructions on felony murder and reasonable doubt. As to the instruction on felony murder, petitioner alleges Judge White "improperly informed the jury that a felony murder must have been an accidental killing, as opposed to any other situation when a killing was not intentional." (Doc. 1, ¶ 335). When Crespi objected that Judge White's explanation omitted the possibility that a "reckless" murder could also satisfy the elements of felony murder, Judge White's clarifying instruction to the jury "did not undo the damage . . . because it did not properly explain the difference between an intentional and a non-intentional killing." (*Id*.). Petitioner also alleges Judge White should not have separately given the defense's requested instruction concerning felony murder because the instruction was "confusing" in that it "present[ed] itself as in instruction for 'murder' instead of 'felony murder.'" (Doc. 1, ¶ 336).

Petitioner alleges four ways in which Crespi's performance was deficient respecting the felony murder instructions: *first*, Crespi requested, and obtained, the chronologically second and "confusing" instruction on felony murder; *second*, Crespi failed to object to Judge White giving the requested instruction "long after

202

reading a proper instruction on felony murder to the jury"; *third*, Crespi "failed to object to the court's reading of all of counsel's suggested instructions after the trial court had completed its own instructions"; and *fourth*, Crespi objected too late to Judge White's description of felony murder as requiring an "accidental" killing. (Doc. 1, ¶ 337).

On the reasonable doubt instruction, petitioner alleges Judge White deviated from the Alabama Pattern Jury Instructions by telling the jury that reasonable doubt is not a difficult concept to grasp. (Doc. 1, ¶ 339). He claims Judge White's instruction that reasonable doubt is "doubt for which you can give a reason" is misleading because the jury is not "required to articulate its doubt[.]" (*Id*.). He asserts that counsel's failure to object to Judge White's explanation of reasonable doubt allowed petitioner "to be convicted under a lesser standard of proof than required by the Constitution." (Doc. 1, ¶ 340).

Petitioner alleges that Crespi was ineffective in failing to raise these objections both at trial and on direct appeal. (Doc. 1, ¶¶ 341–42).

### 2. State court proceedings

In his guilt phase jury instructions, Judge White charged the jury on felony murder as follows:

> And if you should find - or if you should not find that the State
> has proven a capital murder committed during the course of a robbery,

203

then your next consideration should be the lesser-included offenses to the charge of capital murder. And there are actually under the facts as taken in this case, there are actually four lesser included offenses to the charge of capital murder committed during the course of a robbery that I need to charge you on. And the first of those offenses that I need to tell you about is that of felony murder. A person commits the crime of murder if he commits or attempts to commit a robbery in the first degree, and in the course of the crime or in the furtherance of the crime or in immediate flight from the crime that he is committing or attempting to commit, he causes the death of another person.

Now, the one essential element that – delineates between and distinguishes a capital murder committed during the course of a robbery from felony murder is that there is no intent to kill in felony murder. You'll notice that the element of intentional killing is not present in a felony murder. A felony murder is simply a person who commits the crime of - the law says that a person commits the crime of murder if he is committing or attempting to commit a robbery in the first degree. A person is either – during the course of committing a robbery or attempting to commit a robbery in the first degree, he causes – and during the commission of that robbery in the first degree, he causes the death of some other person, but does not have the intent—does not intentionally, you know, cause the death of that other person. And of course, that's a fact to be determined by the jury. I mean, it could be an accidental killing that comes about during the course of the commission of a robbery in the first degree -- he went in and attempted to commit or was committing a robbery, and somehow, a person got accidentally shot during the commission, but he didn't intend to kill that person. Then, that would be a felony murder, as opposed to capital murder committed during the course of a robbery, because there was no intent there? You see? That's the difference in the two.

Therefore, to convict of the offense of felony murder, the State must prove beyond a reasonable doubt each of the following elements of murder. They must prove that the victim, Jimmie Lewis, is dead. Secondly, that the Defendant Brandyn Josephe Benjamin caused the death of Jimmie Lewis by shooting him with a pistol, that in committing the act which caused the death of Jimmie Lewis, that this Defendant

204

> Brandyn Jospehe Benjamin was acting in the course of or in the furtherance of the crime of robbery in the first degree, and that, in doing the acts which constituted the commission or the attempted commission of robbery in the first degree, that the death of Jimmie Lewis was caused by this defendant here, Brandyn Josephe Benjamin.

(Doc. 19-5 at 118–21).

After Judge White completed reading the court's instructions, he proceeded to give some of the defense's requested instructions, including another instruction on the lesser-included offense of felony murder.  Judge White instructed as follows:

> Now, the following written charges likewise state correct propositions of law and are to be taken by you along with the Court's oral charge in arriving at your verdict in this case.  In order to prove that Brandyn Josephe Benjamin acted intentionally in killing Jimmie Lewis, the State must prove beyond a reasonable doubt that Brandyn Jospehe Benjamin had a particularized intent to kill him.

> Also included within the principal charge of capital murder is the lesser-included charge of murder.  A lesser-included charge is one which is included within the charge contained in the Indictment, but is not explicitly written out in it.  If, after you have considered all of the evidence in this case, you are not satisfied that the State has proven – has not proven the charge of capital murder beyond a reasonable doubt, you may consider the lesser-included charge of murder under the instructions which I give you now.  A person commits the crime of murder – and actually, we are talking about felony murder here – if he commits a robbery in the first degree, and in the course of that crime or in the furtherance of that crime or an immediate flight from the crime that he is committing, he causes the death of another person.  To convict, the State must prove beyond a reasonable doubt each of the following elements of felony murder: That Jimmie Lewis is dead, that Brandyn Josephe Benjamin caused the death of Jimmie Lewis, by shooting him, and that in committing the acts which caused the death of Jimmie Lewis, Brandyn Josephe Benjamin was acting in the course

205

of and in furtherance of the crime of robbery in the first degree or was in immediate flight from it; and in doing the acts which constituted the commission of robbery in the first degree, or during the course or in the furtherance of or an immediate flight from robbery in the first degree, the death of Jimmie Lewis was caused by Brandyn Josephe Benjamin.

(Doc. 19-5 at 134–35).

As noted in the petition, Crespi objected to Judge White's first felony murder instruction, specifically arguing that, "under the facts and under the law, it would be equally true that they could make that finding [*i.e.*, convict of felony murder] if it were done recklessly.  And we except to that."  (Doc. 19-5 at 140).  Judge White responded, "I said accidental, but reckless would be the same."  (*Id.*).  Judge White then gave a clarifying instruction to the jury:

> Let me just clear something up.  In the felony -- and really, I probably shouldn't have even done it.  But I gave, in the felony murder thing – definition, I told you that it – you know, where a robbery in the first degree is being committed, and during the commission of that robbery in the first degree or in the flight from it, a person is killed, but not intentionally killed, that that would constitute felony murder.  And I have - I gave as an example -- and I didn't, mean it to be an exclusive example – you know, that robbery was being committed, and while it's being committed, a person is accidentally killed, that it would be a felony murder.  That's not exclusive.  It could also be—the person could be recklessly killed or some other way—any way, other than an intentional killing.

(Doc. 19-5 at 140–41).

Judge White gave the following instruction on reasonable doubt:

Now, this defendant, of course, went into the trial of this case with a presumption of innocence in his favor. And that presumption of innocence attends him and abides with him and stays with him throughout the trial of the case until his guilt is established beyond a reasonable doubt. And of course, after you have weighed and considered all of the evidence in the case if there remains a reasonable doubt in your minds as to the guilt of the defendant, then, of course, he would be entitled to the benefit of that doubt and would be entitled to an acquittal at your hands.

Now, the presumption of innocence is a matter of evidence that is -- that he is entitled to, and it abides with him and stays with him throughout the trial of the case and must -- as I have said, if there remains any doubt of his guilt, doubt for which you can give a reason -- the term reasonable doubt is really not all that difficult. It's a doubt for which you can give a reason, a reason which comes from the evidence, and from the evidence alone. If you have a reasonable doubt of his guilt, then he would be entitled to the benefit of that doubt and would be entitled to an acquittal at your hands.

Now, as I have said, the law requires that you must be convinced beyond a reasonable doubt of the guilt of the party being placed upon trial before you would be justified in returning a verdict of guilty against him. Now, that doesn't mean that you have to be satisfied beyond all doubt and to an absolute certainty and to the point that you cannot possibly be mistaken, but it does mean that if, after you have weighed and considered all of the evidence in the case, that if it has been your fixed conviction and your fixed opinion and judgment that the defendant is guilty, and you are satisfied of that beyond any doubt for which you can give a reason, then, of course, the law says that you are convinced beyond a reasonable doubt, and your verdict should be guilty.

(Doc. 19-5 at 130–31). Crespi did not object to Judge White's instruction on reasonable doubt.

207

On direct appeal, with respect to the trial court's jury instructions, Crespi challenged only Judge White's failure to give a requested instruction on residual doubt. (Doc. 19-7 at 52). He made no arguments about the trial court's instructions on felony murder or reasonable doubt. The ACCA affirmed the trial court's refusal of the requested instruction on residual doubt and did not find any error respecting the court's instructions in its own review of the record. *Benjamin*, 940 So. 2d at 383, 388.

Petitioner presented the instant ineffective assistance claims in his amended Rule 32 petition. (Doc. 19-12 at 40–44 (ineffective assistance of trial counsel); *id.* at 69–70 (ineffective assistance of appellate counsel)). The Rule 32 court summarily dismissed the claims prior to the evidentiary hearing pursuant to Rule 32.7(d). (Doc. 19-13 at 61–62). The Rule 32 court reasoned as follows:

> This Court finds that these claims are without merit and are hereby summarily dismissed. Ala. R. Crim. P. 32.7(d). This Court finds both that trial counsel requested and that the trial Court accordingly gave a standard instruction regarding felony murder to the jury. This court also finds that the trial court gave a standard, pattern jury instruction on reasonable doubt which has been previously upheld by Alabama courts. [S]ee *Lee v. State*, 898 So. 2d 790, 842 (Ala. Crim. App. 2003). Accordingly, because the trial courts instructions were proper, Benjamin's counsel could not be ineffective for challenging the instructions. Therefore, this claim is summarily dismissed. Ala. R. Crim. P. 32.7(d).

(*Id.* (record citations omitted)).

The ACCA affirmed the Rule 32 court's summary merits adjudication:

In his petition, Benjamin asserted that the court failed to distinguish the difference between capital murder and felony murder and that the court's instructions on reasonable doubt were erroneous. Like the circuit court, we have carefully reviewed the jury instructions, and we find no error. The circuit court instructed the jury on capital murder and the lesser offenses of felony murder, murder, manslaughter, and robbery and properly distinguished each offense. The jury instructions on reasonable doubt were thorough and accurate. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." *Lee v. State*, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009).

*Benjamin*, 156 So. 3d at 460–61.

> 3. *The ACCA did not contravene, or unreasonably apply, clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

The ACCA's decision upholding the denial of petitioner's ineffective assistance of trial and appellate counsel claims is reasonable because petitioner failed to plead any factual allegations plausibly establishing how he was prejudiced by counsel's alleged deficient performance respecting the trial court's jury instructions. While petitioner insists that the trial court's instructions on felony murder were erroneous and confusing to the jury, he cites no authority, state or federal, substantiating his claim of error. The closest he gets to an allegation of cognizable prejudice is his claim that Judge White's "improper instructions with respect to the elements of capital murder and non-capital felony-murder result[ed]

209

in the jury's being provided with misleading instructions regarding the respective elements of capital murder and non-capital murder.  This was highly prejudicial to Mr. Benjamin, because a key aspect of his defense to the capital murder charge was that he did not intend to kill the victim."  (Doc. 1, ¶ 338).

Whatever legitimate criticisms might be lodged against Judge White's jury charge, it cannot be said that Judge White left the jury with the impression that it could convict petitioner of capital murder without a unanimous finding that he intended to kill Mr. Lewis.  As reviewed above, Judge White's charge plainly, explicitly, and repeatedly told the jury that what separated the capital murder charge from the lesser-included charges, including felony murder, was the element of intent. (*See, e.g.*, Doc. 19-5 at 119 ("Now, the one essential element that – delineates between and distinguishes a capital murder committed during the course of a robbery from felony murder is that there is no intent to kill in felony murder.  You'll notice that the element of intentional killing is not present in a felony murder.")).  In no sense did Judge White's charge confuse the jury about whether it could convict petitioner of capital murder without a finding that he intended to kill Mr. Lewis.

Although Judge White initially described only an "accidental" killing as the kind of killing contemplated by felony murder, he corrected and clarified the charge when Crespi objected.  Judge White explained that a reckless killing, "or some other

210

way . . . any way, other than an intentional killing," could support a felony murder conviction. (Doc. 19-5 at 140–41). But even as to Judge White's acknowledged error of initially limiting felony murder to "accidental" killings, petitioner fails to plead any facts that could establish prejudice because his theory at trial, and throughout state postconviction, was that the killing of Mr. Lewis was due to an accidental discharge of his firearm during a struggle with Mr. Lewis. (*See* Doc. 19-5 at 96 (Crespi arguing in closing, "what we have is an attempt at robbery that ended tragically in the course of this struggle."); doc. 19-50 at 161 (Crespi confirming at the Rule 32 hearing that the defense theory was "the gun went off potentially accidentally"); *id.* at 10–13 (petitioner's Rule 32 expert's testimony about unintentional shootings, including accidental discharge because of gun defects and due to phenomena such as "hand confusion" and "sympathetic reflex" or "a physical reaction to the manipulation of how events are occurring," *i.e.*, delivering force with a hand holding a gun may cause the unintentional pull of the trigger in the gun hand)). Because Judge White's felony murder charge actually embraced the defense's theory of an accidental shooting, petitioner cannot show that the charge confused the jury about the intent element of capital murder or that he was prejudiced by trial and appellate counsel's failure to object to the court's instructions.

In its totality, Judge White's charge to the jury on capital murder and its lesser-included offenses, including felony murder, was sufficiently clear respecting the elements of each offense that the jury could not have been confused about the requisite elements of each offense and how they differ.  Petitioner cites no authority substantiating any contention that the trial court prejudicially erred in its charge on capital murder or the lesser-included offenses.  The ACCA therefore reasonably determined that there is no reasonable probability that the result of petitioner's trial or direct appeal would have been different had Crespi raised the objections petitioner presented in his Rule 32 petition.  Accordingly, petitioner's claim of ineffective assistance respecting counsel's alleged failure to adequately challenge the trial court's felony murder instructions is due to be denied.

As for Judge White's reasonable doubt instruction, petitioner cites only one decision, *Cage v. Louisiana*, 498 U.S. 39, 39–41 (1990), in support of his claim that the instruction improperly defined reasonable doubt, thereby "allowing Mr. Benjamin to be convicted under a lesser standard of proof than required by the Constitution."  (Doc. 1, ¶ 340).  In *Cage*, the trial court's reasonable doubt instruction "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty."  498 U.S. at 41.  The Court held simply that the trial court's

212

use of "the words 'substantial' and 'grave,' as they are commonly understood, suggest[ed] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Id*.

Although Judge White's charge did instruct that "reasonable doubt" is "doubt for which you can give a reason," nothing in Judge White's charge articulated a reasonable doubt standard that required "a higher degree of doubt" to acquit, as in *Cage*. Rather, Judge White's charge simply instructed the jury that "reasonable doubt" must be tangibly anchored in the evidence admitted at trial. (Doc. 19-5 at 131). Read as a whole, Judge White's charge adequately defined reasonable doubt and did not mislead the jury about the degree of doubt needed to convict or acquit the defendant. The ACCA therefore reasonably determined that it is not reasonably probable that petitioner would not have been convicted had Crespi objected to the reasonable doubt instruction, or that the ACCA would have reversed petitioner's conviction had Crespi raised the issue on direct appeal. Accordingly, petitioner's claim of ineffective assistance respecting counsel's alleged failure to adequately challenge the trial court's reasonable doubt instruction is due to be denied.

### C.   Counsel was Ineffective at the Judicial Sentencing (Claim III.H.3).

#### 1.   *Petitioner's allegations*

Petitioner alleges trial counsel were ineffective at the judicial sentencing hearing before Judge White because they "presented no additional evidence, called no witnesses and did not arrange for anyone to appear for the defense at the sentencing hearing." (Doc. 1, ¶ 349). He specifically cites counsel's failure to offer the testimonies of the defense mitigation specialist, Ms. Pettry, and the defense neuropsychologist, Dr. Passler, at the hearing, as well as the failure to offer evidence about his "lack of future dangerousness." (*Id*.). He alleges that, had counsel "called available witnesses to testify, their testimony would have provided the trial judge with critical mitigating evidence and provided a substantial basis for sentencing Mr. Benjamin to life imprisonment without the possibility for parole." (Doc. 1, ¶ 350). Thus, he maintains, but for counsel's alleged deficient performance at the judicial sentencing hearing, "it is reasonably probable Mr. Benjamin would not have received a sentence of death." (*Id*.).

#### 2.   *State court proceedings*

Petitioner raised this claim in his amended Rule 32 petition. (Doc. 19-12 at 60–61). The Rule 32 court summarily dismissed the claim on the merits prior to the evidentiary hearing pursuant to Rule 32.7(d), finding that the claim was

214

"cumulative" of petitioner's claim challenging counsel's performance at the penalty phase of trial. The Rule 32 court reasoned as follows:

> Benjamin is entitled to present evidence at his evidentiary hearing in support of his claim that his counsel was ineffective during the penalty phase of the trial. However, the presentation of any mitigating evidence pertaining to Benjamin's claim of ineffective assistance of counsel during his sentencing hearing would be cumulative. Accordingly, this Court finds Benjamin's claim [ . . . ] to be cumulative; therefore, this claim is summarily dismissed. Ala. R. Crim. P. 32.7(d).

(Doc. 19-13 at 62–63).

The ACCA found that petitioner's appellate brief respecting this claim failed to comply with Rule 28(a)(10) of the Alabama Rules of Appellate Procedure because he "failed to present sufficient argument, authority or citation to the facts in support of this issue[.]" *Benjamin*, 156 So. 3d at 461 (quoting *Jennings v. State*, 965 So. 2d 1112, 1136 (Ala. Crim. App. 2006)). Accordingly, the ACCA concluded that petitioner waived appellate review of this claim pursuant to Rule 28(a)(10).

### 3. *Respondent's procedural defense*

Respondent asserts that this claim is procedurally defaulted because the ACCA found the claim procedurally barred pursuant to Rule 28(a)(10). (Doc. 29 at 42; doc. 35 at 14–15).

215

### 4.   This claim is procedurally defaulted.

As discussed previously in this opinion, when properly applied, Rule 28(a)(10) is an adequate and independent state procedural rule for purposes of procedural default in federal habeas corpus. Thus, respondent's procedural default defense turns on whether the ACCA properly applied its procedural rule to find this claim waived. This, in turn, requires careful examination of petitioner's appellate brief on this claim. Petitioner's appellate brief argued, in its entirety, as follows:

> The Circuit Court concluded this claim to be cumulative of his claim that trial counsel was ineffective during the penalty phase.

> But, while the mitigating evidence may be relevant to both claims, the Circuit Court's conclusion fails to account for the fact that trial counsel's failure to present various readily-available mitigation evidence rendered his performance ineffective at each of two discrete procedural stages--first, when the jury heard the penalty-phase evidence on July 6, 2004, and second, when Judge White held the sentencing hearing and determined Mr. Benjamin's sentence on September 2, 2004. As Mr. Benjamin has claimed that trial counsel's performance was ineffective at each of these stages, it is nonsensical for the Circuit Court to have dismissed Claim I(H) as "cumulative."

(Doc. 19-52 at 176–77).

Recall that one of the hallmarks of an inadequate brief under Rule 28(a)(10) is the failure to cite legal authorities demonstrating lower court error. *See Ex parte Borden*, 60 So. 2d at 943; *Hamm*, 913 So. 2d at 485–86. Thus, in order to show how the Rule 32 court legally erred, petitioner needed to provide authority supporting his

216

contention that the Rule 32 court's "cumulative" finding was erroneous. Petitioner, however, cited no legal authority demonstrating that the Rule 32 court could have erred in concluding that his judicial sentencing ineffective assistance claim was "cumulative" of his penalty phase ineffective assistance claim. He relied, instead, on the mere fact that the two hearings represent "discrete procedural stages" of trial. (Doc. 19-52 at 176). But this trite observation said nothing about counsel's relative obligations at either phase or otherwise explained why the claims were not "cumulative." In essence, petitioner needed to articulate why the outcome of his penalty phase ineffectiveness claim did not determine the outcome of the judicial sentencing phase ineffectiveness claim. This he did not do. If anything, the substance of petitioner's argument to the ACCA confirmed the "cumulative" nature of his two claims. He conceded that the same "mitigating evidence may be relevant to both claims" and he effectively contended that it was a singular error by counsel— the "failure to present various readily-available mitigation evidence"—that supplied the factual predicate for both claims. (*Id*.).

Counsel had a duty to investigate and present evidence in mitigation of petitioner's sentence. That duty applied with equal force at both the penalty phase before the advisory jury and at the judicial sentencing phase. Petitioner provided nothing in his argument before the ACCA showing that counsel's alleged ineffective

217

assistance at the judicial sentencing hearing was in any way distinct from, and thus not "cumulative" of, counsel's alleged ineffective assistance at the penalty phase of trial before the advisory jury. Thus, the ACCA properly applied Rule 28(a)(10) in determining that petitioner's appellate brief was inadequate and, consequently, finding this claim waived pursuant to state procedural rules.

### 5. *This claim is without merit.*

Even if this claim were not procedurally defaulted, and this court therefore was required to review the claim *de novo*, the claim is without merit and is due to be denied. As set forth previously in this opinion, this court has concluded that the ACCA reasonably determined that petitioner was not prejudiced by his counsel's alleged deficient performance respecting the investigation and presentation of mitigating evidence at the penalty phase of petitioner's trial. Petitioner's claim that counsel were ineffective at the judicial sentencing phase fails to plausibly allege any facts that would support a different result with regard to that phase of trial.

Petitioner appears to allege only three points in support of his contention that counsel performed ineffectively at the judicial sentencing hearing: 1) counsel did not direct Pettry to further investigate mitigating evidence and did not present Pettry as a witness at the hearing; 2) counsel did not present testimony from the defense neuropsychologist, Dr. Passler; and 3) counsel did not present testimony about a lack

of future dangerousness. (Doc. 1, ¶ 349). Petitioner does not allege how these failures resulted in prejudice, however. He does not allege any facts about what Pettry would have discovered with further investigation or what she would have testified about had she been called as a witness. Nor does he allege any facts about what would have been Dr. Passler's testimony at a judicial sentencing hearing. Finally, he does not allege what testimony should have been presented about his supposed "lack of future dangerousness." Nor does he explain why the absence of such testimony was prejudicial considering that there was no "future dangerousness" aggravating circumstance at issue in his sentencing.

In sum, petitioner's allegations in support of this claim, both in the state court and here, are wholly conclusory and lacking in sufficient factual detail to support his claim of error. Accordingly, the claim is without merit and is due to be denied irrespective of petitioner's procedural default of the claim.

### D. Petitioner's Death Sentence Violates the Equal Protection Clause (Claim III.H.4)

#### 1. Petitioner's allegations

Petitioner alleges that his death sentence "violates the Equal Protection Clause of the Fourteenth Amendment because the decision-makers in his case acted with discriminatory purpose." (Doc. 1, ¶ 355). He appears to base this allegation, at least in part, upon statistics "indicating racial disparities in the charging, sentencing, and

imposition of the death penalty after *Furman*." (Doc. 1, ¶ 357 (quotation marks omitted)). While he concedes that *McCleskey*, discussed previously in this opinion, rejected a similar equal protection claim based upon a statistical analysis of Georgia death sentences (*see* doc. 1, ¶ 355), he asserts "[s]everal factors distinguish Mr. Benjamin's case from *McCleskey*[.]" (Doc. 1, ¶ 356). The "several factors" upon which he appears to rely are the following: 1) the existence of a 1990 "evaluation synthesis of existing empirical research on death penalty sentencing after *Furman*" which essentially confirmed the thesis of the *McCleskey* statistical analysis, *i.e.*, that "[t]hose who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks" (doc. 1, ¶¶ 356–57); and 2) his contention that his jury was improperly constituted due to the prosecution's alleged discriminatory exercise of peremptory challenges (doc. 1, ¶ 358).

Petitioner further alleges that, while Crespi nominally raised an equal protection claim respecting his sentence on direct appeal, Crespi ineffectively failed to "even mention the racially discriminatory nature of Mr. Benjamin's death sentence." (Doc. 1, ¶ 359). Had Crespi properly raised this claim, "it is reasonabl[y] probable that the Court of Appeals would have reversed Mr. Benjamin's death sentence." (Doc. 1, ¶ 360).

### 2.  State court proceedings

On direct appeal, Crespi presented a cursory argument that Alabama's "use of the death penalty" "runs afoul of the right to due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments." (Doc. 19-7 at 51). The ACCA rejected this argument, concluding that petitioner failed to "'allege or prove a discriminatory intent[.]'" *Benjamin*, 940 So. 2d at 381–82 (quoting *Deardorff v. State*, 6 So. 3d 1205, 1231 (Ala. Crim. App. 2004)). The ACCA specifically found that, with respect to the equal protection claim, "the appellant has made only vague, conclusory allegations that he has not supported." *Id*. at 382.

Petitioner presented the instant equal protection claim, as well as the related ineffective assistance of appellate counsel claim, in his Rule 32 petition. (Doc. 19-12 at 79–82). The Rule 32 court summarily dismissed the claim prior to the evidentiary hearing. (Doc. 19-13 at 57–58). The ACCA affirmed, finding that "[t]his claim was correctly summarily dismissed as it fails to state a claim upon which relief could be granted." *Benjamin*, 156 So. 3d at 462.

### 3.  *The ACCA did not contravene, or unreasonably apply, clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

On the substantive component of his equal protection claim, petitioner fails to cite any clearly established federal law the ACCA could have unreasonably applied

221

in finding the claim lacking in merit.  The only Supreme Court decision petitioner cites in support of his contention that his death sentence violates equal protection is *McCleskey*, which, as discussed previously in this opinion, specifically rejected an equal protection claim based upon a statistical study purporting to show racial biases in capital sentencing in Georgia.  *See McCleskey*, 481 U.S. at 292 (concluding that McCleskey's statistical showing was insufficient to meet his burden of showing that "decisionmakers in *his* case acted with discriminatory purpose").

Nevertheless, petitioner argues that *McCleskey* does not foreclose his claim because "[s]everal factors distinguish [his] case from *McCleskey*."  (Doc. 1, ¶ 356). But the only "factors" he addresses in the petition are unpersuasive and insufficient to "distinguish" *McCleskey*.  The first factor appears to be the 1990 "evaluation synthesis of existing empirical research on death penalty sentencing after *Furman*" "which found a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty after *Furman*."  (*Id*. (quotation marks omitted)).  But this statistical analysis, coming only three years after *McCleskey*, and apparently not based upon Alabama capital sentencing statistics, does nothing to advance the ball beyond *McCleskey* itself.  If the statistical patterns identified in *McCleskey* were not sufficient to establish an equal protection violation because they demonstrated nothing about any discriminatory purpose of the decisionmakers in

McCleskey's case, petitioner provides no authority explaining why the 1990 statistical analysis he cites warrants a different result.

The real distinguishing "factor" identified by petitioner is his contention that, unlike in *McCleskey*, his sentence was not imposed by a "'properly constituted venire.'" (Doc. 1, ¶ 358 (quoting *McCleskey*, 481 U.S. at 294–95)). In essence, petitioner argues that, because the prosecutor "exercised his peremptory strikes in an illegally discriminatory manner," unlike in *McCleskey*, he "has shown that the death penalty was applied in a racially discriminatory manner in his case." (*Id*.). And because his "death penalty sentence was applied in a racially discriminatory manner, the Alabama capital sentencing scheme as applied to Mr. Benjamin violates the Equal Protection Clause of the Fourteenth Amendment." (*Id*.).

The problem for petitioner is that, as discussed previously in this opinion, the state courts determined that prosecutors did not exercise their peremptory challenges in a racially discriminatory manner and, applying AEDPA, that determination was reasonable. Accordingly, petitioner is not entitled to the benefit of any finding that his venire was not properly constituted for purposes of assessing his equal protection claim. His claim therefore remains cabined by *McCleskey*, which, in petitioner's own words, "declin[es] to draw an inference of racial discrimination based on statistics alone." (Doc. 1, ¶ 358). In sum, therefore, *McCleskey* does not support

petitioner's equal protection claim—indeed, it forecloses it—and petitioner's effort to distinguish *McCleskey* fails. Accordingly, the state courts did not unreasonably apply clearly established federal law in finding the substantive component of petitioner's equal protection claim lacking in merit.

Finally, the state courts did not unreasonably apply *Strickland* in concluding that petitioner's related ineffective assistance of appellate counsel claim is without merit. Because the underlying equal protection claim under *McCleskey* is without merit, counsel could not have been deficient in failing to present the claim to the ACCA on direct appeal, and petitioner could not have suffered prejudice due to counsel's failure to present it. Consequently, petitioner's ineffective assistance of appellate counsel claim is due to be denied.

### E.    Alabama's Secret Lethal Injection Procedures Violate the Eighth Amendment (Claim III.H.5).

#### 1.    Petitioner's allegations

Petitioner's final claim is that "Alabama's method of execution is unconstitutional." (Doc. 1, ¶ 370). He alleges that State authorities have refused his requests to disclose execution protocols, but that he nevertheless has reason to believe the protocols "do not comport" with the Eighth Amendment's prohibition of cruel and unusual punishment. (Doc. 1, ¶¶ 372–74). Notwithstanding his inability to access the full protocol, he alleges several perceived flaws in Alabama's lethal

224

injection execution procedure, including the following: the "three-drug cocktail" is cruel and unusual because it "create[es] a substantial risk that he will be fully conscious and in agonizing pain for the duration of the execution process" (doc. 1, ¶¶ 375–81); numerous state legislatures have banned use of "the same combination of drugs" in animal euthanasia (doc. 1, ¶¶ 382–86); and Alabama's protocol may allow for the "inhumane" application of a "cut-down" procedure (doc. 1, ¶¶ 387–90).

Petitioner also alleges that his counsel was ineffective in failing to challenge Alabama's secret lethal injection procedures on direct appeal. (Doc. 1, ¶¶ 391–93).

   2.    *State court proceedings*

Crespi vaguely argued on direct appeal that the trial court had erred in denying a defense motion "challenging the method of execution and the use of the death penalty generally." (Doc. 19-7 at 51). He further argued "the use of specific methods of judicial homicide" authorized under Alabama law "runs afoul of the right to due process and equal protection" and "contravene the prohibition of cruel and unusual punishment under the Eighth and Fourteenth Amendments[.]" (*Id.*). The ACCA rejected this claim without specific analysis of the constitutionality of Alabama's method of execution. *See Benjamin*, 940 So. 2d at 381–82.

Petitioner next raised the instant claim in his amended Rule 32 petition. (Doc. 19-12 at 93–104). The Rule 32 court summarily dismissed the claim on the merits prior to the evidentiary hearing pursuant to Rule 32.7(d). (Doc. 19-13 at 59–60). The ACCA affirmed, specifically finding that, pursuant to the Alabama Supreme Court's decision in *Ex parte Belisle*, 11 So. 3d 323 (Ala. 2008), petitioner's Eighth Amendment challenge to Alabama's execution protocol was without merit. *Benjamin*, 156 So. 3d at 462–63.

> 3.   *The ACCA did not contravene, or unreasonably apply, clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

By prior order, this court has determined that petitioner's substantive Eighth Amendment claim challenging Alabama's execution protocol is not cognizable in this habeas corpus action. (Doc. 28 at 2–3). Although that order dismissed the substantive Eighth Amendment claim, it further directed that the ineffective assistance component of this claim "remains pending and shall be addressed in accordance with the court's previously entered briefing schedule." (*Id*. at 3).

Respondent asserted in his amended answer that the ineffective assistance component of this claim is procedurally defaulted because petitioner did not present the claim in "either his original or amended Rule 32 petitions in state court." (Doc. 29 at 50). As noted above, however, petitioner did raise in his amended Rule 32

226

petition a claim that Crespi was ineffective at trial and on direct appeal due to his failure to challenge Alabama's secret lethal injection procedures under the Eighth Amendment. (Doc. 19-12 at 104). Both the Rule 32 court and the ACCA denied the ineffective assistance claims on the merits. Accordingly, this claim is not procedurally defaulted as respondent asserts in his amended answer.[52]

Because this ineffective assistance claim was summarily denied on its merits in the state courts, review here is governed by § 2254(d). The ACCA did not contravene, or unreasonably apply, *Strickland*, and did not base its decision upon any unreasonable determination of fact for at least two reasons. *First*, the Supreme Court has never held that the Sixth Amendment right to the effective assistance of counsel includes assistance with challenging an anticipated method of execution. Thus, the ACCA could not have unreasonably applied any clearly established federal law respecting this claim. *Second*, petitioner failed to provide any allegation of fact demonstrating how he was prejudiced within the meaning of *Strickland* due to Crespi's failure to more forcefully challenge Alabama's lethal injection procedures at trial or on direct appeal.

Petitioner alleged only that, due to Crespi's neglect of this claim, he "may be forced to undergo a lethal injection procedure and possibly a cut-down procedure

---

[52] Notably, respondent did not argue that this claim is procedurally defaulted in his brief on procedural default. (Doc. 35).

that will result in an inhumane and painful death by paralysis and suffocation." (Doc. 19-12 at 104).  Whatever the validity of this concern, there is no allegation that, had this claim been raised at trial or on appeal, there is a reasonable probability that petitioner would not have been convicted and sentenced to death, or that the ACCA would have reversed petitioner's conviction or death sentence.

As discussed previously, *Strickland*'s prejudice inquiry turns on whether there is a reasonable probability that the defendant or petitioner would have obtained a better outcome at trial or on appeal had counsel not performed deficiently.  466 U.S. at 694.  Petitioner failed to plead any allegation establishing the likelihood of a better outcome at his trial, sentencing, or appeal had counsel challenged Alabama's method of execution at those stages.

Finally, even if petitioner had plausibly alleged that it is reasonably probable he would have obtained a better result at trial or on appeal, such claim would be without merit.  As the ACCA found on appeal of the denial of this claim, the Alabama Supreme Court's opinion in *Ex parte Belisle* shows that any challenge Crespi might have raised at trial or on appeal would have been futile.  *See Benjamin*, 156 So. 3d at 462–63.  Furthermore, as noted in this court's prior order dismissing the substantive Eighth Amendment component of this claim, Alabama's lethal injection protocol has undergone multiple revisions since petitioner filed his Rule 32

228

petition, including revisions to the specific drugs administered as part of the protocol. (Doc. 28 at 2). More revisions have occurred since that order in 2015. Thus, even if the petition alleged some defect in the old protocol which counsel could have ineffectively failed to challenge in 2004, it is unclear how that fact could support a claim for relief under the current iteration of Alabama's protocol. Accordingly, the ACCA did not unreasonably apply *Strickland* in finding this ineffective assistance claim lacking in merit.

For these reasons, petitioner's claim that Crespi ineffectively failed to challenge Alabama's execution protocol at trial or on appeal is due to be denied.

## CERTIFICATE OF APPEALABILITY

In pertinent part, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides as follows: "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability is necessary before a petitioner may pursue an appeal in a habeas corpus proceeding. 28 U.S.C. § 2253. To mandate the issuance of a certificate of appealability, a petitioner must make a "substantial showing of the denial of a constitutional right." § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S.

880, 893 (1983).  Generally, such a showing requires something more than absence of frivolity, and it is a higher standard than the good faith requirement of 28 U.S.C. § 1915(d).  *See Clements v. Wainwright*, 648 F.2d 979, 981 (5th Cir. 1981).  In short, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*, 463 U.S. at 893 and n.4) (internal quotations omitted).  Based upon careful consideration, the court finds that the petitioner has not made a substantial showing of the denial of a constitutional right on any issue.

Accordingly, it is ORDERED that a Certificate of Appealability is **DENIED**.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Petitioner Brandyn Josephe Benjamin's claims for habeas corpus relief, individually and cumulatively, are **DENIED**.

An appropriate final judgment will follow.

**DONE** and **ORDERED** on this the 13th day of August, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE